UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| AMBER LEI WEBB,<br><br>     Plaintiff,<br><br>  vs.<br><br>NANCY A. BERRYHILL, ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY;<br><br>     Defendant. | 5:16-CV-05085-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................... 1

FACTS ............................................................................................................... 1

 A. Procedural History .............................................................................. 1

 B. Work History ....................................................................................... 4

 C. Ms. Webb's Statements and Testimony ............................................. 5

 D. Medical Evidence – Chronological .................................................... 21

 E. Medical Literature ............................................................................ 78

 F. Opinion Evidence ............................................................................. 79

 G. The ALJ's Decision ........................................................................... 86

 H. Issues Before This Court .................................................................. 87

DISCUSSION ................................................................................................... 88

 A. Standard of Review............................................................................ 88

 B. The Disability Determination and the Five-Step Procedure.................... 90

 C. Burden of Proof. ................................................................................ 91

D.  Did the ALJ Err in Determining the Disability Onset Date? ................... 92

E.  Did the ALJ Err in Failing to Identify Severe Musculoskeletal

   Impairments at Step Two? ................................................................. 100

F.  Did the ALJ Err in Failing to Order Consultative Examinations? ......... 108

   1.  Duty to Develop the Record—Consultative Exams ........................... 109

   2.  Consultative Exam as to Impact of Obesity on Functioning ............. 110

   3.  Consultative Exam as to Mental Diagnoses and Mental RFC ........... 116

   4.  Consultative Exam as to Stage of Hidradenitis Suppurativa ............. 122

G.  Did the ALJ Err in Assessing Ms. Webb's Credibility? ........................ 126

   1.  The Law Applicable to Determining Validity of Subjective

      Complaints ....................................................................................... 126

   2.  Failure to Follow Recommended Treatment ..................................... 132

   3.  Impairments are Well-Controlled with Medications .......................... 137

   4.  Activities of Daily Living Inconsistent with the Described

      Severity of Symptoms ....................................................................... 139

H.  Did the ALJ Properly Evaluate Medical Sources' Opinions? ................ 142

   1.  Dr. Houston's Opinion ..................................................................... 143

   2.  Opinions of Dr. Kamer, Dr. Canham and Dr. Erickson .................... 147

   3.  Dr. O'Toole's Opinion ...................................................................... 149

I.  Did the ALJ Apply the Correct Standard to Determine the

   Availability of Jobs at Step Five? ...................................................... 156

J.  Type of Remand ................................................................................. 160

CONCLUSION ............................................................................................. 162

**INTRODUCTION**

Plaintiff, Amber Lei Webb, seeks judicial review of the Commissioner's final decision denying her application for disability insurance benefits ("DIB") under Title II and denial of attendant Medicare benefits under the Social Security Act. Ms. Webb has filed a complaint and now moves to reverse the decision of the Commissioner. Docket No. 17.

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g). This matter is before this magistrate judge pursuant to the consent of all the parties under 28 U.S.C. § 636(c) and the October 16, 2014, standing order of the Honorable Jeffrey L. Viken, Chief United States District Judge. Based on the facts, law and analysis discussed in further detail below, the decision of the Commissioner is reversed and remanded for further administrative proceedings.

**FACTS**[1]

**A.    Procedural History**

On November 14, 2012, Amber Webb applied for SSD[2] benefits, stating that she had become unable to work due to disabling condition on August 15,

---

[1] The following statement of facts is taken from the parties' joint stipulated statement of facts, Docket No. 16. The court has made minor modifications, such as grammar, punctuation, and incorporating the defined terms from the parties' glossary into footnotes at the appropriate place in the text.

[2] SSD benefits are also known as DIB or "Title II" benefits. Another kind of benefit, SSI benefits, are also known as "Title XVI" benefits. Receipt of both SSD/DIB and SSI benefits depends on whether the claimant is disabled. Both Titles define disability the same. The difference--greatly simplified--is that a

2012. AR 277. Her application summary stated, "I do not want to file for SSI." <u>Id</u>.

She stated that she was married to Michael Webb in 2001 in South Dakota, and

listed three children under the age of 18. AR 277-78.

On September 12, 2013, SSA in Colorado issued a notice of disapproved

claim and notified Webb of her right to appeal to hearing.[3] AR 171-73. On

October 1, 2013, Webb appointed Attorney John Heard of San Antonio, TX, to

represent her. AR 169.

On October 2, 2013, Webb, by counsel, requested reconsideration. AR

174. On February 28, 2014, SSA issued a notice of denial after reconsideration.

AR 175. On April 2, 2014, Webb requested a hearing. AR 181.

---

one's entitlement to SSD/DIB benefits depends on one's "coverage status,"
which is based on one's earning history. The amount of SSD/DIB benefits is
based on a formula using the claimant's earning history. There are no
"coverage" requirements for SSI benefits and the amount of benefits is set by
statute. Title II benefits may include a 12-month period of benefits retroactive
to the date of application; Title XVI benefits are not retroactive to the
application date. SSR 83-20. There are usually identical regulations for each
type of benefit. <u>See</u> <u>e.g.</u> 20 C.F.R. § 404.1520 and § 416.920 (evaluation of
disability using the five-step procedure under Title II and Title XVI). In this
case, Ms. Webb filed her application Title II benefits only. AR277. She was
insured through December 31, 2016, (AR31), so she must establish she was
disabled on or before that date.

[3] The Commissioner delegates to state agencies, known as Disability
Determination Services (DDS) to make decisions concerning disability
applications. 20 C.F.R. § 404.1503. The DDS evaluates the application at the
first two stages of the process, known as the initial stage and reconsideration.
20 C.F.R. § 404.900(a)(1) – (2). The Commissioner uses 54 DDSs to review and
make decisions on claimants' applications. If the DDS denies the request
initially and on reconsideration, the claimant can appeal the decision for a *de
novo* hearing before an ALJ. 20 C.F.R. § 404.900. The same five-step
sequential evaluation is used by both DDS and the ALJ. 20 C.F.R. § 404.1520.

On October 3, 2014, SSA's Office of Disability Adjudication & Review (ODAR) in Rapid City sent Webb and her lawyer a notice of hearing, scheduled for December 4, 2014, in Rapid City, before James W. Olson, administrative law judge. AR 188-92. On October 23, 2014, Webb's attorney, John R. Heard, objected to a video teleconference hearing and requested an in-person hearing. AR 361-62.

On November 14, 2014, Attorney Heard submitted a pre-hearing brief, listing Webb's impairments as Chiari malformation, headaches, Hidradenitis suppurativa, status post left leg surgery, obstructive sleep apnea, peroneal mononeuropathy, bilateral lateral epicondylitis, insomnia, depression and anxiety. AR 363. Attorney Heard discussed Webb's left ankle impairment in some detail. AR 364. He argued that Webb should be limited to a "less than sedentary RFC." AR 364.

On March 25, 2015, ALJ Debra J. Denney, ODAR, sent a notice of hearing scheduled for July 20, 2015, in Rapid City. AR 238.

On July 20, 2015, Attorney Heard submitted a pre-hearing brief with a proposed sequential evaluation to ALJ Denney. AR 369-71. He argued that Ms. Webb was unable to perform SGA on a "regular and continuing basis." AR 371. On the same day, Webb signed a form appointing Jared Cook, attorney, to represent her. AR 275. The July 20, 2015, hearing was held in Rapid City before ALJ Debra J. Denney, with the claimant present and Attorney Cook. AR 53. The psychological and vocational experts testified by telephone. AR 53.

On November 10, 2015, the claimant requested review of the ALJ's

August 17, 2015 denial of benefits. AR 6. On July 13, 2016, the Appeals

Council denied review. AR 1.

**B.      Work History**

Webb's earnings since 1990 are displayed at AR 281-86. According to the

SSA report, her earnings from 1992-2012 ranged from $3,749 to $14,708. AR

286, 289. Her detailed earnings record shows employers and how much each

employer paid each year since 1997. AR 283-85. It reports six employers from

1997-2012. Id. The employer for whom she worked the longest was Schrader

Oil, 1999-2011. AR 284-85.

In 2011 she earned $14,708, which was her highest earning year. In

2012 she earned $8,231. AR 289. After this she had no reported earnings. Id.

Webb described her work and periods of employment in her disability

report: June - August 2001, cashier in a convenience store; August 2001 -

August 2002, account associate in a teleservices business; October 2002 -

March 2011, sales associate in a convenience store; and May 2011 - August

2012, account specialist for teleservices/banking business. AR 296. She

provided additional information regarding work duties; number of hours spent

on her feet, in particular postures, and using her arms and hands; and weight

lifted in her "work history report" at AR 315-20.

Webb testified that her last employment was in July or August 2012,

when she worked for Center Partners, Inc., processing credit card applications

for Capital One. AR 61. She said this involved using a computer and headset,

speaking with people to obtain information, and inputting data. AR 61-62. Webb testified she was not sure if she had been fired: "I didn't go in for, it was about three days. I was already on notice because of previous absences." AR 62.

The ALJ questioned Webb about statements in her application that she could not maintain her work schedule because she had constant headaches, some arm pain, massive anxiety, would sometimes break down hysterically when she drove up to the door, and was on probation for absences. AR 62. Webb affirmed that she had made those statements. AR 62.

The ALJ questioned Webb about previous jobs, and Webb stated that before Center Partners she worked for Schrader Oil, a gas station, and ran the register, stocked, cleaned, ordered, "everything." AR 62-63. Webb stated that job ended when a new manager was hired. She said the new manager did not like her absences although the former manager "would work with me." AR 63.

## C.    Ms. Webb's Statements and Testimony

On February 28, 2013, SSA field office wrote that Webb felt "like she became disabled 06/15/2011, but SGA work does not stop until 8/15/2012.... POD is when work stops 08/15/2012." AR 290.

In her disability report on or about November 14, 2012[4], Webb reported a Ft. Collins address. AR 293. She alleged conditions: Chiari 1 malformation,

_____

[4] The on-line disability report does not show the date of completion. The report must be completed on or about the date of the application. Webb's application was completed on November 13, 2012. AR 277.

social anxiety, depression, and asthma. AR 294. She said she was five feet, ten inches tall and weighed 300. AR 294.

She stated that she stopped working on August 20, 2012 because:

I was unable to maintain my schedule due to constant headaches and arm pains. I was unable to handle the work environment due to massive anxiety. I would break down hysterically at driving up to the door. I was already on probation due to absences for headaches and pain, and had been "talked to" about my arm pains and smell" (uncontrollable).

AR 295.

She stated that she believed her conditions became severe enough to keep her from working on June 15, 2011. AR 295. She had completed twelfth grade in 1990 and had not completed any specialized job training or vocational school. AR 295.

She reported her medications: Percocet[5] prescribed by Orthopedic Center of the Rockies for pain control; Sertraline[6] (Zoloft) prescribed by Family Medicine Center for general anxiety, social anxiety, and depression; and vitamin D supplements for vitamin D deficiency. AR 297. She reported the doctors who had seen and/or treated her. According to her report: In October

---

[5] Percocet (Oxycodone, Vicodin) is a narcotic used to treat pain. https://medlineplus.gov/druginfo/meds/a682132.html, accessed February 16, 2018.

[6] Sertraline (Zoloft) is a selective serotonin reuptake inhibitor (SSRI) used to treat depression, OCD, panic attacks, PTSD, and social anxiety disorder as well as symptoms of premenstrual dysphoric disorder including mood swings and irritability. It is sometimes used to treat headaches. https://medlineplus.gov/druginfo/meds/a697048.html, accessed February 16, 2018.

and November 2003, Ms. Webb saw Dr. Michael Curiel, Ft. Collins Neurology, 2121 E. Harmony Rd., Ft. Collins, CO 80525, for Arnold Chiari Malformation, Type 1.[7] Dr. Curiel referred her to Dr. Coester. AR 298-99, 301.

In October and November 2003 she saw Dr. Hans Coester at CHMG Brain and Spine Surgery, 1107 S. Lemay Ave, Ste 240, Ft. Collins, CO, for Arnold Chiari type 1 malformation with headaches, numbness of legs, equilibrium [problem], nystagmus, and weakness of hands. Dr. Coester had evaluated her by MRI imaging and discussed surgical options. AR 298, 303.

In 2007 she was seen at Surgical Specialists of the Rockies, 2315 E. Harmony Rd, Ste 130, Ft. Collins, for hidradenitis suppurativa[8] surgery. AR 300, 304.

---

[7] Arnold Chiari Malformation, type I.

> Chiari malformation is a condition in which brain tissue extends into your spinal canal. It occurs when part of your skull is abnormally small or misshapen, pressing on your brain and forcing it downward.
> * * * *
> Doctors categorize Chiari malformation into three types, depending on the anatomy of the brain tissue that is displaced into the spinal canal, and whether developmental abnormalities of the brain or spine are present. Chiari malformation type I develops as the skull and brain are growing. As a result, signs and symptoms may not occur until late childhood or adulthood. The pediatric forms, Chiari malformation type II and type III, are present at birth (congenital).

http://www.mayoclinic.org/diseases-conditions/chiarimalformation/home/ovc-20249651, accessed February 16, 2018.

[8] Hidradenitis suppurativa (HS).

> Hidradenitis suppurativa is a chronic skin disease characterized by recurrent, painful, boil-like lumps (nodules) under the skin. HS

From May 2011 to August 2012, Ms. Webb saw Dr. Jackson at

Orthopedic Center of the Rockies in Ft. Collins for an ankle injury, which was

surgically treated. AR 302. She had imaging of her left ankle in 2011-12. AR

302.

---

affects the areas around skin folds (e.g., armpits, groin, and breasts) and where apocrine glands (a form of sweat gland) and hair follicles are found. It is not contagious, but it is recurrent. It typically manifests as a single boil-like, pus-filled abscess or hard sebaceous lumps (lumps composed of sebum, or oil, which is excreted by the sebaceous glands associated with hair follicles) and may progress to painful, deep-seated, inflamed clusters of lesions with chronic seepage involving significant scarring. In most cases, the cause of HS is unknown. It is likely that it results from a combination of genetic and environmental factors. Some cases of HS have been associated with specific genes, including NCSTN, PSEN1, and PSENEN.
* * *
Three stages of disease have been described which progress from single or localized abscesses accompanied by itching or discomfort, to recurrent abscesses that occur in multiple locations, to widespread severe disease that can restrict movement, obstruct lymph drainage and lead to social isolation.
* * *
There is no known cure or a consistently effective treatment. Initial treatments may involve conservative measures such as warm baths, hydrotherapy, and topical cleansing agents to reduce bacterial loads. Acute painful skin lesions may be treated with corticosteroids (e.g., prednisone) or anti-inflammatory pills (e.g., Celebrex, Advil, Naproxen, and others). Although not proven to be effective, antibiotics are often the mainstay of medical treatment, especially for lesions suspected of being super infected.
Affected individuals may also be treated with oral contraceptives or other medications that address a possible hormonal cause. Oral retinoids such as isotretinoin have also been used. Other treatments that have been used with limited success include cisplatin, methotrexate, 5-alpha reductase inhibitors, and TNF-alpha inhibitors.

https://rarediseases.info.nih.gov/diseases/6658/hidradenitis-supprativa, last accessed February 16, 2018.

In 2007, 2011, and 2012, Webb was treated at the Poudre Valley Hospital emergency room for hidradenitis suppurativa flare-up and drainage, and for her work-related ankle injury. AR 303. From 1997 to 2013, Ms. Webb saw Dr. Amber Steves at Family Medicine Center in Ft. Collins for depression, anxiety, nystagmus, equilibrium [problem] and vitamin D deficiency. AR 299-300.

Webb stated in her disability report that she struggled daily with the pain and embarrassment of her medical problems. AR 306. She stated:

> I have tried to work, and previously had a very compassionate manager who would let me leave as I needed due to the length of time I had worked for him. My Chiari 1 Malformation didn't start affecting my quality of life until around 2003 when I gave birth to my daughter. My Hidradenitis Suppurativa increased GREATLY approximately one year later. I am currently housebound due to anxiety and depression which the medications seem unable to alleviate.

AR 306.

Webb completed a function report on July 3, 2013. AR 307-14. She described how her conditions limited her ability to work:

> I have debilitating headaches almost daily, that leave me with my vision temporarily impaired, and poorer balance. It also leaves me with difficulty with my hands' functions ie fine motor control. I also have extremely painful sores that recur on my body that suppurate freely.

AR 307.

The function report questionnaire asked what she did from the time she woke until she went to bed. Webb wrote, "Generally housework in short spurts – the kids help as bending over will give me a headache. I help the kids with homework etc. as I can." AR 308. She took care of her children: "I mostly

supervise them as the oldest is 14 and able to do quite a bit now.... [M]y kids help each other, and fuly [sic] care for their pets." AR 308. Asked what she could do before, that she couldn't do now, Webb wrote, "Be in public regularly, walk a straight line, remember things, lift things, walk." AR 308.

Asked about her sleep, Webb wrote, "My headaches wake me up in the middle of the night 4-5 times a week. The sores make it painful to lay down." She stated, "I have to bathe the sore areas 2-3 times a day." AR 308. "I have to shave affected areas daily – difficult to do due to restricted motion at times." AR 308.

She wrote, "I have to set memos on my phone to remember medications." AR 309. She wrote that her children helped with cooking. AR 309. She wrote that when cooking, "Many times I get dizzy, drop things, forget steps." AR 309. She wrote, "I can do most household cleaning that doesn't require bending but I have to take short breaks often." AR 309. She did not do yard work because bending and stooping gave her a headache, and sweating irritated her sores. AR 310. She wrote that "depth perception and vision before and after a headache" did not permit driving. AR 310.

She shopped in stores and by computer for groceries and items for kids once a month for about an hour. AR 310. Answering the money-management questions, she wrote, "my cognitive abilities are spotty, I don't want to take chances with money." AR 310. She wrote, "I have a harder time with making change - I lose track of the simple math in my head sometimes". AR 311.

Webb's hobbies and interests were reading, crocheting, computer games, television, and going to the movies. AR 311. She wrote that she no longer crocheted. She read but not as long. She still played computer games "but take a break faster" and "I watch more tv, mostly so I can nap." She said she no longer went to the movies or the bookstore. AR 311. She wrote, "I don't enjoy social interaction outside my immediate family" and "I only go to the grocery store or the dr., and I've rescheduled dr visits due to pain and/or anxiety." AR 311. "I feel extremely tense and anxious in groups of people outside my home.... My sister and friends have to come to my house, I dislike going anywhere except occasionally." AR 312.

Asked to check activities affected by her conditions, Webb checked squatting, bending, walking, seeing, memory, completing tasks, concentration, and using hands. AR 312. She did not check lifting, standing, reaching, sitting, kneeling, talking, hearing, stair climbing, understanding, following instructions, or getting along with others. AR 312. She stated, "I can only bend or squat if I keep my head upright. I stumble often when I walk. Pre- and post-headache my vision is blurry, my memory and concentration are poor, and fine motor skills w/my hands is spotty." AR 312.

Webb stated that she could walk one-half mile at most. She stated that she could finish what she started, and could follow written instructions well (the example given is a recipe), "as long as I can refer to the recipe repeatedly." She stated that she followed spoken instructions "poorly - I need a visual reference." AR 312.

She stated that she had been fired: "I got a new manager who decided she didn't want me in my position after 9 years" at Schrader Oil Corp. AR 313. She stated that she did not handle stress well, nor changes in routine. AR 313. She stated, "If too many people are in a store I have to leave because I can't think or breathe." AR 313.

In the "Remarks" section of the function questionnaire, Webb stated that her hidradenitis suppurativa was becoming "more and more of an issue. No matter how careful I am the breakouts come larger and larger all the time. The pain and suppuration are becoming unbearable. The headaches increase every day...." She stated that as she wrote her answers, she was unable to move her left arm due to pain, and "I can no longer wear a brassiere as it will cause a break out of multiple sores if I wear it for more than an hour." My anxiety is still difficult but the dr. is hopeful my new medication will help." AR 314.

Webb responded to a "personal pain questionnaire" that asked for detailed descriptions of her pain, how often she experienced pain, where pain was located, how it limited her activities, and treatment used to relieve pain. AR 327. Webb reported that her headaches were sharp, pounding, and aching. Her hidradenitis sores throbbed or caused dull aching. Headache pain was worsened by laughing, crying, sneezing, bending, and straining. Hidradenitis pain was worse in hot weather. She had pain every day, generally all day. Headache pain radiated down her neck. Hidradenitis suppurativa pain was under the breasts and arms. She used hot compresses and showers on the skin sores. Light massage of neck and shoulder helped her headaches. She

used Salsalate[9] 750 mg. (75% effectiveness at best) and Tylenol 100 mg. (60% effectiveness at best). AR 327.

On July 3, 2013, Webb completed a headache questionnaire. AR 328-29. She reported that she first began having severe headaches at age 9, that her last headache was "Today, when I woke up," that she had 10-12 headaches a week and they lasted from 15 minutes to 16-18 hours. AR 328. "My pain radiates from the back of my head, blurring my vision, causing loss of balance, nystagmus, loss of fine motor skills and grip, also severe dizziness and loss of balance." Headaches were brought on by laughing, coughing, sneezing, bending, lifting, or straining. AR 328. She stated that when she had a headache she could not walk without support, that she no longer drove, and that she had to cancel many appointments due to pain. AR 329. She stated that Salsalate in conjunction with Tylenol eased that pain, that heat sometimes eased headache pain, and that neck or back rubs relieved headache pain. AR 329. She stated that she did not seek treatment when she had a headache as "there really isn't anything they can do." AR 329.

On July 22, 2013, Webb completed a "fatigue questionnaire." AR 332. She stated that she experienced fatigue once a day on average, that her "cm headaches leave me drained, as well as the pain from my HS sores. I also have

---

[9] Salsalate (Disalcid, Salicylsalicylic Acid) is a salicylate NSAID used to relieve pain, tenderness, swelling, and stiffness caused by rheumatoid arthritis, osteoarthritis, and other conditions that cause swelling. https://medlineplus.gov/druginfo/meds/a682880.html, accessed February 16, 2018.

difficulty sleeping most nights." Asked what activities she had had to restrict or stop because of fatigue, she stated, "I do little in the afternoons and mid-morning." Asked to describe her activities in a 24-hour day she stated that she usually did laundry first thing in the morning, then what cleaning and vacuuming she could with her children helping with bending or lifting "to try and avoid triggering a headache." She said she went grocery shopping twice a month. She stated, "My fatigue has increased drastically since my headaches have increased. I went from a headache 1-4 times a month to daily, lasting sometimes all day." AR 332.

On October 1, 2013, Webb's attorney completed a second disability report. AR 341-44. She listed additional sources of medical evidence: Dr. Kevin J. Tool, 1107 S. Lemay Ave, Ste 300, Ft. Collins, CO 80524, Tel. 970-493-7442, stating that she visited Dr. Tool on August 19, 2013, for treatment of hidradenitis suppurativa, noting: "Gave some options but since none would relieve pain from HS, client may not follow through." Also reported was a sleep test on July 1, 2013, at Northern Colorado Pulmonary. AR 343.

On April 2, 2014, Webb, with assistance of Attorney Heard, completed an updated disability questionnaire, reporting nothing new. AR 353-56.

Webb testified at her hearing in Rapid City on July 20, 2015. AR 51, 53. She stated in response to the ALJ's questions that she had been having "significant problems primarily with the headaches" and these "added to my symptoms as far as being unable to use the computer system at work." AR 57. She testified that she would need to go home "because as my headaches

14

progress, I lose my depth perception and my balance, making it really dangerous for me to drive.... I became unable to drive consistently, my husband was having to take me to work." AR 57.

Webb testified that supervisory personnel "knew the situation, I had my doctor's note, but there's still limits to what's acceptable." AR 58. She testified that she was five feet, ten inches tall, weighed 320 pounds, and had "problems" with her knees that "aren't great" and "haven't been since I was a teenager." AR 58.

Webb testified that she and her husband were separated and the three children, ages 17, 15, and 11, lived with her and her husband's former step mother, Amy ("my best friend"), and Amy's daughter in a mobile home in Sturgis. AR 59-60.

Webb testified that she did not have a driver's license "because I really couldn't drive," and her husband or Amy drove her places. AR 60. She had completed twelfth grade. AR 60.

Webb testified that for mental health treatment, she primarily saw Dr. Hoag. AR 72. She stated that she had been referred to one practitioner who was not taking new patients, that it was difficult for her to get back and forth to Rapid City, and that she had recently learned of a therapist in Sturgis who was now accepting Medicaid. AR 72. However, she did not know his specialty and had to find out from Dr. Hoag, her family doctor. AR 72-73. She stated

that Dr. Hoag had prescribed Wellbutrin,[10] which helped significantly. She stated that she also took Celexa and "between the two there's much better function, at least at home.... I can go out with the family on occasion, as long as it's ... limited."[11] AR 73. She testified that she could not go to the mall but she could go to the grocery store or out to dinner if it wasn't terribly busy. AR 73-74. She testified that she also took Hydroxyzine for the times that anxiety kind of overwhelmed her usual medications, and had taken two [pills] before the hearing.[12] AR 74.

Webb testified that her headaches were "by far the most dominant" symptoms, that she had headaches pretty much every day, which could last five minutes to a day. AR 75. She testified that she usually lay down when she had a headache, and took Acetaminophen and caffeine, which "tend[ed] to take the sharp edge off...." AR 75. Dr. Finley had given her Topamax,[13] which was

---

[10] Wellbutrin (Bupropion) is used to treat depression and (as Zyban) to help people stop smoking. It is also sometimes used to treat bipolar disorder. https://medlineplus.gov/druginfo/meds/a695033.html, accessed February 16, 2018.

[11] Celexa (Citalopram) is a selective serotonine reuptake inhibitor (SSRI) used to treat depression. It is sometimes used to treat panic disorder, premenstrual dysphoric disorder, and social phobia. https://medlineplus.gov/druginfo/meds/a699001.html, access February 16, 2018.

[12] Hydroxyzine is an antihistamine used to relieve itching caused by allergic skin reactions. It is also used to relieve anxiety and tension. https://medlineplus.gov/druginfo/meds/a682866.html, accessed February 16, 2018.

[13] Topamax (Topiramate) is an anticonvulsant that is also used to prevent but not relieve migraine headaches. It works by decreasing abnormal excitement in

effective for a while but lost effectivity. AR 76. Dr. Finley had given her Nortriptyline, "which never worked...." AR 76.

Dr. Finley had not offered other medication but "wants to reexamine the sleep apnea and try to alleviate some of that to see if it will ... help with some of the headaches." AR 76.

Webb testified that she had seen Dr. Gasbarre in Spearfish for her hidradenitis, but only once. AR 76. She stated, "I'm pretty much scars from here to here," gesturing under both arms, and "all the way underneath both breasts. I'm pretty much just a mass of scars...." AR 77. She said creams did not work. She also said Dr. Gasbarre had tried steroid injections "and it was not terribly useful" and was excruciatingly painful. AR 77.

Webb testified that she took "Ropinirole" for restless legs and that it helped, or slowed it down. AR 77-78. She testified that she had no side-effects from any of her medications. AR 78-79. Webb testified that she had pain all day every day, and "If it's not the headache it's ... under my arms or in my breast." AR 79.

Webb testified that her boys helped cook, and pulled laundry out of the stacking washer and dryer because she did not have the strength to lift it. Her boys brought laundry to her to sit down and fold. AR 80. She testified that she had not been to any of her children's activities for five years ("since my 17-year-

_____

the brain. https://medlineplus.gov/druginfo/meds/a697012.html, accessed February 16, 2018.

old was in seventh grade") because "I can't handle the crowds." AR 80. She could handle individual parent teacher conferences. AR 81. She could not tolerate concerts. AR 81.

Webb testified that she had been prescribed a BiPAP machine that South Dakota did not approve, "So Dr. Finley wants to revisit that ... [a]nd write a new order...." AR 83.

Webb testified that she took two dogs outside but not for walks: "I couldn't get down the driveway at this point." AR 84. She did not garden, or go to church, or visit relatives, although during the past few months she had made multiple trips to Colorado for her father's last illness and funeral. AR 85.

Webb testified that when she was working she was absent once or twice a week on average. AR 86. She sometimes had a warning of onset of headache, "[w]here... I can be carrying something or holding something and I just drop it." AR 86. She described symptoms associated with her headaches, which were not like a typical migraine with light-sensitivity, "but I do lose depth perception. It's very difficult for me to read or see. My eyes ... become unfocused." AR 87.

Webb testified that her sleep schedule was "all over the place." AR 88. She testified regarding her understanding that surgery for Chiari Malformation was effective for alleviating headaches about 50 percent of the time, but did not alleviate problems with balance, depth perception, or "the numb spots that I get." AR 88-89. She described her balance problem as being unable to walk a straight line and tending to veer left. AR 89. She said that when she walked with her husband, he walked on her left to compensate for this. AR 89.

Webb testified that she could walk 15 or 20 minutes "before it starts affecting me." AR 90. She could sit 15 or 20 minutes before she had to get up and move. AR 90. She could lift 20-30 pounds. AR 90.

Webb wrote a letter to the Appeals Council dated September 11, 2015. AR 373. Webb stated that she had been unable to obtain consistent medical help for her Chiari Malformation, diagnosed in 2003. AR 374. She stated that she had been informed then, that the neurosurgeon recommended surgery.

> I didn't have insurance, beyond the post-natal that I received through Medicaid which expired approximately one week after my diagnosis. There are no medications that alleviate the symptoms of CM. The best that I could do was try to manage the pain the best I could with over the counter medications which is of extremely limited efficacy at best.

AR 374.

* * *

> I had a very understanding boss for several years, who knew my work ethic prior to these headaches taking over my life.... I was able to get off work as I needed to. Then when I no longer had the same manager, due to him leaving, I began to have problems with attendance. My new manager was not as flexible.... I then went to another company.... Then was I not only experiencing the incredible pain, and myriad other CM symptoms, I was also unable to cope with terrible social anxiety. Again, no medical coverage meant no "official" diagnosis, and certainly no medications to alleviate the anxieties. The anxieties, coupled with spotty attendance, became a serious issue in continuing my employment. Again, initially, I was in luck with a fairly flexible supervisor, who helped as he could, but when he moved to another location in the company, I lost that help, and consequently was informed if I couldn't alleviate the issues, maybe I shouldn't work.

AR 374.

During the same time frame, Webb stated, "I was dealing with my Hidradenitis Suppurativa."

> The Hidradenitis began flaring up around 2004... I had to have emergency surgery. This is a bill I still have been unable to pay off.... I was never even able to go to my follow up visits with the surgeon, due to lack of money and/or coverage.... With Hidradenitis, as with CM, there is no medication or consistent course of action or care that is a definitive treatment... I was at my dermatologist this past week, and he reiterated the same to me. He informed me that I was already doing the best that could be done and that we would just try some other options to see if it might help a bit more. The Hidradenitis is incredibly painful as well as socially demeaning.... I ran into consistent issues at work because of it – the pain, the drainage, the smell, the all around mess.... Many days I cannot even move one or both arms due to flare ups, or open sores. This again means I cannot function properly at work, so leads to even more attendance issues, and frequent disciplinary action by my employers.

AR 374-375.

> I have tried to find jobs, but I simply cannot find anything that is flexible enough to deal with my frequent absences. On average, I was absent at my last place of employment once per week, and had to go home early sometimes twice within the same week... I cannot predict when I will be debilitated with pain. I would gladly when I'm not in pain, but I cannot predict when that would be, and so employers cannot rely on a solid schedule with me.... I even attempted work at home programs, but ultimately ran into the same problem.... I was still required to produce X amount of work and/or X hours. Again, unpredictable. I am truly at a loss as to how to proceed at this point. I wish desperately to work....

AR 375.

Webb submitted information about her conditions "since I am aware that neither of my conditions is common, nor is the treatment of them. I am hopeful you will be able to see what I am up against...." AR 376.

She stated that her neurologist was focusing on her sleep apnea "to help alleviate what can be alleviated and therefore help with the pain more

effectively.... There is simply no medication for the other Chiari symptoms that I experience such as the dizziness, loss of depth perception, trouble swallowing, nystagmus, terrible fine motor skills, and more depending on the day." AR 376.

Webb stated that her dermatologist had informed her in the past week that surgery for her Hidradenitis was not an option due to the severity and length of the sinuses that had developed. AR 376.

She stated that she still needed to be able to provide for her children, but "I am lucky in that my children are now of an age that they require little in the course of day to day that I have to be fully functional for. They get rides from family members, friends, their dad, etc. They assist me daily in household maintenance such as laundry and cooking...." AR 376.

Webb submitted an undated addendum to her letter, stating that she had had appointments with her neurologist and dermatologist, and

> [T]here was still nothing that changed or alleviated my symptoms of ... hidradenitis and the Chiari Malformation. My dermatologist recommended a topical ointment that unfortunately I cannot afford. My Medicaid will not cover it due to the huge expense, and I cannot pay over $300 per prescription. My neurologist prescribed another medication that unfortunately isn't efficacious, and instead increases my pain and discomfort with side effects.

AR 372.

## D.    Medical Evidence – Chronological

On July 5, 2011, Kevin O'Toole, D.O., saw Webb at Poudre Valley Health System, Ft. Collins, Colorado, for a June 20, 2011, work related left ankle sprain. AR 463. She was wearing an ankle brace and was weight bearing and doing ankle exercises. She did not complain of instability. The swelling had

improved. She said her pain level was 3/10. AR 463. On exam she demonstrated no pain behaviors. Gait was minimally antalgic and she was wearing her brace. With removal of the brace, there was mild edema inferior to the lateral malleolus. She had tenderness over the anterior and posterior talofibular ligaments and the calcaneal fibular ligament. She had distal peroneal tenderness. She had full range of motion. Anterior drawer testing was positive. X-rays showed soft-tissue swelling and no bony injury. The assessment was "Left ankle sprain, unimproved with signs of increased joint mobility and ligamentous tearing." AR 463. Dr. O'Toole said he was referring Webb for an ankle MRI. She would wear a boot when weight bearing, continue to elevate, do range of motion exercises gently, and apply cold as needed. Her working status was updated to wearing the boot and avoiding stairs. AR 464.

On July 19, 2011, Dr. O'Toole reported the MRI findings that included ankle joint effusion, Grade II sprain of the ATF ligament, and Grade I sprains of the calcaneal, fibular, and deltoid ligaments. AR 461. Also noted was chronic central band plantar fasciitis of which the patient was aware. Examination showed plaintiff demonstrated no pain behavior and with removal of boot, there was just minimal edema, tenderness over the anterior talofibular ligament, and full ankle active range of motion. The assessment was severe left ankle sprain. Treatment was a lace-up brace. AR 461. She would avoid stairs and perform daily range of motion exercises. AR 462. Dr. O'Toole did not expect permanent impairment. AR 462.

On August 2, 2011, Dr. O'Toole recorded that the patient reported improvement, felt comfortable in her new brace, and had minimal trouble with swelling by the end of the day. AR 459. She said she was performing her active range of motion exercises and felt better overall. AR 459. With removal of the brace upon examination, there was just trace edema and minimal tenderness and her active range of motion was full. AR 459. Dr. O'Toole assessed left ankle sprain, improving. AR 459. Her work status continued to be wearing her ankle brace and avoiding stairs. AR 459.

On September 29, 2011, Dr. O'Toole reported that the patient had weaned from her brace, had a pain level of 2/10, and complained of some popping and general weakness. AR 457. She felt better climbing stairs but had some discomfort descending stairs or on very uneven terrain. She did home exercises daily. She reported tolerating full duty [work]. AR 457. Examination was normal except for end-point inversion tenderness. Her gait was not antalgic on a level surface. There was no deformity or edema. She was nontender over the lateral ankle but had end point inversion tenderness. Active range of motion of the ankle was full. The assessment was that her severe sprain was improving but she needed ankle-strengthening. AR 457. Dr. O'Toole planned to refer her to physical therapy for strengthening and proprioceptive training. AR 457. He noted she was on full duty without restrictions. AR 458.

On October 11, 2011, Paul Braunlin, physical therapist at Poudre Valley Health System, reported his evaluation and treatment. AR 454-56. Webb reported she was a full-time customer service employee at Center Partners. AR

454. On June 20, 2011, she was walking outside the building, up the stairs, and caught her left foot on the remnant of a post that had been cut off that had a portion sticking up. She tripped, fell, and sustained a fairly severe ankle sprain. AR 453. Mr. Braunlin noted a June 12, 2011, MRI showed "moderate-sized ankle joint effusion, marked grade II sprain of the ATF ligament, grade I sprain of CF and deltoid ligament, mild posterior tibial tenosynovitis and tendinopathy, mild peroneal synovitis, chronic central band plantar fasciitis." AR 454.

Webb told Mr. Braunlin that she was 50-60 percent back to normal but still had problems on uneven ground and going down stairs. She described feelings of instability multiple times per day in her left ankle. She gave a history of severe right ankle sprain at age 14 or 15. She reported bilateral knee pain and "states they had recommended surgery. She has patellofemoral cartilage problems. The right is worse than the left." AR 454. She smoked 3/4 to 1 pack of cigarettes a day. AR 454. She once quit for a year. AR 454-55.

Webb told Mr. Braunlin that she had headaches from a Chiari I malformation and had days when she was "clumsy with both her hands and feet." AR 455. She took ibuprofen and Tylenol as needed. She rated her ankle pain between 1-2 and denied using heat or ice. Objectively, the patient had a fairly normal gait. Her balance was only fair, and she reported having had poor balance all of her life. AR 455. Active knee range of motion was full extension and 135 degrees of flexion without report of pain. Active ankle range of motion was dorsiflexion 5 degrees, plantar flexion 45 degrees, inversion 35 degrees,

eversion 25 degrees. On passive range of motion the therapist felt instability at the end range of plantar flexion inversion, with excessive motion. She was tender diffusely through the left ankle and had mild swelling. AR 455. She was able to walk on her heels and toes though not comfortably due to pain. She had 5/5 strength for dorsiflexion, plantar flexion, inversion and eversion. The physical therapist gave her instructions for a home exercise program with elevation, use of heat or ice, use of the ankle brace which was preferable to a device that restrained the ligament. He recommended using a stationary bike and "she said she would be unable to because of her knees although she may tolerate 5 degrees." The therapist instructed her how to do balance re-education exercises. AR 455. Therapist and patient agreed on goals: stop smoking, with discussion of the implications in the healing (she said initially no way, although ... there are times when she does want to quit ... and we will discuss this further); improve one-legged standing and dynamic balance; use heat and ice to reduce swelling and pain; and consistently use the brace to protect the ligaments as they heal. AR 456. The patient would be seen once a week for modalities for 3-4 weeks. AR 456. Rehabilitation prognosis was good.

On October 27, 2011, Dr. O'Toole noted Webb's diagnosis, treatment, and July 2011 MRI findings. On September 29 she had reported 2/10 pain, ankle popping and weakness, and was referred to physical therapy. Today she said she felt the same, with 2/10 pain, but denied any problems when she was on even[14] ground. "It is only on uneven terrain that she experiences pain." She

---

[14] Transcribed as "walks uneven ground." AR 449.

said the ankle felt somewhat unstable. She had been wearing her brace but did not wear it this day because of snow. On exam, blood pressure was 150/92, pulse 102, respiration 24, and pain level 2/10. AR 449-450.

Exam findings were mild edema over the inferior malleolus, tenderness over the ATF ligament, and tenderness with endpoint inversion of the ankle, but without laxity. Assessment was severe left ankle sprain with delayed recovery and poor compliance with treatment as she had missed and rescheduled appointments. AR 449- 50. The plan was to continue physical therapy, wear the brace, return to full duty but avoid stairs. AR 450. Dr. O'Toole planned to refer her to Dr. Wesley Jackson for an orthopedic consultation. AR 450.

On November 3, 2011, Dr. Wesley Jackson, M.D., Orthopaedic & Spine Center of the Rockies (hereinafter Orthopaedic Center) saw Webb for a left ankle injury. AR 408. The history was that she had inverted her left ankle on a post in a concrete parking lot on June 13, 2011, and had a lot of swelling. Initially she wore a boot, then an ASO ankle brace. Currently she was in physical therapy. She still had pain and instability on the lateral side of the ankle. Id. She had a medical history of Chiari malformation, asthma, and latex sensitivity. She worked in telesales and was working without restrictions. On examination she was five feet 11 inches tall and weighed 283 pounds. She had swelling along the posterolateral ankle. On seated exam, she had a grade 2 drawer and a grade 2 tilt, which reproduced pain with tenderness over the

ATFL [anterior talofibular ligament][15]. AR 407-08. She had minimal medial gutter tenderness. Her peroneals functioned well but were slightly tender. AR 407. Three non-weightbearing x-rays on the PVH PAC system from June 28 showed no osseous abnormalities. An MRI dated July 12, 2011, showed tearing of the ATFL and CFL [calcaneofibular ligament][16] and quite a bit of fluid in and around the ankle posteriorly, anteriorly, and medially. AR 407. The peroneals were a little bit tenosynovitic without obvious tear. The posterior tibial tendon was the same. Diagnosis was chronic anatomic left ankle instability status post sprain. AR 407. Dr. Jackson discussed the findings, natural history and treatment options. She had ankle impingement and instability. It was now chronic. Her nonoperative option was a more robust brace. AR 407. Or she could have, as an outpatient, ankle arthroscopy, debridement, and Brostrom-Gould ligament reconstruction, which would benefit her greatly. She would be able to bear weight two or three weeks after surgery. AR 407.

On November 14, 2011, Paul Braunlin saw Webb for her fourth and last physical therapy visit. AR 447. She reported intermittent left ankle pain, feeling more stable in the ankle brace, pain going downstairs, but said she was pain-free going upstairs. She states that she was reluctant to have surgery as she had a problem coming out of anesthesia after her last surgical procedure. AR

---

[15] http://medical-dictionary.thefreedictionary.com/ATFL, accessed February 16, 2018.

[16] http://medical-dictionary.thefreedictionary.com/CFL, accessed February 16, 2018.

447. Objectively, she went upstairs quite well. Going down she had obvious pain and was somewhat awkward. This had not changed since Mr. Braunlin began seeing her, he said. AR 447. She had full active range of motion and could walk on her heels and toes but that was painful. AR 447-48.

She had "fairly good" one-legged standing balance. AR 448. She had obvious weakness in her hips and trunk, demonstrating excessive weight shift. She was able to walk on her heels and toes forward and backward and go sideways crossing her right foot over her left and the reverse with good coordination and balance. AR 448.

Mr. Braunlin recommended that she begin doing partial sit-ups and hip abduction strengthening, which was difficult for her. He recommended a stationary bike, treadmill or recumbent bike. She did not have the finances to go to a gym, and did not have time with her young children at home. The physical therapist assessed a "plateau in progress of her physical therapy. She continues to have intermittent pain and [in]stability." AR 448. Mr. Braunlin said he did not have anything else to offer. AR 448.

On December 15, 2011, Dr. O'Toole assessed chronic left ankle instability, status post sprain, and recommended that Webb proceed with surgery proposed by Dr. Jackson. AR 446.

On March 1, 2012, Dr. Jackson reported that the patient had elected to undergo surgery for left ankle instability and impingement. She wanted to take a week or two off work and then go back to a desk job. She still had pain and instability of the left ankle that affected her activities of daily living. On exam,

she had grade 2 drawer, grade 32 tilt, and pain over the ATFL and sinus tarsi. Assessment, again, was chronic left ankle anatomic instability after a sprain. AR 406.

On March 1, 2012, the Poudre Valley laboratory reported results of latex allergy studies. Classes 0, 1, and 2 were undetected to moderate. Class 3 was high, and Classes 4-6 were very high. AR 552.

On March 9, 2012, Webb was post op. She was on Percocet and had severe itching all over her body. She stated that she did not tolerate Vicodin. She said her pain was reasonable. She was given Tramadol[17] and would use Benadryl for the itching. AR 405.

On March 13, 2012, Dr. Jackson saw her six days after left ankle arthroscopy, debridement, and Brostrom-Gould ligament reconstruction. AR 404. She reported intermittent diurnal paresthesias, i.e., tingling and numbness in the top of her foot. She thought her splint was pressing in the front of the ankle. She said she "really has not much pain" and had stopped pain medications. On exam she had moderate swelling, negative drawer, and negative tilt. Light touch sensation was slightly diminished in the superficial peroneal nerve distribution and she had slight paresthesias in the plantar aspect of the foot. Dr. Jackson did not think this was unusual but told her to

---

[17] Tramadol is a narcotic used to relieve pain. https://medlineplus.gov/druginfo/meds/a695011.html, accessed February 16, 2018.

remain non-weightbearing for another week. She would wear a removable Cam Walker boot. AR 404.

On March 16, 2012, Dr. O'Toole recommended that Webb be off work until she saw Dr. Jackson again, and do no weight bearing on her left foot. AR 444.

On March 22, 2012, Dr. Jackson recorded that the paresthesias had resolved and that Webb reported having some aches and pains. On exam she had grade 1 drawer and a negative tilt, and minimal swelling. She had no calf pain. Dr. Jackson stated the treatment plan. She was not working. She could walk one hour and stand one hour a day. She would wean off crutches and Roll-A-Bout as tolerated. She could ice and elevate as needed. AR 403.

On April 11, 2012, Dr. O'Toole updated her work status to one hour walking or standing per day, using a Roll-A-Bout as needed and wearing her cast boot. He stated that she had been unable to work on March 27 due to injury-related pain. He informed Webb that if she had any more problems where she felt incapable of working, to notify him so that he could assess and provide a work status form if appropriate. AR 442.

On April 12, 2012, Dr. Jackson said Webb was doing well, working on restrictions and her cast would be removed today. She had been walking in the cast quite a bit and elevating her leg quite a bit. She had intermittent calf pain below the gastroc when she elevated it. Otherwise her ankle pain was intermittent, with activity. AR 402. Exam findings were negative. The assessment was "excellent postoperative." The plan was to wear a boot except

to sit, sleep, shower, and bathe. She would use the boot to walk for the next three weeks, then an ASO ankle brace. She would do gentle active range of motion. If this did not eliminate her pain within two days, she would return for another evaluation. At work she could walk two hours and stand three hours a day max, wearing the boot. AR 402.

On April 13, 2012, Webb saw Dr. O'Toole for increased pain beginning the evening before, and spasm that she thought might be due to increased activity after she got out of the cast. AR 439. Tramadol helped. She rested, elevated, and the pain improved to 4/10, she said. After coming to the clinic, it was higher at 9/10, she said. AR 439. On exam, with removal of the boot, there was a horizontal ridge in the area of tenderness on the mid posterior calf. Dr. O'Toole assessed left calf myofascial pain secondary to increased activity. AR 439. Dr. O'Toole advised heat, elevation, and gentle ankle active ROM exercises and Tramadol as needed. Her work status was unchanged. She was to go to the ER if she had a significant increase in pain, redness or swelling in the ankle. AR 440.

On April 17, 2012, Webb saw Dr. Johnson who reported to Dr. Jackson in a phone conversation. She had calf pain and a Doppler was negative for DVT. Other than leg or calf pain she had no constitutional symptoms. Her pain could be due to the splint or the cast. AR 401.

On May 24, 2012, Dr. Jackson said that Webb was not in therapy yet. She had been wearing her ASO ankle brace for two weeks. She got calf cramping and pain intermittently with activity. AR 400. She was working. She

denied back pain, leg pain proximal to the knee, or radiation, and paresthesias. On exam her ankle was neutrally aligned with a "very, very subtle varus" and no pain, tenderness or swelling, and good strength and range of motion. Her peroneals were a bit weak. She had a grade 1 to 2 drawer sign. Dr. Jackson said she was satisfactory postoperative. New x-rays showed mild osteopenia and a normal mortise, hindfoot, and subtalar joint. She had subtle hindfoot varus deformity. AR 400. The treatment plan would be to neutralize her subtle varus with a laterally posted Superfeet.[18] Dr. Jackson recommended physical therapy for balance and proprioceptive training. He thought a lot of her muscle aches and pains in her calf were neuromuscular. "I think she has plenty of room for improvement" and "I think she is still too close to having had surgery to make any other assessments...." AR 400. Her only working restrictions were no climbing and no stairs. AR 399.

On May 31, 2012, Dr. O'Toole recorded Webb's complaint of continued problems with ankle and foot pain, reported as 5-6 currently. She said that the Superfeet were not helping but caused pain on the contralateral foot and ankle and that her feet fatigued more quickly using the Superfeet. She also noted persistent pain in the lateral foot. The topical gel that Dr. O'Toole had provided for her calf at the last visit was helping with the pain. AR 437. On exam, gait

---

[18] "Superfeet" is the brand name for insoles advertised as helping to adapt the 2-dimensional midsoles of footwear "to your 3-dimensional foot. The distinct Superfeet shape helps to stabilize the foot, while the deep, structured heel cup and full-length foam provide support and comfort." https://www.superfeet.com/en-us/why-superfeet, accessed February 16, 2018.

was noted to be antalgic on the left. Positive findings were trace edema over the lateral malleolus, minimal tenderness to palpation laterally, positive anterior drawer, calf tenderness with dorsiflexion of the ankle, and no other findings of note. AR 438. Dr. O'Toole advised Webb to discontinue Superfeet, start physical therapy, and see Dr. Jackson earlier than planned to talk about the problem with the inserts. Dr. O'Toole updated her work status to a maximum of one hour walking and standing per day, and she was to wear her lace-up ankle brace. "Date of MMI is unknown at this time." AR 438.

On June 11, 2012, Paul Braunlin, physical therapist, evaluated and treated Webb. He noted in the subjective section of the treatment note that she had failed conservative care and underwent left ankle arthroscopy, debridement, and ligament reconstruction for instability and anterior impingement. Date of surgery was March 7, 2012. AR 431. She described the pain in her left ankle and lateral forefoot as "constant bruising" and rated the pain as 5-6/10. AR 431. She stated that the snapping and popping was 10 times worse than before surgery and reported being "very, very frustrated how tight and how loose my ankle is." AR 431. She said she was mostly sitting at a desk when working. AR 431. When they discussed improving her balance and proprioception, Webb reminded the therapist about her Chiari malformation "and she states she has had balance problems and clumsiness all her life in her hands and feet. She noticed her balance is not good, doubts this can be corrected. I did discuss with her the need for improving it ... since she has been

immobilized for such a long time, and that her balance must be worse...." AR 432.

Objectively the patient moved somewhat slowly from sitting to standing. She had a short but not antalgic gait. When she took off the brace there was still moderate swelling. She was able to heel-toe walk. She was able to stand "fairly well, not good balance but fair on one leg, using her hand to support herself. She is very restricted with her left ankle active range of motion." Dorsiflexion was 2-4 degrees, plantar flexion 35 degrees, eversion 10 and inversion 25 degrees. AR 432.

Mr. Braunlin instructed her in calf stretching for her gastroc and soleus muscles. AR 432. He demonstrated one-legged standing balance improving her trunk sway, using a mirror for feedback. He recommended use of a stationary bike. AR 432. He treated her with gentle passive range of motion in the talocrural and subtalar joints, not moving to end range. AR 432. Goals included gait improvement (Webb reported pain in her fourth and fifth metatarsal regions when she pushed off with her left foot). AR 433.

On June 14, 2012, Dr. O'Toole noted that Webb was in physical therapy to work on balance and prioprioception. AR 429. She questioned the merit because her Chiari malformation affected her balance. "Both her physical therapist and I reassured her that our intent is to optimize her ankle function in order to minimize any disturbance to her balance." AR 429. She stated that her current pain level was 3½/10 and that the topical gel benefited the pain in her foot. The calf cramping had resolved. She had occasional foot cramping. AR

429. On exam, her gait was not antalgic, she had minimal ankle edema, was moderately restricted in dorsiflexion and inversion, and had endpoint tenderness with both. AR 30.

Also on June 14, 2012, Dr. Jackson said that Webb had completed two physical therapy visits, did not like the Superfeet and stopped using them, and did not like the feel of the ASO ankle brace. She complained of pain in the lateral ankle. AR 398. She was still working with restrictions of no stairs. AR 398. On exam she had grade 1 drawer and grade 1 to 2 tilt. Peroneal eversion strength was weak 1-/5. She had no calf pain and had full ankle and subtalar range of motion. AR 398. Assessment was "satisfactory postoperative." He recommended continued physical therapy and told her she could try a MalleoTrain sleeve instead of the ASO. AR 398. He advised no impact activity unless she was perfectly comfortable with it. AR 398.

On July 19, 2012, Dr. O'Toole assessed status post left ankle arthroscopy for debridement and ligament reconstruction, improving. The treatment plan was to continue physical therapy as needed. Her work status was updated: she would wean from the ankle brace as tolerated and avoid stairs. Dr. O'Toole anticipated that Webb would be at MMI [maximum medical improvement] at her next visit with Dr. Jackson. AR 428.

On July 19, 2012, Dr. Jackson wrote that the patient was working, said she felt a little plateaued, had one more physical therapy visit, and was a little bit more convinced that she had made some progress. She wore both her ASO ankle brace and MalleoTrain sleeve and wanted to wean out of them. On

physical exam she had grade 1 drawer and grade 2 tilt. She had no tenderness, swelling, or calf pain and had good ankle and subtalar range of motion. There was no calf pain, tenderness, or swelling, and she was neurovascularly intact. AR 397. Dr. Jackson said she "may ultimately plateau with a little bit of intermittent pain. She is still at risk of recurrence and instability." AR 397. He assessed her as satisfactory postoperative. AR 397.

On July 24, 2012, Dr. O'Toole reported that Webb continued physical rehabilitation, working on balance and proprioception. AR 425. Dr. O'Toole stated that Mr. Braunlin had seen the patient yesterday when she came to the clinic limping after a severe calf cramp. AR 425. "She has been working as usual. She has attempted weaning from her brace. She ... has been doing her recommended exercises.... Her sleep was still disturbed last night. Her pain level is reduced today to 6/10." AR 425. On exam her gait was non-antalgic, she had some muscle spasm in her left calf and was tender to palpation of the proximal calf, and had restricted dorsiflexion. AR 425. Dr. O'Toole assessed calf tightness and spasm. He ordered lab work to evaluate for electrolyte abnormalities and prescribed Flexeril. "She remains on temporary restrictions of avoiding stairs and weaning from her brace gradually as tolerated." AR 426.

On July 27, 2012, Dr. O'Toole reported that Webb returned early complaining of increased pain and cramping in the left calf. He had refilled her Flexeril three days before but she had not been able to pick it up. She was doing her directed stretches. She also reported numbness on the back of the calf. On exam, her gait was antalgic. The calf and ankle were not swollen but

there was spasm and tenderness in the calf and diminished sensation in the calf. Supine and seated straight-leg-raises were positive on the left. Reflexes were absent at both knees. Reflexes were 1+ at both ankles. Great toe strength was 4+/5 on the left, ankle dorsiflexion was 4+ on the left and 5 on the right, and plantar flexion was 5/5 and equal. She had difficulty with the heel walk. AR 423. Dr. O'Toole assessments included possible lumbar radiculopathy. He referred Webb to Dr. Rebekah Martin for electrodiagnostic testing and physiatric consult and took her off work temporarily. AR 424. He noted that the recent metabolic panel was remarkable only for a marginally elevated glucose and slightly low AST. AR 424. "Date of MMI is unknown at this time." AR 424.

On July 30, 2012, Webb had a first-time visit with Amber Steves, M.D., at Poudre Valley Health System, Family Medicine Center.

Webb presented several concerns. AR 479.

> She has a history of Chiari 1 malformations and as a result, often has headaches associated with dizziness. She has been evaluated by a neurosurgeon but is NOT interested in surgery currently. The headaches sometimes go away with Excedrin, but sometimes she needs to go home and sleep it off. She is asking that I fill out FMLA [Family Medical Leave Act] paperwork today so that they cannot fire her for her medical condition. She states that currently she has headaches that are bad enough to go home 2-4 times a month.

AR 480.

Dr. Steves noted the history of recent ankle surgery and the patient's report, "She is having a lot of nerve pain so they are going to be doing an EMG soon." AR 480. Webb reported mood swings, "feels like her mood can go from happy to tearful with no explanation," although she denied depression or anxiety and was not interested in counseling. She did not have a history of

psychiatric diagnosis and had never been on a psychotropic medication. AR 480. She was interested in quitting smoking. AR 480.

Dr. Steves recorded medical history of morbid obesity, Chiari 1 malformation diagnosed after the delivery of her last child. The patient had been pregnant three times and had three normal vaginal deliveries. AR 480. She was married, employed, drank alcohol occasionally and smoked 15-20 cigarettes a day. AR 480.

On review of systems Webb complained of headache and left leg paresthesias, and mood changes. AR 480. Webb denied abnormal gait, muscle aches and stiffness, anxiety, decreased concentration, and depression. AR 480-481. Dr. Steves reported (relevant) examination findings: full affect, cooperative and oriented, grossly normal mental status, mild swelling around the left ankle joint, normal upper extremity reflexes, normal lower extremity reflexes, appropriate range of motion and strength in upper and lower extremities, intact cerebellar finger-to-nose test and intact rapid alternating movements, 5/5 motor strength throughout and intact sensation, and narrow-based gait. AR 481. Dr. Steves' assessment was tobacco dependence syndrome, history of Chiari 1 malformation with resultant headaches, left ankle surgery 2012, and mood swings. AR 482. The treatment plan: Bupropion (Wellbutrin) for tobacco cessation; mood swings (patient declines counseling), and possible weight loss. Dr. Steves filled out FMLA paperwork for the patient. AR 482.

On July 31, 2012, Dr. Jackson recorded the patient's complaint of cramping and now pain and numbness from the knee down, laterally. AR 396.

When she had this symptom before, a Doppler was negative for DVT. She was not working currently. On exam she had some tenderness around the leg. It was not any more swollen than the opposite side. Dr. Jackson could not reproduce the cramp. Straight leg raise was negative, distal strength was good (eversion, inversion, dorsiflexion and plantar flexion), and reflexes were normal. Dr. Jackson discussed the treatment plan: "We know she does have a Chiari malformation. I am not so sure that has much influence on it.... She has not had this problem before, except after her injury and subsequently surgery." Dr. Jackson recommended EMG and NCV studies. AR 396.

On August 15, 2012, Dr. O'Toole reported Dr. Rebekah Martin's findings on August 7: significant for electrodiagnostic evidence of peroneal mononeuropathy, both demyelinating and axonal. There was evidence of reinnervation. There was no electrodiagnostic evidence of a lumbar or lumbosacral source of symptoms. AR 421. Dr. O'Toole reported Dr. Martin's statement that she felt the prognosis was excellent. She recommended application of cold several times a day to the peroneal head region, physical therapy with local iontophoresis and dorsiflexion strengthening, and weaning from the ankle brace, which Webb had already done. Webb still complained of painful cramping, pain level 5-6/10. She took Bupropion. AR 421. Her blood pressure was 146/100, and she had palpable cramping in the calf, with reports of tenderness to palpation and pins-and-needles sensation after compressing the lateral lower leg just inferior to the fibular head. AR 421-22. She had persistent 5- strength for great toe extension and ankle plantar flexion. AR 422.

Dr. O'Toole referred her to PT and prescribed topical Gabapentin to apply around the fibular head 3-4 times daily. AR 422.

On August 23, 2012, Mr. Braunlin reported what Webb told him. She had had continued pain and paresthesia and left leg and cramping. She saw Dr. Martin. Since taking off her ankle brace "per Dr. Martin," she has improved. Her pain and cramping were less. She was having only three cramping episodes per days and was able to walk more. Paresthesias continued in her left lateral shin. AR 419. Objectively her gait was much less antalgic, and she went down stairs with improved dorsiflexion with weight bearing. This was still painful, however. She was able to heel walk with slightly less dorsiflexion on the left compared to the right. She was able to go up on her toes, although it was very weak and she put more pressure on her right foot. She continued to have tenderness with passive ROM in the left ankle, especially dorsiflexion. AR 419. Mr. Braunlin designed a home exercise program and she demonstrated the calf-stretching exercises well, although she had 50 percent loss of range of motion when demonstrating these. AR 419-20. "We will continue to focus on [balance], although I recognize she has a Chiari I malformation and will never have perfect balance." AR 420. Assessment was improved pain, improved function, positive nerve conduction/EMG testing per Dr. Martin. AR 420. Mr. Braunlin prescribed particular stretches and icing and said that Webb would be seen weekly for three more weeks. AR 420.

On August 28, 2012, Dr. Jackson completed a report of Workers Compensation injury identifying June 13, 2011, as the date of a left ankle injury. AR 393.

On August 30, 2012, Dr. O'Toole wrote a "closing note impairment rating." He stated that working status was restricted. AR 415. Webb noted improvement from discontinuing ankle brace. AR 416. He reported the August 7 specific electrodiagnostic test results. AR 415.

On exam, Webb's blood pressure was 152/84, pulse 96, and pain level 4½/10. AR 416. Gait was nonantalgic. She had difficulty descending stairs. She had an area of decreased sensation over the lateral malleolus. She had 4+/5 great toe extension and dorsiflexion strength. Heel walk was difficult. AR 416. Dr. O'Toole referred to the *AMA Guides to Evaluation of Permanent Impairment*. "Her best measurements were with 45 degrees of knee flexion. There her dorsiflexion was to 0 degrees at the neutral position and plantar flexion to 60 degrees. Inversion was 25 degrees, eversion 10 degrees. He assessed left peroneal mononeuropathy with both sensory and motor effect. AR 416. He completed "closing form M164" and "made Miss Webb's temporary restrictions permanent. These are avoiding stairs and walking as tolerated." AR 417. Dr. O'Toole stated:

> Permanent impairment is assigned in accordance with the AMA Guides to *Evaluation of Permanent Impairment, 3rd Edition (revised)*. Based on the active range of motion measurements the dorsiflexion at 0 degrees past neutral results in a 7% lower extremity impairment.... With inversion at 25 degrees, she receives a 1% lower extremity impairment. Eversion to 10 degrees results in a 2% impairment. The total active range of motion impairment is 10% lower extremity.

For peripheral nervous system impairment under table 51 involvement of the common peroneal nerve, under sensory the maximum impairment is 5%.

Because this limits activity, I have assigned a 50% correction from table 10. This results in a 3% impairment. For motor impairment, the maximum assignment is 35%. Applying table 11, she has range of motion against gravity and some resistance, so I have applied 25% which results in a 9% lower extremity impairment. The combined value for peripheral nervous system impairment is then 9%. Combining this with the active range of motion impairment results in a 21% lower extremity impairment.... The total lower extremity impairment is 21% converted to a whole person impairment of 8%.

Further follow-up is as needed.

AR 417.

On August 30, 2012, Dr. Jackson saw Webb. AR 394-95. Her symptoms were unchanged. AR 395. She said the cramping had not improved with iontophoresis. Dr. O'Toole had prescribed therapy and she was also getting "compounding" and did not think it was working. Id. She had seen Dr. Rebekah Martin for EMG and nerve-conduction study, which suggested a peroneal nerve mononeuropathy that was "in evidence of resolution. Apparently Dr. Martin has a conjecture that this is compression related from either a cast or a Roll-A-Bout, which is something that is almost completely unseen in orthopaedic practice these days but certainly is not completely unheard of." Id. Dr. Martin stated that he would be "more prone to suggest that her popliteal nerve block would [more likely have] set this off than any kind of compression neuropathy." He said this seemed to be "moving in the right direction although it may take quite some time...." Id.

On examination she had normal range of motion, strength, flexion and eversion. Except for a few branches of the sural nerve, she had normal sensation. She had no calf pain, tenderness around the fibular head, or swelling. He assessed left lower leg cramping and suggested adding nerve-stabilizing agents like Lyrica or Cymbalta, and provided samples of Lyrica. He stated that he thought most of her symptoms were "somewhat nerve related." Therefore, Dr. Martin could consider a sympathetic blockade since her symptoms were consistent with someone who might be developing a complex regional pain syndrome. AR 395. Her only restriction was no stairs. Id. It was difficult to say when she would reach MMI. AR 394.

On September 14, 2012, Mr. Braunlin reported Webb's 12th and last physical therapy visit. AR 409-10. He noted her original injury was June 20, 2011, with surgery on March 7, 2012, and postoperative complications of "left calf cramping, which was disabling, which began around July, and persistent left ankle and foot pain and paresthesia, and there was electromyographic evidence of peroneal mononeuropathy." AR 409. Mr. Braunlin reported Webb's statement that she had "plateaued with progress and admits not being consistent with her home exercise program, especially in the last week." She reported that she continued to have trouble going up and down stairs and had limited walking. "She is able to walk approximately 15 minutes.... She is very careful on uneven surfaces, she will use her brace, which she stopped wearing due to the possibility this was causing some of her neuropathy. Since she stopped wearing the brace, her ... paresthesias improved; however, even in the

grocery store she can tell her ankle will tend to roll." Objectively the patient had a fairly normal non-antalgic gait and still had obvious discomfort, "very slow and careful," going up and down stairs one step at a time. AR 409. Her active and passive range of motion was within normal limits. Mr. Braunlin noted that Dr. Jackson had noted subtle instability after surgery. AR 409. She had 5/5 strength but had pain going up on her toes and heels. AR 409-10. They discussed her home exercise program. AR 410. They discussed her smoking. She had had a reaction to Wellbutrin, still smoked 15 cigarettes a day and "may pursue Chantix in the near future." AR 410.

Mr. Braunlin said, "I reiterated her home calf stretching exercise program, her ankle range of motion, and her brief one-legged balance exercises; she performed these all well." He noted that she had had two iontophoresis treatments that were not helpful and caused quite a bit of discomfort when they were on her ankle. He discharged the patient from therapy. AR 410.

On November 7, 2012, Dr. Steves, Family Medicine Center, reported history:

> Patient is here to discuss her mood and her headaches. She recently tried the Wellbutrin and although it helped her smoking, it makes her anxiety much worse. She also tried Paxil with no improvement and has since quit her job because she gets very anxious being around people for more than one hour. She reports difficulty sleeping, weight gain, anhedonia, but denies SI/HI. The patient talked to her parents, and her mother is on Zoloft and has had good results. She is not interested in counseling at this time. The patient also has headaches secondary to a Chiari Malformation and states her headaches are now daily, and she is considering trying for disability. She does not want a referral to a

neurosurgeon or a neurologist, and is not interested in any
headache medication.

AR 475-76.

On review of systems, Webb complained of fatigue, weight gain,
headache, anxiety, irritability, sadness/tearfulness, and depression. AR 476.
She denied mood changes, panic attacks, decreased concentration, memory
problems, and confusion. AR. 476. She denied joint pain, muscle aches,
stiffness, and abnormal gait. AR 476. Her pain score was 0 [no pain]. AR 475.
On examination, affect was anxious, mental status was grossly normal,
judgment was normal, and the patient was alert and oriented x 3. AR 477.
Dr. Steves assessed mild major depression, single episode, and prescribed
Sertraline (Zoloft). AR 477. She said she would consider Celexa if there was no
improvement. AR 478. Dr. Steves discontinued Paroxetine. AR 477. She
ordered laboratory studies to include thyroid studies and Vitamin D level. AR
477. She noted that Webb took tylenol/ibuprofen as needed for Chiari 1
malformation resultant headaches and was not interested in surgical options.
AR 478. Dr. Steves recorded that the patient had tried quitting tobacco use
with gum, lozenges, patches, and Wellbutrin. She would have routine screening
labs. AR 478.

On November 7, 2012, the Poudre Valley laboratory reported Vitamin D
level of 12, and reference ranges: mild to moderate deficiency equals 10-30,
and optimum is 31-100. AR 497.

On April 23, 2013, Webb returned to Family Medicine Center, where she
was seen by Breanna Berry, D.O. AR 471. Her height was recorded as 5'10½"

and her weight as 326 pounds. BMI was 46.2. Blood pressure was 142/86. Pulse oximetry on room air, sitting, was 95%. AR 471. Webb rated her pain as 3/10. AR 471. Her active medications were Salsalate, Prodrin,[19] Cholecalciferol (Vitamin D3) 50,000 units, and Sertraline (Zoloft) 50 mg. a day. AR 471.

The patient gave a history of worsening headaches. AR 472. She was no longer driving due to vision impedance and depth perception not being so great anymore. Over the past year, she said, her headaches had been getting worse and at this point were almost nonstop. AR 472. She states that she could not take too much Ibuprofen because it would be bad on her and took generic Excedrin Migraine. She said Salsalate was what helped her headaches the most, just the anti-inflammatory without the pain killer. She stated that it helped her balance issues as well. AR 472. She stated that smoking helped her headaches because it evened things out by lowering her BP or something, which seems to alleviate her headaches. She wants to quit smoking for her Suppurativa, but it helps her headaches and she smoked 3/4 pack per day. AR 472. Wellbutrin had not helped smoking; she said it magnified her anxiety about a thousand fold and she couldn't function. She admitted to social anxiety which intensified and worsened with the Wellbutrin for 1-2 months before she stopped the medication altogether. AR 472.

---

[19] Prodrin (acetaminophen/caffeine/isometeptene) is used for migraine and tension headaches. http://reference.medscape.com/drug/prodrin-acetaminophencaffeine-isometheptene-999925, accessed February 16, 2018.

Dr. Berry reported that on examination, Webb was an obese female who appeared fatigued but in no acute distress and unremarkable clinical examination. AR 473. Webb's mental examination showed she was oriented, demonstrated good judgment and reason, and had normal affect and behaviors during examination. AR 473. Her extremities had edema and her strength and sensation were intact. AR 473. Dr. Berry prescribed Salsalate and Prodrin. AR 474.

On May 20, 2013, Webb saw Dr. Steves for a well woman exam. AR 465. Height and weight were recorded as 5' 11" and 333 pounds, and the reported pain level was 3/10. AR 465. Webb was concerned that she might have a UTI and reported that her right kidney had been hurting for four days. She had stopped taking Zoloft because of shakes, dizziness, sleep problems, and fuzziness, and "still feels depressed and that her social anxiety makes it very difficult for her to be outside." AR 466. Her Chiari malformation headaches were worse and she hadn't seen Dr. Curiel in nine years and had not had an MRI since then. She took Tylenol/ibuprofen as needed and was not interested in surgical options. AR 469. She reported fatigue, reported that she snored, and that both parents had sleep apnea. AR 466. On review of systems she complained of fatigue and weight gain. AR 466. She denied joint pain, muscle aches or stiffness. AR 467. She complained of headache, denied paresthesias, and endorsed anxiety and sleep disturbances. AR 467. She denied mood changes, confusion, memory problems, depression, and decreased concentration. AR 467. Webb declined counseling for historic mood swings but

was interested in medication. AR 470. Allergies and reactions were listed, all with a July 30, 2012 date: Iodine, anaphylaxis; Nitrofurantoin, nausea; and Clarithromycin, psychotic episodes. AR 466.

Clinical exam including mental status was unremarkable. AR 467-68. Dr. Steves assessed abdominal pain, anemia, morbid obesity (and ordered lab studies), mild major depression single episode, Chiari malformation type 1, and anxiety. She prescribed Citalopram for depression, Salsalate for Chiari malformation, and Lorazepam (Ativan) for anxiety.[20] AR 468-69. She ordered a sleep study. AR 469.

The May 20, 2013 laboratory studies showed white blood cells elevated at 11 (normal range 4-10), and RDW elevated at 16.4 (normal range 11.5 - 14.5). AR 490. The lab reported low Potassium, total bilirubin, and AST, and high triglycerides. AR 491.

On May 29, 2013, Poudre Valley Imaging reported findings on an MRI of the brain. AR 485. This was compared with a brain MRI dated October 22, 2003 and a head CT dated August 3, 2010. The cerebellar tonsils remained low, 7 mm. below the level of the foramen magnum, and were pointed in shape. Compared to the prior exam, when the tonsils were 6 mm. below the foramen magnum, this was a minimal change. AR 485. There was no evidence of acute infarct, hemorrhage, or mass lesion. AR 486.

---

[20] Ativan (Lorazepam) is a benzodiazepine used to relieve anxiety.
https://medlineplus.gov/druginfo/meds/a682053.html, accessed February 16, 2018.

On July 2, 2013, Anne Voorhes, physician assistant at Colorado Health medical Group Pulmonology, reported an evaluation preliminary to sleep study. AR 553-55. The patient was 40 and had been referred by Dr. Steves. AR 553. Her chief complaint was fatigue that had become worse in the past six months. Her sleep pattern was variable: she went to bed as early as 10:30 p.m. or as late as 4 a.m. Her preferred bedtime was 3-4 a.m. If she did not fall asleep, she got out of bed and read until she was drowsy. She averaged 6-10 hours of sleep at night and often napped 2-4 hours during the day. AR 553. Her husband was with her and reported that her legs moved at night. The patient was unaware of this but reported that her legs ached in the evening. Her husband said she snored. The patient slept on her side and avoided sleeping in a supine position due to hip pain. Both husband and patient agreed that she had memory problems. The patient described poor focus and concentration. She had a history of night shift work that worked well with her preferred sleep schedule. AR 553.

On the Epworth Sleepiness Scale the patient reported that she had a high chance of dozing or falling asleep when sitting and reading, watching tv, or lying down to rest in the afternoon when circumstances permitted this. AR 553. She reported she would never doze while sitting and talking to someone and had only a slight chance of dozing while sitting inactive in a public place, sitting as a passenger in a car for an hour, and sitting quietly after lunch without alcohol. AR 553. Ms. Voorhes noted the medical history of hidradenitis

suppurativa, mild single episode of major depression, morbid obesity, and vitamin D deficiency (but not Chiari malformation).

On the review of systems, the patient endorsed lower extremity edema, constipation, diarrhea, arthralgias, and joint pain. AR 554. Objectively her BMI was 45.86, blood pressure 142/92, and O2 saturation 93. AR 554. Review of systems was negative for mood or personality changes, joint and limb swelling, and joint stiffness. AR 554. On exam, Ms. Voorhes described a morbidly obese female in mild pain due to headache, with a "mallampati class III" airway, thick neck, clear lungs, regular heart rate and rhythm, no pitting lower extremity edema, normal gait, and normal affect and mood. AR 555. She assessed fatigue, snoring, headache, and delayed nonorganic circadian rhythm sleep disorder. There was strong suspicion for sleep apnea based on snoring, headache, memory and concentration impairment, and fatigue. AR 555. Risk factors included body habitus, crowded posterior oropharynx, and positive family history. Insomnia and delayed circadian rhythm disorder could be contributing to fatigue. As for headache, there was known Chiari malformation, and underlying sleep apnea could be contributing as well. AR 555.

On August 13, 2013, Webb saw Kevin Tool, M.D., at the Women'sClinic of Northern Colorado, to discuss a hysterectomy. She provided history of BTL in 2003, regular heavy cycles with clots and severe cramps. "She had an embx 2 months ago." AR 556. She had had pregnancies and normal deliveries in 1998, 2000, and 2003. AR 556. On review of symptoms, Webb endorsed bilateral vision loss, irritability and/or mood swings before periods, bloating

and/or swelling before periods, emotional outbursts and/or memory loss before or during periods. AR 557. Neuropsychiatric ROS was positive for headaches. "Psychiatric/Emotional Evaluation patient is anxious, in depressed moods." AR 557. Musculoskeletal ROS was negative for joint, back, or muscle pain. AR 557. Physical examination showed extremities were normal with no edema, varicosities, arthritic deformity, or tenderness. AR 557. Neurological assessment was normal. AR 557. Dr. Tool reported examination findings. "Based on ACOG FMI standards the patient's build is classified as extreme Obesity - Class III." AR 557. The gynecological examination was unremarkable other than an anteverted uterus. AR 557-58. Dr. Tool assessed menorrhagia, dysmenorrhea, and hidradenitis suppurativa. He recommended "embx in office or in OR." He discussed options: OCP, Mirena, Ablation, RTC mctrin [sic], Lysteda, and finally hysterectomy, which has the highest risk. "Will schedule an office embx and Mirena. She will call if she decides on an ablation." AR 558.

On August 28, 2013, Kerry Kamer, D.O., reported a consultative disability examination. AR 570-76. Dr. Kamer noted that she arrived as a passenger in her husband's vehicle and he accompanied her during the evaluation. AR 570. Dr. Kamer said the history of present illness was somewhat vague and that the patient was unable to provide more detailed information about her history of care. AR 570. According to the patient she was diagnosed with a Chiari I malformation after a 2003 brain MRI. "She was being evaluated for complaints of imbalance, dropping things, dizziness, and headaches." She saw a neurologist and neurosurgeon who told her she could

51

"have surgery or not," some type of "decompression." AR 570. She decided not to, had a repeat brain MRI two months ago and was told the findings were stable. "She complains of imbalance, dizziness, gait disturbance, she drops things, she has memory problems, problems with her vision and depth perception, and she constantly has sudden headaches." AR 570. She was diagnosed with hidradenitis suppurativa in 2004 and had not been evaluated by a dermatologist. "She has taken care of the condition on her own. She does currently have some draining lesions in her underarms, beneath her breasts, and in her groin." AR 571. She was diagnosed with anxiety and depression in 2013, was given a medication that did not help, and was not referred for a mental health evaluation. She complained of agoraphobia, and disliked being around people. She was diagnosed with asthma in 1986, used an inhaler, and had good relief of symptoms and no problems at this time related to asthma. AR 571.

Dr. Kamer listed the records he reviewed: the Poudre Valley Brain MRI dated May 29, 2013 and outpatient note dated May 20, 2013, her "personal pain questionnaire" and "function report - SSA 3373." AR 571. He listed her surgeries: appendectomy and cholecystectomy in 1994, left ankle ligament reconstruction in 2013. AR 571. Dr. Kamer summarized her social history and activities of daily living. AR 572. Webb was able to get herself in and out of bed, dress herself, and bathe herself, as well as drive, cook, and clean for herself. AR 572. She woke up her kids, supervised them getting ready for school, did a

load of laundry, cleaned dishes while she could stop often, and alternated

housework, reading, or napping depending on the day. AR 572.

Dr. Kamer reported Webb's general appearance: pleasant, cooperative, no

acute distress, and that she appeared to sit comfortably, get on and off the

examination table comfortably, removed shoes comfortably, and arose

spontaneously and unaided from a seated position without discernible

discomfort.

> She transferred from seated to laying supine on the exam table and
> vice versa with a straight sit-up maneuver, with no functional
> difficulty or apparent discomfort.... She did not appear particularly
> anxious, agitated, or drowsy and responded appropriately with
> adequate effort throughout. Appeared to have no difficulty with
> hearing during our discussion and speech was clear and coherent.
> She intermittently and inconsistently exhibited signs of slight
> instability.

AR 572.

She was 67 inches tall and weighed 323 (BMI 50.6), and her oxygen

saturation was 93 percent. AR 572.

Vision with lenses was 20/40 bilaterally. She responded appropriately to

visual cues. AR 573. Skin examination showed diffuse erythematous pustules

over left and right subaxillary areas, beneath left and right breasts, and the left

groin, with "scant clear and no purulent discharge" [sic] and no signs of

abscesses or cellulitis. "These skin lesions are not likely to impact her

functional capabilities." AR 573. Extremities had no cyanosis, clubbing,

varicosities, lower extremity edema, weakness, or atrophy. AR 573.

Dr. Kamer reported no remarkable findings in the examination of head,

eyes, ears, nose, throat, neck, chest and lungs, cardiovascular, abdomen,

pulses, and extremities. AR 573. Dr. Kamer stated that she was able to perform finger-nose, heel-knee, and that Romberg was absent. He stated that ambulation did not appear ataxic or antalgic, that Webb was able to stand and walk on heels and toes, and had a "full deep squat." AR 574. She did not use an assistive device. Range of motion was reported for cervical spine, dorsolumbar spine, hip joints, and knee joints; ankle, shoulder, elbow, and wrist joints. AR 574. He stated that these were all normal and caused no discernible discomfort. Dr. Kamer reported that the Fabere test caused hip pain bilaterally and Milgram's caused low back pain. AR 574. Straight leg tests were negative. AR 574. Dr. Kamer reported ranges of motion of finger and thumb joints, and she stated they were all normal range and without discernible discomfort. AR 575. Dr. Kamer reported a spine examination without tenderness to palpation. AR 575. Neurological exam was normal. AR 575.

Dr. Kamer reported a brief mental status survey: pleasant, cooperative, no acute distress. AR 575. Attention and concentration appeared sufficient. She appeared oriented and was able to recall the day of the week, the year, and the state. Simple arithmetic questions revealed average simple mathematical skills. Fund of knowledge was average based on the stated level of education. Memory was average for recent and remote events. Five-minute recall of five random objects was "average." She had "average ability to think abstractly. A test of reversing multiple digit number was attempted and the results were average." She could draw a clock showing the time, identified geometric figures

and relative sizes, and recalled an average degree of detail after being read a short story. Insight into illness suggested an average perception of illness. "Observations of judgment are average ability to come to appropriate conclusions." AR 575. Findings appeared to suggest no significant neurocognitive deficiency. AR 575.

Dr. Kamer assessed RFC: "no recommended limitations on the number of hours she should be able to sit, stand, or walk during a normal 8-hour workday," "no postural limitations," and she could lift and carry 20-40 pounds based on resisted strength testing. There were no manipulative limitations. AR 576. No assistive device was recommended. AR 576. Based on her neurological condition and intermittent instability workplace limitations (such as working at heights, climbing ladders, operating heavy or dangerous machinery) "may be prudent." AR 576.

On September 5, 2013, Dr. Steves reported, "Patient has not followed up with a neurologist secondary to cost concerns." Dr. Steves filled out FMLA paperwork and encouraged her to follow up with a neurologist after she moved to South Dakota. AR 577. Dr. Steves recorded that anxiety was not well controlled on current medication, that Webb had social anxiety and agoraphobia that was better on Celexa but not ideal. Webb wanted to get back on Wellbutrin since it seemed to help in the past. The patient had had a sleep study test and needed a CPAP but had not gotten the machine titrated. AR 577. Dr. Steves discussed with Webb that she should do this before she leaves or get records transferred so she could take care of it in South Dakota. AR 577. She

had left breast cellulitis secondary to infected hidradenitis and would be given Keflex. AR 577. Dr. Steves discussed the benign nature of positional vertigo and gave Webb an Epley maneuver handout. AR 577. Examination showed normal mood, affect, and behavior. AR 578.

On September 6, 2013, Webb returned to CHMG Pulmonary to review findings of her August 1 sleep study.

> This revealed severe obstructive sleep apnea with an AHI of 37/hr and average oxygen saturation of 87%. Frequent leg movements. CPAP and BIPAP were both tried. She did not tolerate CPAP well and did best on BIPAP at 14/8 c. Leg movements resolved and oxygen saturation improved to 89% on CPAP.

AR 580.

Review of systems was positive for shortness of breath, cough, heartburn, arthralgias, joint pain, joint stiffness, limb swelling, skin lesion, skin wound, dizziness, and anxiety. AR 581. She was 70 inches tall and 330 pounds, with blood pressure 142/90, heart rate 93, and oxygen saturation 94%. Physical exam was deferred. AR 581. The assessment was obstructive sleep apnea. AR 581. Ms. Voorhes noted, "She is moving to South Dakota this weekend." AR 580. Ms. Voorhes said she would provide a prescription for the appropriate BIPAP setting and that Webb would need to establish with a sleep specialist in South Dakota to initiate treatment. AR 581.

On October 25, 2013, Webb saw Michael Hogue, M.D., at Regional Health Physicians in Sturgis. AR 687. She was there to get established and discuss her headaches and medications. She told Dr. Hogue that she had Chiari I malformation and a recent diagnosis of sleep apnea. She said she got a

prescription for a CPAP from her pulmonologist before she left Ft. Collins but had not had a chance to pick it up. She had a history of appendectomy, cholecystectomy, and left ankle ligament reconstruction. AR 687. She was morbidly obese. She wanted to know if she should take Salsalate with Celexa and her Albuterol inhaler and someone told her they interacted. "I have no idea and I have never seen an interaction with these in the past." AR 687. She also wanted to know what to do for her headaches "although it is pretty clear ... she did have a positive sleep apnea study." AR 687.

Dr. Hogue reported an unremarkable examination other than morbid obesity. AR 688-89. She ambulated normally with no limping; was oriented; had normal mood, affect, and speech; and demonstrated good judgment. AR 688. Neurological examination showed normal gait, station, and balance. AR 689. He assessed: carbuncle, sleep apnea, headache, obesity, and Chiari malformation. AR 689. Dr. Hogue planned to get her records from the Poudre Valley clinics. He said he would put her sleep apnea high on the list as a cause of her headache. AR 689. "We checked with the local DME and they will not accept the prescription [presumably for BIPAP] from Colorado; however, if she has got an abnormal test they will accept a prescription from me.... [I]f we can verify this I will go ahead and write her that prescription. If we cannot verify this information, I want to send her to pulmonary and have her evaluated there and they can determine whether or not a different sleep test is needed." AR 689. In the meantime, he said they would wait until they get her started on the CPAP and see what that does for the headaches. AR 689.

The laboratory reported a Westergren sedimentation rate within normal range and a normal basic metabolic panel except for low calcium. AR 690.

On November 19, 2013, Webb saw Dr. Hogue at Regional Health Physicians in Sturgis. She reported that she was still having problems with headaches. Dr. Hogue stated that he had reviewed her records from Colorado and that her MRI confirmed a Chiari 1 malformation. "It does not appear that this is any accelerated from what it was previously; however, as I explained to her, I am not an expert in this area. She needs to follow with the neurologist who knows something about this.... We also did get a copy of her sleep apnea study and she does have some fairly severe symptoms." AR 684. Dr. Hogue recorded, "She also has some increasing anxiety of late and wonders about how to approach this." AR 684. Dr. Hogue's assessment was: headache, Chiari malformation, history of kidney disease, anxiety, and arthritis. He ordered laboratory study of erythrocyte sedimentation rate. AR 685. He discussed the treatment plan: get a neurologist to at least look at her and render an opinion and with her history of sleep apnea, she would see Dr. Rob Finley. With the history she gave of kidney scarring, he would order a basic metabolic panel. For headaches he would try switching Salsalate to Indomethacin because Webb stated that Salsalate gave good relief for a long time but less so now. "I think part of this [is] maybe her sleep apnea and so she absolutely needs to get this addressed." AR 685. For anxiety, Dr. Hogue said he would try Hydroxyzine in addition to her current medicines. "I think the patient did seem a little frustrated that she had some other issues to address. She has scheduled

herself for a 20-minute appointment and basically came in with a laundry list...." AR 685. Dr. Hogue reported his physical examination, which was negative except for morbid obesity. AR 686.

On this date, the patient called to say that her script for a BIPAP was older than one month so Regional Home Medical would not accept it. She wondered if Dr. Hogue would write a new script for her "bi-pap 14/8 with heated humidity, smart card, and mask of choice and send to DME here." AR 700.

On January 6, 2014, Webb saw Suzanne Harris, M.D., at Regional Health Physicians in Sturgis, for sore throat, cough, chest congestion, laryngitis, right-ear hearing loss, and sinus pain and pressure. She also needed a refill of Celexa. AR 639. She was accompanied by several of her children. AR 640. Dr. Harris assessed acute bronchitis and anxiety. AR 642. This would be treated with antibiotics. AR 642.

On January 13, 2014, Webb saw Lori Fritz, C.N.P. at Regional Health Physicians in Sturgis for upper respiratory problems, "coughing constantly" over two weeks. AR 636. She appeared acutely ill, no acute distress, and ambulated normally. AR 638. Ms. Fritz assessed bronchitis and tobacco user. AR 639. She planned to try a higher burst of Prednisone and Levaquin, with Cheratussin for cough at night. She advised to patient to quit smoking. AR 639.

On February 14, 2014, Webb saw Dr. Hogue to refill medications. She complained of pain in her forearms and numbness and tingling into her hands,

and right knee pain. She had not filled a prescription for Indomethacin because, she said, this did nothing for the pain she had been seen for in the past. She was told that Dr. Hogue did not prescribe narcotic pain medications. Dr. Arban completed the "HPI." The patient had pain in her elbows and wrists. The lateral epicondylitis in both arms were the locations of elbow pain. It was worse on the right and she was right-handed. The pain was a burning-type pain, especially when she moved her hands. "Her job is basically operating keyboard and 10-key entry." AR 633. Her second problem was "increasing problems with numbness in her fingers. She notices this mostly on the palmar side and says it is hitting all 5 fingers including the thumb." She said she did not do much freeway driving in Colorado, but she had been going back and forth to Rapid City periodically. "She notices that if she just hangs her hands on the steering wheel it does not seem to be a problem, but if she tries gripping the steering wheel she gets numbness...." AR 633.

Webb was accompanied by her spouse. Examination showed tenderness over the lateral epicondyles bilaterally, right greater than left. "Pain shoots down arm. Exacerbated with wrist motion.... Tinel's and Phalen's both positive however sx go only into the middle and ring fingers...." A wrist splint was ordered, and Salsalate. Dr. Hogue stated:

> She clearly has some mild lateral epicondylitis. It does seem worse on the right than on the left and flexion and extension in her wrists causes it to increase. We talked about carpal tunnel splints to see how this would help.... [S]he got a burning sensation in her wrist when I did the Tinel's... She did have pain in her wrists when I retried to test Phalen's. It is a little bit of a bizarre response, but I think these may be positive. We had discussed the fact that she had been on Salsalate for chiari malformation symptoms and that

one always seemed to work the best. She did not realize that she could take 3000 mg a day so what I told her to do is to go back to the 750 mg. tablets and take 1 or 2 b.i.d. to see how she responded....

AR 636.

If this did not work, they would discuss injections and nerve conduction studies. AR 636. A psychiatric examination showed she was oriented, cooperative, and alert and had normal mood, affect, and judgment. AR 635.

On February 27, 2014, Webb saw Dr. Arban for a respiratory infection. She had gone through two courses of antibiotics, which helped but symptoms never completely went away, and two days ago, she started coming down with the same thing, symptoms of which were a cough, plugged sinuses, phlegm, body aches, and fevers. AR 630. The patient was a smoker. She reported coughing without remission, using Albuterol, and reported that she had reduced her smoking to a few a day. AR 630. Dr. Arban stated that she was accompanied by her spouse and teen-aged son. AR 632. Clinic exam was unremarkable other than Dr. Arban's observation that Webb was morbidly obese, had nasal discharge and rhonchi that cleared with coughing. Dr. Arban said that her wheezing required hand-held nebulizer treatment. After treatment, she had clearing of wheezes and rhonchi. The patient's peak-flow, pre- and post-nebulizer, was 250 L/min. Normal for her age, sex and height was 349. Post peak flow was 325 L/min. Assessment was bronchitis. Dr. Arban prescribed Vicodin and Ventolin. AR 632. He also prescribed Symbicort. AR 633. For her diagnosis of acute sinusitis, he prescribed Augmentin. He noted

that a chest x-ray was negative for pneumonia. AR 633. Webb was not quite ready to quit smoking as far as Dr. Arban could tell. AR 633.

On March 26, 2014, Webb saw Michael Hogue, M.D., Regional Health Physicians, Sturgis, taking him disability questionnaires that she needed to have filled out and noting she had been denied and was hoping for a hearing soon. AR 626. Dr. Hogue stated that he started treating her after she moved from Colorado. She had a history of Chiari 1 malformations, and on and off throughout her life had some fairly significant headaches that waxed and waned. "She can get them pretty severely sometimes and get a pretty good run of these." AR 626.

Second, she had hidradenitis suppurative, which she had learned to control fairly well using a particular body wash and antibacterial soap three times a day. She wore loose-fitting clothing and did not wear a brassiere. "Most of her issues are under her breasts and in her axilla. I have never seen her for this." AR 626.

Third, she had been diagnosed "by her doctor back home" with social anxiety disorder. She had worked at a credit card center and started developing severe anxiety. "It got to the point where she could [not] go to work when there were large crowds around and basically that was the whole function in the call center. She now operates such that she will get up early in the morning and go shopping right when the stores open before there is any kind of crowd and she will have to leave when a big crowd comes along. She avoids stores such as Walmart, Target.... She worked with her physician in Colorado. She got on [a]

number of different medicines that she was trying to help get this to settle down." AR626. Her combination of Citalopram 40 mg., Wellbutrin SR 150 mg., twice a day, and Hydroxyzine helped to control her symptoms fairly well. Id. "She has some chronic ankle pain from an injury where she disrupted ligaments and apparently has some nerve damage." Id. She still smoked occasionally. Id.

Dr. Hogue summarized Webb's problem list, past medical and surgical history, allergies and medications, family and social history. AR 626-28. Dr. Hogue recorded her vital signs (blood pressure 128/78, pulse 77), oxygen saturation (97%), and height and weight (5' 10" and 339 pounds). AR 628. On exam, she was morbidly obese, was in no acute distress, ambulated normally, was oriented, had normal mood and affect, was cooperative and active and alert, and had good insight and judgment. AR 628. Today's assessment was acute bronchitis. Dr. Hogue stated:

> Basically I have known her for 8 months. She came to me with these diagnoses and I have done very little personally to manage this. I am reporting on these forms based on what is reported to me. I also told the patient very clearly I do not do disability physicals.... [S]he may need to go through some very specific physical testing and evaluations prescribed by the Court. We will certainly help accommodate that with referrals as needed.... It is my opinion based on what she has told me that I would not allow her to go back to work. She would need to see a neurologist and she would need to see a psychiatrist on the evaluation of these problems.

AR 628.

Dr. Hogue signed a form to establish Webb's eligibility for more suitable housing conditions indicating she was handicapped. AR 629. He did not

indicate whether or not she had a disability as defined by the Social Security Act. Id.

On April 16, 2014, Webb saw Tara Carlson, physician assistant at Sturgis Regional Health. AR 622. She was concerned about a continued cough. AR 623. This had started in December 2013 and had been on and off. She had been on Levaquin, Augmentin, Cephalexin, and another medication and they did not seem to help because the cough came back. She had also been on "a little bit of prednisone here and there." She also had Chiari malformation with an appointment with Dr Finley in May. Until then she wanted something for her headaches as they seemed to be getting quite a bit worse. AR 623.

Ms. Carlson reported that Webb was 5' 10" tall and weighed 350, which was a BMI of 50.2. Her O2 saturation was 95 percent. AR 625. On examination she was morbidly obese and clinical examination was otherwise unremarkable. AR 625. She had no anxiety, stress, depression, irritability or sleep disturbances. AR 625. She had no muscle aches, weakness, or back pain, or extremity swelling. AR 625. Ms. Carlson ordered Tramadol, Symbicort, Depo-Medrol, Zithromax, and Prednisone to treat acute bronchitis, fever and headache. AR 625. She could try the Tramadol for severe headache pain until she saw Dr. Finley on May 20. AR 626.

On April 17, 2014, Thomas Hermann, M.D., treated Webb at the Sturgis Regional Hospital Emergency Department for an acute injury to the left index finger. AR 589-90. He also assessed bronchitis and that it was partially treated on Azithromycin. AR 589. She was given Prednisone and Symbicort for this

recent pulmonary exacerbation. AR 590. The ER admission form noted chronic medical problems of Chiari 1 malformation, H.S., social anxiety, asthma, and mild COPD. AR 591. The ER nurse reported diminished breath sounds throughout but did not report oxygen saturation. AR 593.

On May 2, 2014, Webb was seen by Suzanne Harris, M.D., at Regional Health in Sturgis. Her chief complaint was a one-week headache. Webb described her headaches as starting over the posterior head and then coming to the area between her ears. She had been using Salsalate to control the headaches. On this day, she denied any headache associated symptoms like vision changes, etc. AR 620.

Dr. Harris ordered an Ativan injection. AR 622. She explained that she was reluctant to use narcotic medication because it could cause a rebound headache, and Webb had been in the ER recently and was given Demerol and Phenergan, which could lead to a rebound headache. "Initially wanted [to] use Toradol, but she has been using Salsalate quite a bit and has already taken quite a bit of that already today." Dr. Harris said "certainly she could also have chronic daily headaches from medication overuse." AR. 622. Dr. Harris advised Webb to keep a headache diary and record how much pain medication she used. AR 622.

On May 15, 2014, Charles Lewis, D.O., saw Webb at the Sturgis ER for complaints of increasingly severe headache for the past 2 days.

> She has a history of chronic headaches secondary to Chiari malformation and recently had a change in therapy. She had been on prophylactic salicylate which were controlling it probably 75% to 90%, but she was still having some breakthrough so they

switched her to indomethacin and she has totally lost control of
the headache now, rates it a 9/10. Denies typical symptoms
suggestive of migraine. She does have an upcoming appointment
with Dr. Finley next week for further evaluation. The last time she
was in the ED was March 27, seen by Dr. Hermann.... She received
an injection of Demerol and Phenergan, which helped considerably.
Earlier this week she was at the clinic and got a shot of Ativan
which really did not help.

AR 601.

Dr. Lewis ordered an injection of Demerol 75 mg. and Phenergan 25 mg.,
and Webb had significant relief. "[A]fter about an hour it was starting to come
back, so she was given another 50 mg. Demerol IM and discharged home." AR
601.

On May 20, 2014, Robert Finley, M.D., neurologist, saw Webb at Rapid
City Regional Hospital for a complete neurologic evaluation. AR 610-14
(duplicate at AR 678-82). The chief complaint was Chiari malformation. The
problem list included obesity, anxiety, headache, migraine without aura,
sinusitis, bronchitis, carbuncle, arthritis, lateral epicondylitis, obstructive sleep
apnea syndrome, and numbness of hand. AR 610. The patient was on
medications: Citalopram 40 mg. Headache Relief 1000 mg., Hydroxyzine 25
mg., Salsalate 750 mg., Symbicort inhaler, Ventolin inhaler, Topamax 25 mg.,
and Welbutrin SR 150 mg. AR 610. She currently smoked five cigarettes a day,
and as of February 27, 2014, smoked one-half cigarette every other day. AR
611.

Blood pressure was 159/90. She was 340 pounds and five feet seven
inches tall. AR 611. She was accompanied by her husband. AR 611. Dr. Finley
recorded relevant history. AR 611-12. In 2003 she was evaluated for problems

66

that included dizziness and intermittent trouble with fine motor control, balance trouble, intermittent nystagmus, and trouble with headaches. Chiari malformation was discovered. "She actually has always had trouble with headaches. She has poor balance and had poor balance at the time that the Chiari 1 malformation was discovered." AR 611. She had been treated for migraine at age 11 or 12 in Ft. Collins "and that was not overly successful." AR 612. In 2003 she was seen by a neurologist and then referred to a neurosurgeon. According to Webb, both doctors felt she needed surgery. However, due to a number of factors in her personal life, she did not want surgery. She was told there were no other options so she did not maintain follow-up with neurology or neurosurgery and just "dealt with it." AR 612.

Dr. Finley recorded Webb's history that about a year ago, she was having problems with a back injury and was put on Salsalate. "[R]emarkably to her, that actually helped her headaches," and she continued to use Salsalate. After she moved to the Rapid City area, she continued to use Salsalate. For a while, she was tried on Indocin but that did not benefit her. She tried it twice and went back to Salsalate. AR 612. "Her headaches are manageable as long as she does not strain or do a lot of activity. Unfortunately, she has to be active to some point and therefore the headaches do flare up at times. She does have some coordination trouble and may stumble at times or may veer off to one side or the other." She was not sure she wanted to revisit the surgery issue but noted that the headaches at times were debilitating. "When they occur, she seems to lose her train of thought and is very scatter brained." She took a

combination of Tylenol, aspirin, and caffeine up to 8 a day. She took up to 100 mg. of Tylenol at times for her headaches.

Dr. Finley recorded that Webb had recently been diagnosed with sleep apnea, was to be put on BIPAP, but did not have a machine yet. AR 612. She snored, had apnea, was not rested in the morning, had excessive daytime somnolence, and her legs moved all night long. AR 612. She had a slight headache when she got up in the morning, that would get a little better, then recur around 1 p.m., and "she has to take something or it gets real bad for 3:00 or 4:00 in the afternoon. If it gets too bad then the patient, despite taking medication, can't really get on top of the pain." AR 612. Her husband said her worst headaches were around 3:00 in the morning. AR 612. Some headaches were worse with light, but sound did not bother her. "She does feel that she is depressed," and said she did well on Wellbutrin and Celexa, with Hydroxyzine p.r.n. AR 612. She did not necessarily feel she had to take the hydroxyzine on a regular basis. AR 612.

Dr. Finley's review of systems was positive (indicated by boldfaced items in the list) for exercise intolerance, snoring, apnea, blurred vision, dizziness, dry mouth, dysphagia, menorrhagia, muscle aches and weakness, arthralgias/joint pain and morning stiffness, dizziness, weakness, and frequent or severe headaches, anxiety, stress, sadness/depressed mood and sleep disturbances, and tremor. AR 612.

Dr. Finley reported that on examination she was in no distress and morbidly obese. AR 613. She was oriented and she had intact recent and

remote memory and fund of knowledge. Attention span, concentration, receptive and expressive language were normal; and she had appropriate mood and affect. AR 613. Dr. Finley's cranial nerve examination was unremarkable. AR 613. Dr. Finley's motor exam was normal for range of motion and strength. Webb had full range of motion in both ankles. AR 613. Dr. Finley reported all reflexes normal; he reported normal motor coordination, sensation, gait, posture, stability, heel walk, tandem gait, and mobility. AR 613. She ambulated independently. AR 613.

Dr. Finley assessed "known history of Chiari 1 malformation with a multitude of neurologic symptomatology potentially related to that. This was initially evaluated back in 2003 and the patient declined surgical intervention." AR 613. Dr. Finley assessed increasing problems with headache symptomatology, some of which may be related to her Chiari abnormality and some of which may have some sort of vascular component or musculoligamentous or tension type etiology, and further evaluation and attempts at treatment were indicated. AR 613. She had known obstructive sleep apnea (OSA) and her worst headaches, which are around 3 a.m., were potentially related to that. Certainly, treatment for OSA was indicated. AR 613.

She had difficulty with periodic limb movement symptomatology. She had depression and was on medication for it. She had a remote but not real active migraine headache problem. AR 613. She was having coordination difficulty with stumbling at times or veering to one side or the other which could be related to her Chiari malformation. AR 613-14. She had intermittent

69

trouble coordinating her thoughts and was often scatter brained when headaches were bad. AR 614.

Dr. Finley formulated a treatment plan: Get her BIPAP machine and start on that, try Topamax, stay active, return in four months. "We will try to review the patient's MRI scan." AR 614. Diagnoses were chiari malformation, headache, migraine without aura, and obstructive sleep apnea syndrome. AR 614.

On July 10, 2014, Dr. Hogue saw Webb to discuss her antidepressants, side-effects from Topamax, and her hidradenitis. AR 616. Webb reported increased problems with moods swinging quite a bit. AR 616. She notes a family history of bipolar and said she seems to swing from mood to mood very quickly. When she gets irritable, she can snap off at people in the family pretty easily. We talked about different medications she has tried. I told her I have been very comfortable through the years with Lithium; it seems very smooth in terms of its ability to stabilize the mood. We can use it with Topamax; we just have to watch the Lithium level pretty closely.[21] She also wonders if it is possible to see a dermatologist for her problems with hidradenitis. AR 616. Dr. Hogue noted, "Very flat affect today." AR 618. She had normal mood, was oriented, and had good judgment. AR 618. She ambulated normally. AR 618. Dr. Hogue assessed hidradenitis, mood swings, and depressive disorder, and

---

[21] Lithium is used to treat and prevent mania in people with bipolar disorder. https://medlineplus.gov/druginfo/meds/a681039.html, accessed February 16, 2018.

he prescribed Lithium, increasing to 900 mg. over the course of a week. AR 618. Dr. Hogue wanted to see the patient after two weeks to get a Lithium level and see how she was doing. AR 619.

On September 8, 2014, Webb saw Christopher Gasbarre, D.O., in Spearfish, for her hidradenitis. AR 648-50. The HPI shows a report of painful nodule present approximately three years in the left axilla. "She does develop similar lesions on the breasts and in the bilateral axillae." The problem list was reviewed - obesity, mood swings, anxiety, depressive disorder, headache, migraine without aura, Chiari malformation, sinusitis, acute bronchitis and bronchitis, carbuncle, hidradenitis, arthritis, lateral epicondylitis, sleep apnea and obstructive sleep apnea syndrome, and numbness of hand. AR 648.

The surgical history was reported as appendectomy, cholecystectomy, left ankle ligament reconstruction, and tubal ligation. AR 648. Medications were Doxycyline, Headache Relief OTC medication, Lithium 600 mg. a day, Salsalate, Topamax 75 mg. twice a day, ventolin inhaler, Wellbutrin 300 mg. a day, and Zyrtec. AR 649.

Height and weight were recorded as five feet, seven inches, and 342 pounds. The physical examination report is mostly unreadable other than something affecting "inframammary folds. There is also an inflamed papule on the left breast. There is an inflamed cystic nodule in the left axilla." AR 650. Treatment consisted of a Kenalog injection of "1 hidradenitis" and a prescription for Doxycycline 100 mg. twice a day for 30 days. AR 650.

Dr. Gasbarre's discussion note is unreadable except for, "I discussed treatment options with her, which would include continued topical antibacterial washes. I also discussed longterm use of tetracycline class antibiotics and I would recommend a trial of Doxycyline 100 mg. b.i.d ...." AR 650. He recommended a Kenalog injection as a first approach. AR 650.

On September 26, 2014, Webb saw Dr. Arban. AR 714. She complained of leg and foot cramps and restless leg. "Wakes up exhausted." She wanted treatment for RLS. "Headache mgmt by Dr. Finley, no changes overall but chronic problem aggravated by lack of sleep." AR 714. Exam was negative except for morbid obesity. Gait and station were normal. AR 717. Dr. Arban assessed restless legs syndrome, depressive disorder, and headache. AR 717. He discussed a trial of Ropinrole and discussed stretching and sleep hygiene. He continued Bupropion. He noted that the headache was treated by Dr. Finley. AR 717.

On October 2, 2014, Dr. Finley reported a follow-up visit. AR 673. Chief complaint was headaches. AR 673. She stated that things went well for about three months. AR 675. The last one and one-half months she had had an increase in headaches, but not as severe as before. Head pain was "7 out of 10 right now." AR 675. Dr. Finley reviewed the diagnoses and symptoms, Chiari malformation and obstructive sleep apnea syndrome with (subjective) difficulty coordinating her thoughts and feeling scatter brained at times. AR 675. In addition she had clinical symptoms concerning for periodic limb movement disorder. She stated that overall she was doing all right. She

thought Topamax 75 mg. twice a day actually worked fairly well for awhile but the benefit slowly reduced, although she still thought that the severity of her headaches was less as she continued to take Topamax. Recently she had a headache which, in the past, would have been really severe, but she was able to struggle through it, which prior to Topamax she would not have been able to do. AR 675. Dr. Finley noted that she had not been tried on a lot of other medications for her headaches. She had been on Amitriptyline for insomnia in the past and was not sure why the medication was stopped. AR 675.

She noted having intermittent leg cramps from the knee region down, which used to be primarily on the left but now was in both legs. The calves could cramp or the toes curl under "and she may have flexion of the foot area that is very problematic." AR 675.

She noted some restless leg symptoms. Whenever she lay down to go to bed or watch a movie "her feet will just seemingly automatically start rubbing against each other and this can be exhausting for her although she can stop it. If she sits up and rests quietly, then her legs do not necessarily feel the urge to move. She has been told by family members that her legs are going "all the time" when lying down and sleeping. She had significant sleep apnea but was unable to afford a BIPAP machine. "She has also been told that her hand seems to shake a little bit," mostly on the right but it could happen bilaterally and once present lasted all day. "It does impact her fine motor control at times" and was likely more prominent when she was tired. AR 675. On the review of

systems, Webb endorsed [ROS items that are boldfaced indicate items she endorsed; due to poor copy these are not clear]. AR 676.

On exam she was morbidly obese and had a Mallampati score IV for narrowed posterior pharynx. AR 676. Dr. Finley reported a normal examination of cranial nerves, motor function, reflexes, coordination, and gait, posture and mobility. AR 676. Her attention and concentration were normal, memory was intact, and mood and affect were appropriate. AR 676. Dr. Finley assessed known history of headache symptomatology likely related to tension-type etiology and also to migrainous etiology, improved on Topamax, with benefit not quite as efficacious as it was initially. AR 676. He assessed history of OSA "but she is not treating herself as she cannot afford her BIPAP machine." AR 676. Dr. Finley assessed probable restless leg syndrome and periodic limb movement disorder and gave her Requip.[22] He assessed a history of depression, history of coordination difficulty and stumbling at times, Chiari 1 malformation, trouble in the past coordinating her thoughts and somewhat scatter brained when her headaches are real bad, and some history of mild tremor that came on recently. AR 677. Dr. Finley planned to try the patient on Pamelor.[23] She would likely transition onto Requip "once we see how she is

_____

[22] Requip (Ropinrole) is a dopamine agonist used to treat Parkinson's and restless legs syndrome.
https://medlineplus.gov/druginfo/meds/a698013.html, accessed February 16, 2018.

[23] Pamelor (Nortriptyline) is a tricyclic antidepressant used to treat depression. It is also sometimes used to treat panic disorders, post-herpetic neuralgia, and to help people stop smoking.

going to do on her nortriptyline." She would likely be tapered off Topamax once she got to a therapeutic range on Pamelor or nortriptyline. AR 677.

Dr. Finley diagnosed headache, migraine without aura, Chiari malformation, obesity, obstructive sleep apnea syndrome, restless legs, and tremor. AR 677.

On October 29, 2014, Webb had an appointment with Dr. Arban. She told the clinic nurse that she was losing her Medicaid at the end of this week and was on some medication that she "will not be able to quit cold turkey." She mainly had questions regarding her Lithium and Salsalate. She was "under good control with prior meds." AR 711. Dr. Arban reviewed her problems: obesity, mood swings, anxiety, depressive disorder, restless legs, headache, migraine without aura, Chiari malformation, sinusitis, bronchitis, carbuncle, hidradenitis, arthritis, lateral epicondylitis, sleep apnea and obstructive sleep apnea syndrome, tremor, and numbness of hand. AR 711. Dr. Arban spent most of the 25-plus minute visit discussing her conditions, medications, and management. AR 713. He prescribed a 90-day supply of Pamelor and Bupropion. AR 713-14. He discussed the headache treatment prescribed by Dr. Finley, transitioning to Nortriptyline, and said he would assist the patient as this developed. AR 714.

---

https://medlineplus.gov/druginfo/meds/a697012.html, accessed February 16, 2018.

On March 16, 2015, Webb saw Dr. Arban for medication refills, a new referral to Dr. Finley, and an Ob-Gyn exam. AR 707. Dr. Arban reported an unremarkable physical examination other than obesity. AR 709-10. She was oriented, cooperative, and had normal mood and affect. AR 709. She had normal motor strength and gait and no skin rash. AR 710. He spent "25-plus minutes with 50% or more in counseling and coordination of care regarding RLS, bipolar disorder, and chronic pain." AR 710. Dr. Arban assessed depressive disorder, headache, tobacco user, asthma, and arthritis. He replaced Bupropion SR with Bupropion XR "as the morning dosing usually does not disturb sleep." He counseled Webb about [cigarette] reduction as an aid to eventual cessation of smoking. AR 710.

On April 3, 2015, Lori Fritz, C.N.P., saw Webb for headache, cough, sore throat, and cold symptoms with body aches and lethargy for approximately a month. AR 704. On exam she was morbidly obese, had sinus tenderness and post nasal drip. AR 706. She had normal mental status. AR 706. Ms. Fritz prescribed Augmentin and a Prednisone burst and refilled Symbicort. AR 707.

On April 13, 2015, Webb saw Dr. Finley for follow-up. AR 720. Her primary insurance was Medicaid. AR 720. She was accompanied by her husband. AR 722. "She feels she is doing all right." AR 722. Dr. Finley reviewed her treatment plan: when last seen she was to be put on Pamelor and considered for transition to Requip, and was to be tapered off Topamax. She lost Medicaid in November and could not stay on her medications and ultimately went off Topamax and she could not tolerate the side-effects. She

went on Nortriptyline but it caused nausea and dry mouth as she worked her way up to 50 mg. so she weaned off it in February. She really didn't feel it helped that much. AR 722.

> Currently, her headaches are occurring almost daily. They are in the back of the head on the right more than left, and also in the right head region. The headaches are present all the time. They are worse around 3:00 in the morning and will awaken her. They are a steady constant type pain like her head is in a "vise." She saw Dr. Arban a couple of weeks ago and was put back on Salsalate and that helped to some extent with her headache pain but does not alleviate it completely. She still has not pursued getting on CPAP and previously had not been able to afford it. She had been tested and documented as having sleep apnea prior to moving to Rapid City from the Colorado area.... Records are available from the hospital in Colorado; however, the patient has not been greater than year without it and reevaluation would be indicated. She is told that certainly her headache symptoms could be impacted by her untreated sleep apnea which when last evaluated was severe.... Her restless leg symptoms are still bothering her at times and she never started the Requip...She notes that she is very active during her sleep and will do activities such as taking of her jewelry.... She also notes ... a little bit more trouble with swallowing. She is choking at times and this is not necessarily related to eating... Over the last few weeks this has been occurring 2 to 4 times per day. The coughing that results from this inhalation of saliva can increase her headache. She was wondering if she could see a chiropractor for back trouble in view of [her] Chiari malformation.

AR 722-23.

Dr. Finley reported items endorsed on the ROS: fatigue, exercise intolerance, snoring, apnea, dizziness, arm pain on exertion, lightheaded on standing, shortness of breath, indigestion, nausea, dysphagia, wakes in the night "to go to the bathroom?," muscle aches and weakness, arthralgias/joint pain and morning stiffness, dizziness, numbness, tremor, weakness, frequent or severe headaches, restless legs, anxiety, stress, sadness/depressed mood, and sleep disturbance. AR 723.

Dr. Finley reported a normal physical examination other than morbid obesity, abnormal pharynx (Mallampati score IV, narrowed posterior pharynx), abnormal tandem gait, and unsteady station. AR23-34. She had normal attention span and concentration, intact memory, and appropriate mood and affect. AR 724. She had normal strength in the extremities and normal coordination. AR 724. She ambulated independently. AR 724. Dr. Finley's assessment was increasing headache symptomatology, probable migraines, with severe sleep apnea possibly contributing to them, Chiari malformation, obstructive sleep apnea syndrome previously diagnosed but never went on CPAP and now re-evaluation was indicated, some trouble with obesity, restless leg syndrome, some trouble with dysphagia and evaluation would be indicated, right-side head pain of a neuralgic nature, and anxiety symptomatology being followed by her primary care physician. AR 724.

Dr. Finley's treatment plan was to refer to speech therapy to evaluate her swallowing trouble and a possible swallowing study, undergo repeat nocturnal polysomnogram to reassess her sleep trouble, and try to get her onto CPAP to see if this will help with headaches. AR 825.

**E.    Medical Literature**

Webb submitted medical literature to the Appeals Council. AR 376-92. The sources of information regarding Hidradenitis Suppurativa were the Hidradenitis Suppurativa Foundation on-line (AR 379) and the American Academy of Dermatology website (AR 380).

Sources of information regarding Chiari Malformation was the Chiari Institute's website (AR 381), National Institute of Neurological Disorders and Stroke website (AR 387), and a patient-education website, "Conquer Chiari" (AR 392).

## F.     Opinion Evidence

James Wanstrath, Ph.D., non-examining DDS psychologist, opined that "While clmnt may be experiencing headaches at listing level frequency ... MER does not reflect listing level severity." AR 108.

Dr. Wanstrath opined on September 9, 2013, that Webb experienced mild restriction of activities of daily living; moderate difficulties maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration. AR 109. He stated that evidence did not establish the presence of the "C" criteria. AR 110. Dr. Wanstrath opined mental RFC: not significantly limited ability to carry out very short and simple instructions; moderately limited ability to carry out detailed instructions; not significantly limited ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; not significantly limited ability to sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and make simple work-related decisions, and complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods. AR 114.

Dr. Wanstrath opined that ability to interact appropriately with the general public was moderately limited, ability to ask simple questions or request assistance was not significantly limited, and ability to accept instructions and respond appropriately to criticism from supervisors was moderately limited. AR 114. He opined that ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was moderately limited, and ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness was not significantly limited. AR 115.

On September 11, 2013, Michael Canham, M.D., non-examining DDS consultant, opined RFC for light work, i.e., 20 pounds occasionally and 10 pounds frequently, with standing, walking, and sitting a total of six hours in an eight-hour workday, with unlimited pushing and pulling other than the limitations for lifting and carrying. AR 111. He opined postural limitations: unlimited climbing of ramps and stairs, occasional climbing of ladders, ropes, and scaffolds; unlimited balancing, occasional stooping, occasional kneeling, frequent crouching, and occasional crawling. He opined no manipulative, visual, or communicative limitations. He opined environmental limitations: avoid concentrated exposure to extreme cold and extreme heat. AR 112. She should avoid concentrated exposure to gases, fumes etc., as exacerbating factors of asthma, and avoid unprotected heights due to headache-induced

impacts with depth perception. AR 113. She was unlimited with respect to wetness, humidity, noise, and vibration. AR 112.

On February 19, 2014, Jerry Buchkoski, Ph.D., non-examining DDS psychologist, agreed with Dr. Wanstrath's assessments. AR 164-66.

On February 24, 2014, Gregory Erickson, M.D., agreed with Dr. Canham's assessments. AR 167.

On March 26, 2014, Dr. Hogue completed a physical RFC questionnaire. AR 586-88 (duplicate at 652-54.). Dr. Hogue listed Webb's diagnoses: Chiari 1 malformation, hidradenitis suppurativa, and social anxiety disorder. AR 586. Prognosis was stable. AR 586. Dr. Hogue provided estimates of functional limitations resulting from these impairments. Walking was limited due to calf cramps to approximately one block.[24] She could continuously sit 20 minutes and stand five minutes, a total of about two hours each in a work day. Dr. Hogue's answer to the question, "Does your patient need a job which permits shifting positions at will from sitting, standing or walking?" was "cannot work." Asked how often she would need to take unscheduled breaks during an 8-hour work day, he opined "frequently." AR 586. Asked how long she would have to rest before returning to work, Dr. Hogue opined "unpredictable." AR 587. He stated that she did not need to elevate her legs with prolonged sitting or use a cane for occasional standing or walking. Asked how many pounds she could safely lift and carry, he indicated 10 pounds frequently but objected to the questions in the questionnaire: "I believe she cannot work Questions Don't

---

[24] Dr. Hogue used the tilde symbol to indicate "about" or "approximately."

Address That." To the question whether she had significant limitations of ability to do repetitive reaching, handling or fingering, he circled "no." Asked the percentage of the working day that his patient could perform manipulative activities, he reiterated that she was "not recommended to work." AR 587.

Asked about environmental factors, Dr. Hogue wrote, "Pt has Social Anxiety Disorder & Frequent Headaches Balance off at times she has been told not to work because of her "nervous breakdown. I am not in a position to Dispute This." AR 588. Dr. Hogue stated that Webb's impairments were likely to produce "good days" and "bad days." AR 588. He stated that he would anticipate that her impairments or treatment would cause her to be absent from work more than twice a month. AR 588.

Dr. Hogue also completed a "Medical Opinion Questionnaire (Mental Impairments)." AR 740-42. He said he treated her for 6-7 months and her prognosis was stable. AR 740. He stated that Webb had social anxiety disorder and that her ability to interact with the general public was fair; ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness was good; and ability to travel in unfamiliar places and use public transportation was "poor or none." AR 740. Asked to assess mental abilities and aptitudes needed to do any job, Dr. Hogue assessed "poor or no" ability to maintain regular attendance and be punctual, work in coordination with or proximity to others, complete a normal workday and workweek without interruptions from psychologically based symptoms, and respond appropriately to changes in a routine work setting. AR 741.

Dr. Hogue opined that she had unlimited or very good ability to understand, remember, and carry out detailed instructions; set realistic goals or make plans independently; and "prob OK" ability to deal with the stress of semiskilled and skilled work. AR 742. He commented "better away from people - some days OK but stays away intentionally from crowds because this is a trigger." He stated that he would expect her to be absent from work twice a month at least. AR 742. He opined she had good ability to maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and deal with normal work stress. AR 740-741. He opined she had fair ability to interact appropriately with the general public, maintain attention for a two-hour segment, and get along with coworkers or peers without unduly distracting them or exhibiting behavior extremes. AR 740-41.

On December 4, 2014, Ronald P. Houston, Ph.D., completed the "Psychiatric Review Technique" form (PRTF). He listed the categories upon which medical disposition was based: Depression, Social Anxiety, and Agoraphobia. AR 655. He assessed the degree of limitations as "None" for all "B" criteria: restriction of ADLs; difficulties maintaining social functioning; difficulties maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration. AR 665. He opined that the "C" criteria were not met. AR 666. Dr. Houston referred to medical evidence from the Family Medicine Center, Dr. Finley, and Regional Medical Clinic. AR 667.

Dr. Houston opined that Webb's mental impairments did not affect her ability to understand, remember, and carry out instructions. AR 669. He opined that her impairments had no effect on her ability to interact appropriately with supervision, co-workers, and the public, or to respond to changes in the routine work setting. AR 670. He opined that no other capabilities were affected. AR 670.

The ALJ called Ronald P. Houston, Ph.D., to provide forensic evidence. AR 64-66. Dr. Houston's curriculum vitae is at AR 214-19. Dr. Houston testified that he had been given "Exhibits 1F through 25F" to review, and some additional evidence, "let's see what those are." AR 66-67. The ALJ stated that Dr. Houston had also been given Exhibits 27F and 28F. AR 67.

Dr. Houston stated that there was "sufficient objective medical and other evidence" to allow him to form opinions about the nature and severity of Webb's condition from 2012 to the present. He stated that the records showed affective and anxiety disorders. AR 68. Dr. Houston assessed "mild" restriction of activities of daily living; "moderate" difficulties maintaining social functioning; "mild" difficulties maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration, defined as two weeks. AR 69. Dr. Houston opined that Webb was not completely unable to function independently outside of the home, so the "C" criteria (ref. 20 CFR Part 404, Subpart P, Appendix 1, Listing 12.00) were not established. AR 69. Dr. Houston stated, "the depression is more secondary to the anxiety." AR 69.

The ALJ turned Dr. Houston over to claimant's counsel, who asked
Dr. Houston if he thought there were limitations in terms of interaction with
others. AR 70. Dr. Houston responded, "I don't really know what "poor" and
"none" means. But I can say that given the social anxiety and the difficulty
being around others and leaving the home ... it's going to create some level of
anxiety in working around coworkers, the public, and supervisors." AR 70. The
ALJ asked, "if this individual were not required to have regular interactions
with people, if they could go into work and ... greet people and then go to their
work stations and work independently ... [w]ould they be experiencing these
same limitations ...?" to which Dr. Houston answered "no." AR 71.

On July 20, 2015, Barry Brown, the ALJ's vocational expert (credentials
at AR 367-68), was asked to identify jobs that matched the hypothetical RFC
presented by the ALJ: an individual able to lift 20 pounds occasionally and 10
pounds frequently; stand, walk, and sit "all six hours in an eight-hour work
day" with normal breaks; with no limitations in the climbing of ramps and
stairs; who could frequently balance and occasionally stoop, kneel, crouch, and
crawl; could be exposed occasionally to unprotected heights or fastmoving
machinery; and tolerate brief, casual interactions with coworkers and
supervisors but not work with the public. AR 93. The ALJ said the individual
could tolerate the supervisor giving them basic unskilled instructions, possibly
15, 20 minutes in the beginning, as the job was learned. AR 94. Mr. Brown
identified light, unskilled jobs, specifically the job of merchandise marker, DOT
209.587-034, with 271,000 jobs in the United States, and "some housekeeping

cleaner jobs," DOT 323.687-014, with at least 136,000 jobs in the United States. AR 94. The VE was not asked and did not volunteer numbers of jobs in the region or several regions of the country. The VE said his testimony was consistent with the *Dictionary of Occupational Titles*. AR 95.

In response to the ALJ's second hypothetical RFC, Mr. Brown opined that there were no matching jobs: sit, stand, and walk two hours in an eight-hour day, take a ten-minute break each hour or, alternatively, be absent three or more days a month. AR 95. In response to Webb's attorney's question, Mr. Brown opined that the employer-tolerated absenteeism threshold for an unskilled worker was one absence every month or every other month, between six and twelve days a year. AR 96.

**G.    The ALJ's Decision**

The ALJ, Debra J. Denney, denied the claim on August 16, 2015. AR 43. Sequential evaluation findings were as follows:

Step one: The claimant had not engaged in substantial gainful activity (SGA) since August 15, 2012, the alleged onset date (AOD), and had not performed any work since the AOD. AR 34.

Step two: Severe impairments were depression, anxiety, morbid obesity, obstructive sleep apnea, Chiari I malformation, and hidradenitis suppurativa. AR 34.

Non-severe impairments were asthma; history of reconstructive surgery of the left ankle with post-surgical complications of cramping, pain, paresthesias, and EMG study revealing a resolving peroneal mononeuropathy,

asymptomatic by September 2012 except for sensation at "a few branches of the sural nerve;" restless legs; and mild bilateral lateral epicondylitis. AR 35. Conditions that were not medically determined were hip and lower back pain and longstanding knee problems alleged but not documented. AR 35.

Step three: No impairment or combination of impairments met or medically equaled a listed impairment. AR 35.

Residual functional capacity: Light work, frequently balance; occasionally stoop, kneel, crouch, and crawl; occasional exposure to unprotected heights and fast-moving machinery; would do best if allowed to work independently, but able to tolerate brief, casual interactions with coworkers and supervisors; and should not work with the public. AR 36.

Step four: The claimant was unable to perform past relevant work (PRW) as a charge account clerk, order clerk, and cashier II. AR 41.

Step five: The claimant's RFC matched the requirements of representative unskilled light occupations such as merchandise marker (271,000 positions in the U.S.) and housekeeping cleaner (136,000 positions in the U.S.). AR 42. These were significant numbers. AR 43. Therefore, she was not disabled. Id.

## H.    Issues Before This Court

In support of her motion to reverse the Commissioner's decision, Ms. Webb raises six assignments of error:

1.    The agency and the ALJ erred in determining the onset date of Ms. Webb's disability;

2.    The ALJ erred in failing to identify severe musculoskeletal impairments at step two;

3.    The ALJ erred in failing to order consultative examinations;

4.    The ALJ erred in assessing Ms. Webb's credibility;

5.    The ALJ gave insufficient weight to opinions of Ms. Webb's treating physicians;

6.    The ALJ applied an incorrect standard to determine availability of jobs which Ms. Webb's RFC would allow her to do at step five.

Ms. Webb requests this court to reverse the Commissioner's decision denying benefits and order an immediate award of benefits. Alternatively, she requests an order reversing and remanding for further development of the record and reconsideration of the issues raised in her appeal. The Commissioner seeks an order affirming the agency's denial of benefits to Ms. Webb.

## DISCUSSION

**A.    Standard of Review.**

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue,

529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Woolf v. Shalala 3 F.3d 1210, 1213 (8th Cir. 1993). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311. Where "[s]everal errors and uncertainties in the opinion [occur], that individually might not warrant remand, in combination create sufficient

doubt about the ALJ's rationale for denying" benefits, remand for further proceedings before the agency is warranted. <u>Willcockson v. Astrue</u>, 540 F.3d 878, 880 (8th Cir. 2008).

**B.      The Disability Determination and the Five-Step Procedure.**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  <u>Smith v. Shalala</u>, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. <u>Bartlett v. Heckler</u>, 777 F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as follows:

Step One:    Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, she is not disabled and the inquiry ends at this step.

Step Two: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments

significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

Step Three: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett 777 F.2d at 1320, n.2. This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

Step Four: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows her to meet the physical and mental demands of her past work, she is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow her to meet the physical and mental demands of her past work, the ALJ must proceed to Step Five.

Step Five: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.     Burden of Proof.

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof

shifts to the Commissioner at step five.  Clark v. Shalala, 28 F.3d 828, 830 (8th

Cir. 1994).  "This shifting of the burden of proof to the Commissioner is neither

statutory nor regulatory, but instead, originates from judicial practices."

Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting at step

five has also been referred to as "not statutory, but . . . a long standing judicial

gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir.

1987).  Moreover, "[t]he burden of persuasion to prove disability and to

demonstrate RFC remains on the claimant, even when the burden of

production shifts to the Commissioner at step five." Stormo v. Barnhart 377

F.3d 801, 806 (8th Cir. 2004).

## D.    Did the ALJ Err in Determining the Disability Onset Date?

Ms. Webb argues the ALJ erred in determining August 15, 2012, to be

the disability onset date.  The ALJ wrote: "claimant has not engaged in

substantial gainful activity since August 15, 2012, the alleged onset date."

AR34.  Thus, the ALJ did not specifically find August 15, 2012, to be the

disability onset date.  The ALJ merely noted this was the "alleged" date of

onset.  Furthermore, although the ALJ noted that Ms. Webb did not engage in

SGA after August 15, the ALJ never addressed if there was an earlier date at

which Ms. Webb's SGA stopped.

Because Ms. Webb alleged in her application and elsewhere that she felt

she was disabled as of June 15, 2011, Ms. Webb argues the ALJ should have

made affirmative determinations about (1) the disability onset date and (2) the

last date Ms. Webb engaged in SGA. Specifically, Ms. Webb alleges that from March 7, 2012, (the date of her ankle surgery), through August 15, 2012, she did not engage in SGA because that period constituted an unsuccessful work attempt.

The Commissioner points out that Ms. Webb alleged a date of onset of disability in her application of August 15, 2012. Furthermore, the Commissioner argues Ms. Webb's lawyers at the agency level twice represented to the ALJ that the disability onset date was August 12, 2012. Thus, the Commissioner appears to argue the responsibility for the mistake, if any, in determining the disability onset date rests with Ms. Webb, not the ALJ.

An ALJ's mistake of law cannot be excused by the fact that the claimant made a similar mistake of law. Walker, 141 F.3d at 853 (mistakes of law require reversal). This is especially true where, as here, the agency proceedings are non-adversarial. Snead v. Barnhart, 360 F.3d 834, 838 (8th 2004). Accordingly, the court addresses the merits of Ms. Webb's argument.

Disability onset date is the first day an individual meets the requirements for disability under the Social Security Act. SSR 83-20. Disability onset date is determined by factors such as the individual's allegation, the work history, and the medical evidence. Id. "The starting point in determining the date of onset of disability is the individual's statement as to when disability began." Id. The date the impairment caused the claimant to stop work is also of great significance. Id. The claimant's medical records are also "basic" to the determination. Id.

Ms. Webb's argument raises three alternative dates to consider for the disability onset date: June 20, 2011, (the date mentioned by Ms. Webb in her application—AR290); March 7, 2012 (the date Ms. Webb left work for her ankle surgery—AR405, 431); or August 15, 2012 (the date alleged by Ms. Webb in her application—AR290--and the date found by the ALJ—AR34). In order to evaluate these potential dates of disability onset, a review of medical and work records is necessary.

Ms. Webb injured her ankle on June 20, 2011.[25] AR463. There are no records before this court indicating Ms. Webb ceased working between June 20, 2011, and March 7, 2012.

On March 7, 2012, Ms. Webb took time off work to have reconstructive surgery on her left foot ligaments. AR405, 431. Ms. Webb returned to work on restricted duty April 11, 2012. AR402, 442. Between June 11, 2012, and August 15, 2012, she missed work for 12 physical therapy sessions and orthopedic surgeon appointments. JSMF 103-11.

On July 27, 2012, Dr. O'Toole placed Ms. Webb on a temporary leave of absence from work due to her complaints of increased pain and cramping in her left calf. AR424. Dr. O'Toole referred Ms. Webb to Dr. Martin for electrodiagnostic testing of the left lower extremity and physiatric consultation. Id. On July 30, 2012, Ms. Webb saw Dr. Amber Steves for the first time and

---

[25] Ms. Webb stated it was June 15, 2011, in her disability application, but the cited medical record records it as June 20.

Dr. Steves filled out Family and Medical Leave Act paperwork for Ms. Webb. AR479-82.

On August 15, 2012, Dr. O'Toole released Ms. Webb back to work with restrictions after getting the results of the electrodiagnostic testing. AR421-22. Ms. Webb's work ended August 20, 2012.[26] JSMF 13, 17. On August 30, 2012, Dr. O'Toole opined that Ms. Webb had reached maximum medical improvement and made avoiding stairs and walking as tolerated permanent work restrictions. AR417.

Of the above-mentioned potential disability onset dates, the date cannot be June 20, 2011. Ms. Webb worked for longer than six months at an SGA level ($1,010 or more per month) between June 15, 2011, and March 7, 2012. The Commissioner will not consider any work attempt lasting for longer than six months to constitute an unsuccessful work attempt. 20 C.F.R. § 4041574(c)(4); Program Operations Manual System (POMS) DI 24005.001. From June 15, 2011, the date of Ms. Webb's ankle injury, to March 7, 2012, the date she took off work to have surgery on her ankle, is nearly 9 months, which is longer than six months.

The court turns to consideration of March 7, 2012, as the next potential disability onset date. From March 7, 2012, to August 15, 2012, is a period of 5 months and 8 days, so it is less than the 6-month cut-off for unsuccessful work attempts. There are two questions to answer as to this period: did

---

[26] There is an inconsistency in the record as to the date Ms. Webb's work ended.

95

Ms. Webb engage in SGA during this period and was this an unsuccessful work attempt?[27]

In 2012, Ms. Webb earned $8,230.67 from her then-employer, Center Partners, Inc. AR285. Of this total, $1,818.00 was earned in the third quarter (July-September). AR280. That means $6,412.67 was earned in the first two quarters of the year. Compare AR285 with AR280.

Ms. Webb filled out a Work History Report that sheds some light on this issue. AR315-26. In that document, Ms. Webb reported she worked as an application specialist [for Center Partners, Inc.], from May, 2011, to September, 2012. AR315. She worked full time (4 10-hour days) at this job for an hourly wage of $9.25. AR316. Thus, for one week, Ms. Webb's gross pay would have been $370 at this job ($9.25 x 40).

From the medical records, the court pieces together that Ms. Webb did not work from March 7, 2012, to April 11, 2012. AR401, 405, 431, 442. She was also off work from July 27, 2012, to August 15, 2012. AR421-22, 424. For the first two quarters of the year, then, Ms. Webb worked 21 weeks; 9.5 of these weeks occurred before March 7. If she was working full time from January 1 to March 6, Ms. Webb would have earned $3,515 (9.5 weeks x $370 weekly pay). Thus, of Ms. Webb's $6,412.67 earnings in the first two quarters

_____

[27] The following calculations are rough estimates based on the established record which contains numerous inconsistencies as to the date Ms. Webb's work ended and incomplete wage information for the specific time period in question. The calculations are done in an attempt to determine whether Ms. Webb engaged in SGA from March 7, 2012, to August 15, 2012. The unsuccessful work attempt analysis only applies to a less-than-six-month-period in which the claimant did work at an SGA level.

of 2012, $2,897.67 were earned in the second quarter, that is, from April through June ($6,412.67 total first half earnings - $3,515 earnings from Jan. 1 – March 6 = $2,897.67 earnings from April 12 – June 30).

Ms. Webb worked 11 weeks and 3 days (11.4 weeks) between April 12 and the end of the second quarter (June). Her total earnings for this period, $2,897.67, divided by 11.4 weeks' work, equates to $1,016.72 per month (4 weeks). This is just narrowly above the $1,010 set by the Commissioner for SGA. It would appear that Ms. Webb did engage in SGA from April 11 to June 30, 2012. As explained next, she would have also met the requirements for SGA for the third quarter of 2012.

Ms. Webb worked approximately 5 weeks in the third quarter (July 1-26 and August 16-20), according to the information in the record. All $1,818 her employer reported paying her for the third quarter would have had to be earned after June 30. The court notes that Ms. Webb stated in her Work History Report that she worked until September, 2012. AR315. This is at variance with the last day of work she reported in her application. Compare AR315 with AR290. Ms. Webb also worked at the SGA level in the third quarter ($1,818 total earnings ÷ 5 weeks = $363.60 per week; $363.60 x 4 weeks = $1,454.40/month).

The normal rule is that if a claimant is working at SGA levels, she does not qualify for disability benefits. 20 C.F.R. § 404.1571. However, the Commissioner has established an exception for "unsuccessful work attempts." 20 C.F.R. § 404.1574(a)(1) and (c); SSR 84-25. An unsuccessful work attempt

97

may be disregarded for SGA purposes if the claimant discontinued work after a short time because of the impairment(s). § 404.1574(c); POMS DI 24005.001. The Commissioner's field office is supposed to make the first determination of whether a claimant engaged in SGA, and then the DDS is supposed to resolve questions and discrepancies as to SGA as revealed by the claimant's disability report and work history report. POMS DI 24005.001.

An unsuccessful work attempt must be preceded by a break in the continuity of the claimant's work, defined as being out of work for at least 30 consecutive days. Id.; 20 C.F.R. § 404.1574(c); SSR 84-25. Ms. Webb's leave from her job from March 7, 2012, to April 11, 2012, satisfies this discontinuity requirement because it was a break in the continuity of her work for at least 30 consecutive days.

Following a break in continuity of work, an unsuccessful work attempt is also characterized by a period of work of less than six months. 20 C.F.R. § 404.1574(c); SSR 84-25; POMS DI 24005.001. This period of attempted work must have ended for one of two reasons: (1) the work ended because of the impairment(s) *or* (2) the work ended because special conditions that allowed the claimant to do their job were removed and the claimant could not do their job without the special conditions. 20 C.F.R. § 404.1574(c); SSR 84-25; POMS DI 24005.001.

If the work such as Ms. Webb's herein lasted longer than 3 months, but less than 6 months, she must show the work ended due to the impairment or removal of special conditions related to the impairment *and* she must show one

98

of the following: (1) frequent absences due to the impairment,

(2) unsatisfactory work due to the impairment, (3) work was done during a

temporary remission of the impairment, or (4) work was done under special

conditions related to the impairment. SSR 84-25.

Here, Ms. Webb asserts her work ended August 20, 2012, due to her

impairment(s). Between April 11 and August 20, she had frequent absences for

physical therapy and doctor appointments. JSMF 103-11. She also missed

over two weeks of work due to flare-ups in her ankle post-operatively.

AR421-22, 424. If the ALJ found these conditions to satisfy the above-

discussed requirements, the prerequisites for finding Ms. Webb's work from

April 12, 2012, to August 20, 2012, to be an unsuccessful work attempt may

be met. On this record, there are no findings.

Although the field office was required to, and did (AR290), request

Ms. Webb to fill out a Work History Report, no analysis of that data appears to

have been made by either the field office or the DDS. Furthermore, the ALJ's

decision contains no analysis of this issue.

Although it appears Ms. Webb's lawyers at the agency level were not alert

to this issue of a potential unsuccessful work attempt either, that does not

excuse the ALJ's failure to develop the record if necessary and rule on the issue

affirmatively. Ms. Webb told the agency from the inception of her application

she felt her disability onset date was prior to her last actual day of work.

AR290, 295. All the information necessary to determine that there was a

potential issue as to an unsuccessful work attempt was in the record and

before the ALJ, as discussed above.  The court will not make findings and

conclusions on this issue in the first place.  It is more appropriate that the ALJ

make those rulings first.  Accordingly, this court will remand this matter in

order that the ALJ may address the issue whether Ms. Webb's work from April

12, 2012, to August 20, 2012, represents an unsuccessful work attempt.

**E.      Did the ALJ Err in Failing to Identify Severe Musculoskeletal
         Impairments at Step Two?**

Ms. Webb asserts the ALJ should have found she had severe

musculoskeletal impairments at step two.  She bases this assertion on the

documented impairment of her left ankle as shown in Dr. Kevin O'Toole's

medical records and the consultative physical exam conducted by Dr. Kamer.

On August 30, 2012, 14 months after her initial left ankle injury and

nearly six months after ligament reconstructive surgery on her left foot,

Dr. O'Toole concluded Ms. Webb's left foot had reached maximum medical

improvement.  AR413.  At that time, Dr. O'Toole conducted an examination of

Ms. Webb's left lower extremity pursuant to the American Medical Association's

Guides to Evaluation of Permanent Impairment, 3rd Edition, revised.  AR412-

13.  Ms. Webb's best measurements were taken with her knee at 45 degrees of

flexion.  Id.  In this position, her dorsiflexion was to 0 degrees at the neutral

position and her plantar flexion was 60 degrees.  Id.  Inversion was 25 degrees,

and eversion was 10 degrees.  Id.  Ms. Webb's left lower extremity was intact to

light touch sensation.  Id.  Her skin color and warmth were normal.  Id.

Dr. O'Toole noted that the electrodiagnostic nerve testing he requested

from Dr. Martin showed evidence of peroneal mononeuropathy that was both

demyelinating and axonal. AR411. There was also evidence of reinnervation. Id. Ms. Webb showed decreased sensation over the lateral malleolus. AR412.

Based upon all of this data, Dr. O'Toole assigned a 21-percent total lower extremity impairment and an 8-percent whole-person impairment. AR413. He imposed permanent activity restrictions in the form of avoiding stairs and walking as tolerated. Id.

At the request of the Commissioner, Dr. Kerry Kamer conducted a consultative physical exam of Ms. Webb on August 28, 2013, a year after Dr. O'Toole's exam discussed above. AR570-76. Dr. Kamer examined, among other things, Ms. Webb's ankle joints. AR574. He did not distinguish between the findings on the left and the right and, unlike Dr. O'Toole, he did not record precise range of motion in terms of degrees, but rather expressed ability to move as a range. For example, where Dr. O'Toole found Ms. Webb had 0 degrees range of motion for dorsiflexion, Dr. Kamer wrote Ms. Webb had "0-20 degree" range of motion for dorsiflexion. Compare AR412-13 with AR574. Similarly, for plantar flexion, Dr. O'Toole documented Ms. Webb's range of motion to be 60 degrees, while Dr. Kamer documented 0-50 degrees. Compare AR412-13 with AR574. Dr. Kamer's findings were not differentiated between Ms. Webb's right and left lower extremities. AR574.

As to Ms. Webb's hips, Dr. Kamer documented that the FABER[28] Test caused hip pain on both sides. AR574. He also wrote that Milgram's test

---

[28] Dr. Kamer called the test the "FABERE" test, but this appears to be a typographical error as the medical term is actually "FABER."

caused low back pain.  Id.  Ms. Webb explains that FABER is an acronym for Flexion, ABduction, and External Rotation test; the test is designed to evaluate pathology of the hip, lumbar, and sacroiliac region.  See Docket No. 18 at p. 16 n.23 (citing https://www.physio-pedia.com/FABER_Test, last checked Feb. 16, 2018).  She explains Milgram's test involves the patient lying on her back and performing a bilateral leg lift held 6 inches above the table for 15 to 30 seconds; a positive test is one in which the patient experiences lumbosacral pain, which indicates unspecified lumbosacral pathology.  Id. at p. 16 n. 24 (citing https://wwwncbi.nlm.nih.gov/pmc/articles/PMC2647096/, last checked Feb. 16, 2018).

On May 20, 2014, Dr. Finley wrote:  "Left Ankle FROM, plantar flexion 5/5, and dorsiflexion 5/5."  AR613.

It is based upon the above findings, particularly the hip and lumbosacral exam results by Dr. Kamer and the impairment ratings by Dr. O'Toole, that Ms. Webb argues the ALJ should have found she had severe musculoskeletal impairments at step two.  Ms. Webb argues there was evidence of severe musculoskeletal impairments alone.  However, she also argues in the alternative that the ALJ should have evaluated whether her morbid obesity also contributed to musculoskeletal impairments and together constituted a severe impairment.

An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities.  Caviness v. Massanari, 250 F.3d 603, 604 (8th Cir. 2001).  However, this burden is not great.  Id.  Analysis

of an impairment can be terminated at step two only if "the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Id. See also 20 C.F.R. §§ 404.1521 & 404.1522 (an impairment is severe if it is an anatomical, physiological, or psychological abnormality shown by medically acceptable clinical and laboratory diagnostic techniques that significantly limits your physical or mental ability to do basic work activities).

The Commissioner recognizes that extreme obesity, defined as a body mass index (BMI) of 40 and over, often leads to and complicates chronic diseases of the musculoskeletal body systems. See SSR 02-1p. The Commissioner also acknowledges that obesity is a life-long disease, treatment for obesity is often unsuccessful, and even where treatment is successful, improvements in body weight and health are often very modest. Id. The Commissioner will consider obesity as a medically determinable impairment even in the absence of a diagnosis if medical records indicate a consistently high body weight or BMI. Id. The ALJ may ask a medical source to clarify whether obesity exists, but in most cases, the ALJ will simply use their judgment to determine the existence of obesity. Id.

At step two, the Commissioner will find obesity to be a severe impairment, either alone or in combination with other impairments, if it significantly limits an individual's physical or mental ability to do basic work activities. Id. The Commissioner promises "we will do an individualized

assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." Id.

There are no listings for obesity alone at step three of the analysis. Id. The Commissioner will find listing-level severity if a claimant meets the requirements of a listing by itself, or if the impairment in combination with obesity meets a listing. Id.

Here, the record shows Ms. Webb consistently had a BMI in the most extreme category above 40. The following are the records kept by various physicians as to her BMI:

| | | |
|---|---|---|
| BMI 41.9 | November 7, 2012 | AR475 |
| BMI 46.4 | May 20, 2013 | AR465 |
| BMI 46.2 | April 23, 2013 | AR471 |
| BMI 45.86 | July 2, 2013 | AR554 |
| BMI 50.6 | August 28, 2013 | AR572 |
| BMI 50.2 | April 16, 2014 | AR625 |
| BMI 53.6 | September 8, 2014 | AR650 |

In addition, she suffered from sleep apnea, a common impairment that often co-occurs with obesity. AR76, 363, 376, 555, 580-81; SSR 02-1p. The ALJ found Ms. Webb's obesity and her obstructive sleep apnea to be severe impairments, but not Ms. Webb's musculoskeletal issues noted above. AR34.

Regarding the left ankle, the ALJ noted Ms. Webb had injured the ankle and had surgery on it, however, the ALJ never mentioned Dr. O'Toole's objective impairment findings or functional limitations. AR35. Furthermore,

the ALJ concluded Ms. Webb's left ankle problems had resolved because there were "no significant associated complaints or abnormalities documented thereafter."[29] Id. However, what the ALJ did not acknowledge was that no other doctor after Dr. O'Toole ever conducted the same type of specific examination of Ms. Webb to document whether she continued to have left lower extremity impairment and, if so, to what extent. Dr. O'Toole issued permanent functional limitations of avoiding stairs and walking "as tolerated." These limitations are not revoked anywhere in the record by any other doctor.

As noted above, Dr. Kamer made some findings as to range of motion, but those findings were expressed as a range of findings and he did not distinguish between Ms. Webb's left and right lower extremities. Neither party explains what the reference to "FROM" is in Dr. Finley's records. The positive medical evidence from Dr. O'Toole was never refuted by like tests at a later date with better findings.

Furthermore, the ALJ acknowledged Ms. Webb complained of hip and lower back pain as well as longstanding knee problems, but the ALJ wrote these complaints off as lacking medical evidence. This overlooks the positive medical evidence from Dr. Kamer as to Ms. Webb's back and hip pain. Furthermore, knee problems in one who is morbidly obese are not unanticipated. The ALJ erred in discounting musculoskeletal problems as "lacking in medical evidence."

---

[29] This particular passage in the ALJ's opinion is discussed at length under subdivision H3 of this opinion, *infra.*

This case must be remanded for a reconsideration of Ms. Webb's musculoskeletal problems, alone and in combination with her obesity, to determine whether those are severe impairments at step two and beyond. If the ALJ finds them to be severe impairments, the ALJ must consider what functional limitations are imposed by the impairments. SSR 02-1p; <u>Arche Gonzalez v. Colvin</u>, 2015 WL 224656 at *7 (D. PR Jan. 15, 2015); <u>Enderle v. Colvin</u>, 7 F. Supp. 3d 928, 934 (S.D. Ia. 2014) (must consider combined effects of obesity and with other impairments); <u>Trent v. Astrue</u>, 2011 WL 463371 at *8-10 (S.D. Ohio Jan. 14, 2011) (remanding because ALJ did not consider functional limitations of obesity in formulating RFC); <u>Rockwood v. Astrue</u>, 614 F. Supp. 2d 252, 278-79 (N.D.N.Y. 2009) (remanding where ALJ failed to account for claimant's obesity in formulating RFC in accordance with SSR 02-1p and directing further development of the record if information about functional impact of obesity is insufficient); <u>Sotack v. Astrue</u>, 2009 WL 3734869 at *4-5 (W.D.N.Y. Nov. 4, 2009) (same). Jobs that require a person with morbid obesity to support their great weight with their legs may not be within the capability of a claimant. <u>Arche Gonzalez</u>, 2015 WL 224656 at *7. If no evidence exists in the record regarding functional limitations from obesity and musculoskeletal impairments, the ALJ should obtain medical evidence regarding that issue. SSR 02-1p; <u>Id</u>. It is not enough for an ALJ to simply mention the fact of a claimant's obesity; the real functional limitations imposed by her obesity and any musculoskeletal impairments must be considered and

incorporated into the RFC.  <u>Norman v. Astrue</u>, 694 F. Supp. 2d 738, 741-42 (N.D. Ohio 2010).

The Commissioner argues that the findings from Dr. O'Toole, which were for purposes of worker's compensation, should be disregarded because findings of disability by another agency are not binding on the Commissioner.  The court agrees with that proposition, as far as it goes.  If Dr. O'Toole were proffering an opinion as to the ultimate issue of disability, the Commissioner would be justified in refusing to be bound by that opinion.  <u>See</u> 20 C.F.R. § 404.1504 (findings of disability by other agencies not binding on the Commissioner).  However, Dr. O'Toole issued objective findings based on medical evidence—the American Medical Association's Guides to Evaluation of Permanent Impairment, 3rd Edition, revised—not an ultimate opinion as to whether Ms. Webb was "disabled."  AR412-13.  No other medical record exists in the file showing that another doctor evaluated Ms. Webb according to these medical standards and found different results.  Dr. O'Toole's findings are precisely the type of evidence the Commissioner requires claimants to adduce in order to prove their disability:  (1) it was based on medically determinably physical impairment and (2) it was "permanent" and so could be expected to last for 12 months or more.  <u>See</u> 20 C.F.R. §§ 404.1505 (impairment must be medically determinable and last 12 months or more) and 404.1513(a)(1) (objective medical evidence consists of medical signs, laboratory findings, or both).  The Commissioner cannot reject bona fide objective medical findings just because they were rendered in connection with some other adjudicative

proceeding.  The objective medical findings by Dr. O'Toole should be considered

on remand.  In any event, even though findings of disabilities by other agencies

are not binding on the Commissioner, they are entitled to be considered by the

ALJ and given some weight.  Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir.

1998).

Alternately, the Commissioner argues the ALJ's failure to find severe

musculoskeletal impairments at step two was harmless error because the ALJ

proceeded past step two and established an RFC that limited Ms. Webb to light

work.  The court cannot conclude the ALJ's error at step two was harmless

because the RFC formulated by the ALJ included unlimited stair climbing.

AR36.  Even if not severe, the musculoskeletal impairments must be

considered in combination with other impairments to arrive at Ms. Webb's

RFC.  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  Because the ALJ

erroneously found no medical evidence to support the existence of any

musculoskeletal impairments, it appears those impairments were never taken

into consideration when formulating Ms. Webb's RFC.

**F.      Did the ALJ Err in Failing to Order Consultative Examinations?**

Ms. Webb next asserts the ALJ erred in failing to obtain a consultative

examination to determine the impact of her obesity on her functioning.  If the

court orders remand, Ms. Webb also asserts the ALJ should be instructed to

obtain consultative exams to determine Ms. Webb's mental impairments and

functioning, and the specific stage of her skin disease, hidradenitis

suppurativa, to determine if it meets Listing 8.06.  The court addresses each of these areas separately.

### 1. Duty to Develop the Record—Consultative Exams

The duty of the ALJ to develop the record—with or without counsel representing the claimant--is a widely recognized rule of long standing in Social Security cases:

> Normally in Anglo-American legal practice, courts rely on the rigors of the adversarial process to reveal the true facts of the case. However, social security hearings are non-adversarial.  Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.  The ALJ's duty to develop the record extends even to cases like Snead's, where an attorney represented the claimant at the administrative hearing.  The ALJ possesses no interest in denying benefits and must act neutrally in developing the record.

Snead, 360 F.3d at 838 (citations omitted).  See also Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010) (ALJ has a duty to develop the record even when claimant has counsel); and 20 C.F.R. § 404.1512(b).  If the record is insufficient to determine whether the claimant is disabled, the ALJ must develop the record by seeking additional evidence or clarification.  McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).  However, this is true only for "crucial" issues.  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

The ALJ may exercise its duty to develop the record in numerous ways, such as requesting medical records in existence but not yet part of the administrative record.  Another specific tool available to the ALJ to develop the record is the consultative exam—an exam at the Commissioner's expense with a professional of the Commissioner's own choosing. 20 C.F.R. § 404.1512(b)(2).

109

The Commissioner has promulgated numerous regulations relating to the consultative exam.  See, e.g. 20 C.F.R. §§ 404.1512(b)(2), 404.1518 – 404.1519j.

The ALJ "may" decide to purchase a consultative exam when the information the ALJ needs cannot be obtained from the claimant's medical sources and one of the following circumstances is present:  (1) the additional evidence is not contained in the records before the agency, (2) the evidence cannot be obtained from the claimant's treating sources for reasons beyond the claimant's control, (3) highly technical or specialized knowledge needed by the ALJ is not available from treating sources, or (4) there is an indication the claimant's condition has changed  in a way likely to affect the severity of the impairment, but the change in condition is not established in the records before the agency.  See C.F.R. § 404.1519a.

## 2.    Consultative Exam as to Impact of Obesity on Functioning

Ms. Webb's obesity is well established in the record.  Although she did not allege obesity as a disabling condition, her lawyer did allege obesity as a severe impairment in his opening statement at the ALJ hearing.  AR55.  There is scant information in the medical records, however, other than a bare recording of Ms. Webb's weight and BMI.  Unfortunately, for highly stigmatized conditions such as obesity, this is not unusual.  Persons suffering from obesity find it difficult to broach the subject, with their doctors and with an ALJ in a hearing.  See Christopher E. Pashler, Mirror, Mirror on the Wall:  Stigma and Denial in Social Security Disability Hearings 43 U. Mem. L. Rev. 419 (2012).

Similarly, physicians often fail to broach the obvious subject of their patients' obesity with them.  Id.

Despite this, or perhaps because of it, in Ms. Webb's case the ALJ found her obesity to be a severe impairment at step two of the analysis.  None of Ms. Webb's treating medical sources specifically evaluated the impact of her obesity on her functioning.  Similarly, none of the state agency physicians rendered opinions specifically as to that issue.

The ALJ made the following conclusions regarding Ms. Webb's RFC:

[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following restrictions:  can lift 20 pounds occasionally and 10 pounds frequently; can sit, stand, and walk for six hours each in an eight-hour workday with normal breaks; can climb ramps/stairs unlimited; can frequently balance; can occasionally stoop, kneel, crouch, and crawl; should have no more than occasional exposure to unprotected heights or fast-moving machinery; would do best if allowed to work independently, but can tolerate brief, casual interactions with coworkers and supervisors; and should not work with the public.

AR36.  The regulation referenced above by the ALJ defines light work as:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

The Commissioner has provided specific guidance to ALJs making RFC determinations regarding claimants with obesity. SSR 02-1p. When determining RFC at step four, the Commissioner recognizes that obesity can result in limitation or loss of function. SSR 02-1p. The person may be physically limited in their ability to manipulate (due to adipose tissue in the hands and fingers); they may be unable to tolerate extreme heat, humidity or hazards; they may be limited in ability to move about and assume certain postures; they may lack mental clarity during the day due to nighttime sleep apnea, which can lead to drowsiness; and they may be limited in social functioning. Id. The Commissioner directs its ALJs to consider the effect obesity has on an individual's ability to perform routine movement and necessary physical activity in the work environment day in and day out. Id. The Commissioner recognizes fatigue may be a factor affecting the claimant's ability to sustain physical and mental work activity. Id.

Here, the Commissioner urges this court not to remand for a consultative exam as to the impact of Ms. Webb's obesity on her functioning. The Commissioner argues the ALJ acknowledged Ms. Webb's obesity as a severe impairment, but asserts the medical evidence before the agency indicated that condition imposed no functional limitations. Therefore, the Commissioner argues, the ALJ's conclusion in the form of Ms. Webb's physical RFC is supported by substantial evidence.

In arriving at Ms. Webb's physical RFC, the ALJ relied on Dr. Kamer's consultative examination and reports from state agency physicians. AR40.

The ALJ stated Dr. Kamer found no limitations on Ms. Webb's ability to sit, stand, or walk. Id. (citing Ex. 7F, AR570-76). The ALJ then cited the state agency physicians' reports for the proposition that Ms. Webb could do light work. AR40 (citing Ex. 2A, 3A, 4A and 6A, AR112-13, 129, 145-46, 162-63).

Interestingly, each one of the state agency physicians were asked to weigh Dr. Kamer's opinions as to Ms. Webb's abilities to function. Each physician gave "less weight" to Dr. Kamer's opinion because, among other things, it failed to take into account Ms. Webb's BMI—her obesity. See AR111, 128, 145, 161. Each of the state agency physicians listed obesity among Ms. Webb's severe impairments. AR109, 126, 143, 160.

Each of those physicians ostensibly attributed some functional limitations to Ms. Webb on account of her obesity in terms of postural limitations. AR112, 129, 146, 162-63. However, identically, they all rated her ability to climb stairs and ramps and to balance as "unlimited." AR112, 129, 146, 162-63. They all rated her as being able to occasionally climb ropes, ladders and scaffolds; stoop; kneel; and crawl. Id. They all rate her as able to crouch frequently. Id.

Nowhere in these records relied upon by the ALJ is there an assessment of the factors listed in SSR 02-1p which the Commissioner has directed its ALJs to consider in determining whether obesity is disabling. None of these doctors assessed Ms. Webb's ability to manipulate with her hands due to excess adipose tissue. See SSR 02-1p. None of the doctors assessed Ms. Webb's ability to sustain her own weight on her own legs by walking and

standing day in and day out.  Id.  The nontreating nonexamining physicians'
opinions that she was unlimited in her ability to climb stairs is in stark
contrast to Dr. O'Toole's opinion, discussed *supra*, that she should avoid all
stairs.  And none of the doctors assessed the effects of Ms. Webb's severe sleep
apnea, which had been diagnosed prior to the issuance of any of these state
agency assessments.  Id.

Dr. Hogue rendered an opinion as to Ms. Webb's physical RFC, but he
did not consider her obesity or the related sleep apnea.  See AR586-88.  He
opined Ms. Webb had no limits on the ability to reach, handle and finger, but
contradictorily, he expressed no opinion as to her ability to grasp, turn, and
twist with her fingers; engage in fine manipulation; or reach overhead with her
arms.  AR587.  In any case, Dr. Hogue's opinion cannot provide the needed
support for the ALJ's opinion because the ALJ gave that opinion "limited
weight."  AR41.  During the ALJ hearing, the ALJ never asked Ms. Webb any
questions regarding the impact of her obesity on her functioning.  AR58-60,
72-90.

The ALJ is under a duty to assess the combined effects of all of
Ms. Webb's impairments, severe and not severe, when determining her physical
RFC.  Lauer, 245 F.3d at 703.  The state agency physicians gave short shrift to
the Commissioner's own instructions about evaluating obesity as an
impairment and they did not consider the combination of obesity, sleep apnea,
and a left lower extremity impairment together.  In any case, given the wide
variety in which obese people carry their weight, the court is extremely

skeptical that a nontreating nonexamining physician can appropriately evaluate the impact obesity has on a claimant's functioning without physically seeing the claimant.

For example, when a claimant has a BMI of over 50, it begs credulity to conclude (as the state agency physicians did) the claimant can climb ropes, ladders and scaffolds at all.  Even if the claimant could do these activities, how many workplaces have ropes, ladders and scaffolds designed to hold persons of such great weight?  Moreover, such activity requires a degree of dexterity that those carrying extra flesh around their legs and abdomens likely could not perform.  Not every person with a BMI of 50 carries their weight in the same place on the body, resulting in what could be significantly different functional limitations for different obese claimants.  One person may have a pendulous abdomen that interferes with the ability to move her legs; another may have large legs that interfere with the ability to kneel, crouch and crawl; still another may have excess adipose tissue in their hands, interfering with the ability to manipulate with their hands and fingers.

Finally, the state agency physicians rightfully gave Dr. Kamer's opinion "less weight" because he failed to consider Ms. Webb's obesity at all when determining functional limitations.  A consultative examination to determine the impact Ms. Webb's obesity has on her functioning is certainly warranted here because the records relied upon by the ALJ inadequately assess that issue.  The court is not aware of any records from Ms. Webb's treating medical sources that specifically address the impact of her obesity on her functioning.

Where a claimant has a consistent BMI over 40, the Commissioner has recognized this "represents the greatest risk for developing obesity-related impairments." <u>Enderle</u>, 7 F. Supp. 3d at 934 (discussing SSR 02-1p).

The court is cognizant of the fact that the regulations regarding consultative exams use the word "may." 20 C.F.R. §§ 404.1517, 404.1519a. Thus, even if the stated circumstances justifying a consultative exam are present, the ALJ "may," but is not required to, conduct a consultative exam. <u>Id.</u> Because this case is being remanded, the court orders the ALJ to *consider* ordering such an exam, but stops short of actually ordering the ALJ to purchase such an exam. Obesity is somewhat analogous to mental impairments. The claimants themselves may feel stigmatized and may not wish to raise the issue, even with their own treating doctors, and they may not freely relate functional impairments to strangers like the ALJ. They may not have great insight into the limits imposed by their impairments. In such cases, an ALJ's duty to develop the record is especially relevant.

Obesity, *unlike* some mental impairments, is apparent to the eye. The ALJ in this case found Ms. Webb's obesity to be a severe impairment. Having so found, it was up to the ALJ to develop information in the record if none existed about the impact that condition has, in combination with Ms. Webb's other impairments, on her ability to function in the workplace.

### 3. Consultative Exam as to Mental Diagnoses and Mental RFC

Ms. Webb's argument in favor of a mental consultative exam is very vague. She asserts a consultative report would be "helpful" as there is "very

little in the record." Docket No. 18 at p. 21. She further assails the ALJ's finding of mental impairment "without diagnostic findings and functional assessment." Id.

Ms. Webb testified at the hearing as to her mental limitations, primarily that she could not "handle crowds" and only went out of the house occasionally, if the outing was limited and did not involve encounters with crowds. AR73. She testified she has been prescribed and takes Wellbutrin and Celexa, and hydroxyzine for anxiety. AR73-74. At the time of the hearing, she testified she had not attended her children's activities for approximately 4 years because she could not handle being around crowds. AR80.

A Psychiatric Review Technique Form (PRTF) (see 20 C.F.R. § 404.1520a) was performed by nontreating nonexamining consultant James Wanstrath, Ph.D on September 9, 2013. AR109-10. He found Ms. Webb had severe anxiety disorder and severe depression. Id. He found these impairments mildly restricted Ms. Webb's activities of daily living; moderately restricted her ability to maintain social functioning; mildly affected her ability to maintain concentration, persistence and pace; and resulted in no episodes of decompensation of extended duration. AR109. Dr. Wanstrath credited Ms. Webb's reported anxiety around groups and its effect on her socialization. AR110.

A mental RFC was conducted by Dr. Wanstrath on the same date. AR113-15. He opined Ms. Webb had memory and understanding limitations, but that they were not significantly limited. AR113. He stated Ms. Webb could

remember and understand very short, simple instructions as well as detailed instructions. AR114. Dr. Wanstrath relied on Dr. Kamer's findings as to attention, concentration, recall, and neurological deficiency. Id. He identified anxiety and daily headaches as Ms. Webb's primary impairments limiting her functioning. AR114. This prefigured almost exactly Ms. Webb's testimony before the ALJ, where she stated her daily headaches and anxiety over crowds were the primary conditions which kept her home-bound most days. AR57, 60, 73-76, 79-80, 85-86.

Dr. Wanstrath credited moderate limitations in Ms. Webb's ability to sustain concentration and persistence and to carry out detailed instructions due to daily headaches. AR114. He also found her moderately limited in her ability to interact socially, to receive criticism from bosses, and to get along with coworkers or peers due to her anxiety around groups and inability to adjust to stress/change. AR114-15. Dr. Wanstrath opined Ms. Webb could do work of limited complexity, but which required accuracy and attention to detail. AR115. He opined she could respond appropriately to supervision and coworkers, but should have minimal interaction with the general public. Id.

In arriving at his conclusions, Dr. Wanstrath reviewed Ms. Webb's medical evidence, including Dr. Kamer's consultative exam. AR102-09. He also reviewed evidence directly given by Ms. Webb as to her symptoms, activities, and functioning: her fatigue questionnaire, her pain questionnaire, her headache questionnaire, her work history, and her function report. Id.

Dr. Amber Steves saw Ms. Webb November 7, 2012, and documented her complaints of anxiety, especially around people. AR476. At this time, Ms. Webb reported that previously-prescribed Wellbutrin helped with her smoking cessasion, but made her anxiety worse. Id. Paxil was tried, but did not work. AR478. Dr. Steves then prescribed Zoloft. Id.

Dr. Steves saw Ms. Webb on May 20, 2013, and changed her prescription for mental impairments from Zoloft to Celexa. AR468. Dr. Kamer saw Ms. Webb and conducted a brief mental status survey, but that consisted almost entirely of cognitive assessment rather than mood. AR575.

Dr. Michael Hogue, Ms. Webb's treating physician, saw her on July 10, 2014, regarding mood swings and relative ineffectiveness of current medications. AR616. Dr. Hogue prescribed lithium. Id. Dr. Hogue noted Ms. Webb had a very flat affect on this occasion. AR618.

Ronald P. Houston, Ph. D., performed a PRTF on December 4, 2014, to evaluate Ms. Webb's depression and anxiety/agoraphobia. AR655. Regarding "Paragraph B" criteria, Dr. Houston found no limitations in Ms. Webb's daily activities; social functioning; or ability to maintain concentration, persistence and pace. AR665. He found no episodes of decompensation of extended duration. Id. He also found the "Paragraph C" criteria not to be met. AR666. The references to "Paragraph B" and "Paragraph C" criteria are from the listings for mental disorders, found at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. Paragraph B for each listing (except § 12.05) provides the functional criteria by which the Commissioner assessing the impact of a mental disorder on a

claimant's mental functioning.  Id. at § 12.00A2b.  Paragraph C criteria is used to evaluate serious and persistent mental disorders.  Id. at § 12.00A2c.  Using this criteria from the Commissioner's listings, Dr. Houston concluded Ms. Webb's mental impairments of anxiety and depression imposed no functional limitations.  AR667.  As seen below, Dr. Houston revisited his opinions at the ALJ hearing and revised some of them.  Dr. Houston reviewed only Ms. Webb's medical records in arriving at his opinions; he reviewed none of her own statements as to her symptoms, functioning, and activities. AR655-71.

On March 26, 2014, Dr. Hogue rendered an opinion as to Ms. Webb's mental RFC.  AR740-42.  He opined Ms. Webb's ability to travel in an unfamiliar place and use public transportation was "poor or none."  AR740.  He opined she had a "fair" ability to interact with the public.  Id.  He rated her ability to maintain attention for two hours at a time and to get along with coworkers was fair.  AR741.  He rated her ability "poor or none" in the following categories:  maintaining regular attendance and punctuality; working in coordination with or proximity to others without being unduly distracted; complete a normal workday and week without interruptions from psychologically-based symptoms; and respond appropriately to changes in a routine work setting.  Id.  Dr. Hogue opined Ms. Webb's mental impairments would cause her to miss work at least two days per month.  AR742.

At the hearing before the ALJ, Dr. Houston testified that Ms. Webb had three documented mental impairments:  (1) depression, (2) anxiety disorder,

and (3) a reference to bi-polar disorder that was not otherwise developed in the record.  AR68.  Dr. Houston testified Ms. Webb's mental conditions did not meet any of the listings of mental impairments.  Id.  He testified to the PRTF and concluded under Paragraph B that Ms. Webb had mild restrictions in her activities of daily living; that she had moderate difficulty with social functioning; that she had mild difficulty maintaining concentration, persistence and pace; and that she had no episodes of decompensation.  AR69.  Thus, Dr. Houston testified Ms. Webb did not meet the Paragraph B criteria.  As to Paragraph C, Dr. Houston testified Ms. Webb's impairments did not meet that criteria either.  Id.

Dr. Houston testified Ms. Webb's social anxiety associated with being around others and leaving home would create some level of distress if she worked with the public, coworkers and supervisors.  AR70.  However, Dr. Houston testified Ms. Webb's mental impairments would impose no functional limitations in a work setting if she had a job where she just went into work and worked at a work station independently.  AR71.  The ALJ described Ms. Webb's mental RFC as follows:  Ms. Webb would do best if allowed to work independently; she could tolerate brief, casual interaction with coworkers and supervisors; and she could not work with the public.  AR36.

Based on Ms. Webb's vague arguments to the contrary, the court believes there was sufficient information in the administrative record to allow the ALJ to come to conclusions about the impact Ms. Webb's mental impairments had on her functioning.  Although Dr. Houston did not listen to Ms. Webb's hearing

testimony or review any of the questionnaires and reports she wrote describing

her symptoms, functioning, and activities, the state agency physician *did*

review these documents (though not the hearing testimony).  The ALJ accorded

"significant" weight to both Dr. Houston and the state agency physicians'

opinions as to mental RFC.  AR36.  Therefore, the court will not order the ALJ

to purchase a consultative exam as to Ms. Webb's mental functioning on

remand.  The ALJ, of course, is free to do so of her own accord should she

believe such an exam is necessary to develop the record.

### 4.      Consultative Exam as to Stage of Hidradenitis Suppurativa

Ms. Webb asserts that the court should issue an order requiring the ALJ

to order a consultative exam to determine whether her skin condition

(hidradenitis suppurativa) meets Listing 8.06.  Listing 8.06 reads, in its

entirety, as follows:

> 8.06 *Hidradenitis suppurativa*, with extensive skin lesions involving
> both axillae, both inguinal areas or the perineum that persist for at
> least 3 months despite continuing treatment as prescribed.

See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 8.06.

Ms. Webb's medical records reveal that she has seen various doctors who

have either documented her skin condition and did not prescribe treatment

(Dr. Kamer—AR573), or saw Ms. Webb on an acute-care, one-time basis for her

skin treatment but did not treat the condition long term (Dr. Steves – AR577,

581—single lesion in left breast).  In her July, 2013, function report, Ms. Webb

stated her skin condition was becoming more problematic.  AR314.  In August,

2013, Dr. Kamer documented skin lesions beneath Ms. Webb's breasts, in her underarms, and in her groin that were draining.  AR571.

There are numerous doctors' records that do not mention any skin condition at all.  See, e.g. AR480-82 (7/30/12—Dr. Steves--patient denied any rash); AR475-78 (11/7/12—Dr. Steves—no mention of rash); AR554 (7/2/13— negative for rashes); AR710 (3/16/15—Dr. Arban—inspection showed no rash). There are other records that show Ms. Webb told the physician she suffered from hidradenitis suppuativa, but the physician neither documented the state of that condition nor prescribed any treatment.  See, e.g. AR472, 558, 626. There is no record of a three-month prescribed treatment and a reassessment of Ms. Webb's condition following the treatment.

Dr. Christopher Gasbarre saw Ms. Webb specifically for treatment of her skin condition on September 8, 2014.  AR648-50.  At that time, he documented one nodule under Ms. Webb's left arm that she self-reported had been present for 3 years.  AR648.  At that time, Ms. Webb had no other nodules anywhere else.  Id.  She stated she had none in her groin, and Dr. Gasbarre documented scars from past lesions on her breasts, but no lesions there at that time.  Id. Ms. Webb described her only self-treatment of the lesion as washing with Dial® Antimicrobial wash.  Id.

Of note is the fact that Ms. Webb reported in her Disability Report that she had gone to the Emergency Room for surgery on her lesions because of flare-ups/drainage (see AR303), but in her medical history which she gave to Dr. Gasbarre, although she listed a number of surgeries, she did not mention

any surgery for her skin lesions.  See AR648.  This is somewhat significant because she was consulting Dr. Gasbarre for the specific purpose of receiving treatment for her skin lesions.  Id.

Other discrepancies are apparent.  At the ALJ hearing on July 20, 2015, Ms. Webb testified Dr. Gasbarre was her doctor for her skin condition.  AR76.  She testified that Dr. Gasbarre told her surgery is useless.  AR77.  She indicated that creams and steroidal injections were ineffective.  Id.  However, Dr. Gasbarre's own record indicates that he injected her one nodule with 10 milligrams of Kenlog and prescribed 30 days' of oral Doxycycline.  AR650.  He recommended to Ms. Webb that she try long-term use of tetracycline antibiotics.  Id.  He asked Ms. Webb to come back and see him for a recheck in 6 weeks.  Id.  There are no other records from Dr. Gasbarre in the administrative record, so one assumes Ms. Webb did not go back to see him for the recommended recheck.  Ms. Webb never testified about taking Doxycycline or tetracycline, so one assumes she did not follow this treatment recommended by Dr. Gasbarre.

The trouble in Ms. Webb's case with meeting listing 8.06 is that, in order to meet the listing severity, a claimant must have followed prescribed treatment for at least 3 months and still have the extensive skin lesions described.  See 20 C.F.R. Pt. 400, Subpt. P, App. 1, § 8.06.  In the first place, she did not have extensive lesions at the time of her appointment with Dr. Gasbarre—she had one nodule.  No medical records show a consistent presence of extensive lesions.  The condition appears to wax and wane.

Secondly, as the listing further explains, if one has not been treating with a physician and following their prescribed treatment for at least 3 months, one cannot meet the listing.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 8.00H.  In such a case, the Commissioner will consider whether you are disabled under *other* listings, or may find you disabled at steps 4 or 5 of the sequential analysis, but the Commissioner will not find you disabled at step 3 based on listing 8.06.  Id.

Ms. Webb concedes that she has mostly self-treated her skin condition and does not have the necessary track record of following a physician's prescribed treatment for 3 months without improvement in the condition.  See Docket No. 18 at p. 20.  The listing makes clear that, without this prerequisite, Ms. Webb cannot meet listing 8.06.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 8.00H.

A consultative exam would not change this fact.  The consultative exam could establish the extent of Ms. Webb's lesions at that moment in time, but the consultative examiner would not be able to supply the other half of the equation:  prescribing treatment, requiring Ms. Webb to follow that prescribed treatment for 3 months, and then reassessing whether the lesions still meet the severity described in the listing after 3 months' treatment.  For these reasons, the court rejects Ms. Webb's suggestion that a consultative exam should be required on remand as to her skin condition.  As per the listings, the ALJ must consider that skin condition at steps 4 and 5, but Ms. Webb clearly has not

met the listing for 8.06 at step 3. The ALJ's decision at step 3 as to Ms. Webb's skin condition is supported by substantial evidence.[30]

## G. Did the ALJ Err in Assessing Ms. Webb's Credibility[31]?

### 1. The Law Applicable to Determining Validity of Subjective Complaints

In determining whether to fully credit a claimant's subjective complaints of disabling pain, the Commissioner engages in a two-step process: (1) first, is there an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (2) if so, the Commissioner evaluates the claimant's description of the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work. See SSR 16-3p; 20 C.F.R. § 404.1529. Here, the ALJ found Ms. Webb had medically determinable

---

[30] The Commissioner argues the fact Ms. Webb worked for many years with her skin condition shows that the skin condition is not disabling. See Docket No. 19 at 14 (citing Gowell v. Apfel, 242 F.3d 793, 798 (8th Cir. 2001)). The court decides the issue on the basis of the language of Listing 8.06, and so need not address the Commissioner's argument. However, the court notes that the rule of thumb cited by the Commissioner only applies where there is no evidence the condition has deteriorated. Gowell, 242 F.3d at 798. Here, there is evidence in the record that Ms. Webb's skin condition did worsen. AR314.

[31] The court notes that as of March 28, 2016, the Commissioner determined to discontinue the use of the term "credibility" in its sub-regulatory policy. See SSR 16-3p (which superseded SSR 96-7p). The Commissioner wanted to make clear that in evaluating a claimant's subjective complaints of symptoms, it was not examining the claimant's character. Id. The court uses the term "credibility" herein because it is prevalent in the case law that has developed, the ALJ used that term (AR37), and the ALJ issued her decision under the prior SSR 96-7p because the ALJ's decision (Aug. 17, 2015), was issued before SSR 96-7p was superseded by SSR 16-30 (Mar. 28, 2016). Nevertheless, like the Commissioner, this court emphasizes that "credibility" is not interchangeable with "character."

physical and mental impairments that could reasonably be expected to produce her symptoms in accordance with part 1 above. So the credibility determination rested on the second prong discussed above.

In evaluating the second prong of the analysis, an ALJ must consider several factors, including: whether such complaints are supported by objective medical findings, whether the claimant has refused to follow a recommended course of treatment, whether the claimant has received minimal medical treatment, whether the claimant takes only occasional pain medications, the claimant's prior work record, observation of third parties and examining physicians relating to the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). A claimant's subjective complaints of pain may be discredited only if they are inconsistent with the evidence as a whole. Id.

With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities." Wagner, 499 F.3d at 852 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original). Although activities which are inconsistent with a claimant's testimony of disabling pain reflect negatively on the claimant's credibility, the

ability to do light housework and occasional visiting with friends does not support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world." <u>Reed</u>, 399 F.3d at 923 (quoting <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989)).

The Commissioner has provided guidance for evaluating credibility with regard specifically to the impairment of obesity. <u>See</u> SSR 02-1p. Regarding prescribed treatment, as with any other impairment, a claimant's failure to follow prescribed treatment in the absence of good reason may give rise to an adverse credibility inference. <u>Id.</u> However, if a treating source merely recommends a claimant "should" lose weight or "advises" them to get more exercise, this is not "prescribing treatment." <u>Id.</u> Furthermore, the Commissioner notes treatment goals for obesity are "modest" and treatment is often ineffective. <u>Id.</u> The Commissioner considers treatment for obesity to be successful when it results in loss of at least 10 percent of initial body weight and that loss is maintained for at least 12 months. <u>Id.</u> Failure to follow treatment prescriptions which the claimant cannot afford or which carry a high degree of risk is justified and does not result in an adverse credibility inference. <u>Id.</u>

The Commissioner has also provided guidance for evaluating a claimant's subjective complaints of symptoms more generally. <u>See</u> SSR 16-3p. With regard to a claimant's infrequency of treatment or failure to follow prescribed treatment, the Commissioner counsels that it will not find this factor to be

contrary to the claimant's described symptoms unless the Commissioner first contacts the claimant for an explanation regarding lack of treatment, or asks the claimant for such an explanation at the ALJ hearing.  Id.  The Commissioner specifically acknowledges a claimant may not seek treatment or may not follow prescribed treatment because she "may not be able to afford treatment and may not have access to free or low-cost medical services."  Id. The Commissioner further teaches it is not enough for an ALJ to recite the [Polaski] factors.  Id.  Instead, the ALJ's opinion "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  Id.

The Commissioner has provided even more refined guidance for evaluating a claimant's failure to follow prescribed treatment.  See SSR 82-59. When the Commissioner determines a claimant has failed to follow prescribed treatment, the Commissioner must also determine whether the failure to follow treatment was justifiable.  Id.  The treatment prescribed must be expected to restore the claimant's ability to work.  Id.  As with SSR 16-3p, the Commissioner promises in SSR 82-59 to give the claimant an opportunity to explain why she has not followed her doctor's advice and why that is important to the disability determination process:

> The claimant . . . should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal.  The record must reflect as clearly and

accurately as possible the claimant's . . . reason(s) for failing to follow the prescribed treatment.

Individuals should be asked to describe whether they understand the nature of the treatment and the probable course of the medical condition (prognosis) with and without the treatment prescribed. The individuals should be encouraged to express in their own words why the recommended treatment has not been followed. They should be made aware that the information supplied will be used in deciding the disability claim and that, because of the requirements of the law, continued failure to follow prescribed treatment without good reason can result in denial or termination of benefits.

Id.

Depending on the claimant's explanation, the Commissioner counsels that it may be necessary to recontact the treating medical source to substantiate or clarify what the source told the claimant. Id. There are several claimant explanations for failing to follow recommended treatment that the Commissioner identifies as justifiable reasons. Id. Among those are inability to afford the treatment and lack of free community resources. Id.

Where an ALJ believes a claimant does not have justifiable reasons for refusing recommended treatment, the ALJ is supposed to advise the claimant *before* a determination of eligibility of benefits is decided; that way, the claimant can elect to undergo the treatment if desired. Id. This prophylactic measure is necessary for fundamental fairness because, once a disability application is denied, the claimant may not later undertake to follow the treatment recommendation and revise the adverse determination. Id. An ALJ may consider whether an examining medical source determines that the claimant was malingering in assessing the credibility of the claimant's

testimony as to subjective complaints of pain.  <u>Clay v. Barnhart</u>, 417 F.3d 922,

930 n.2 (8th Cir. 2005) (two psychologists' findings that claimant was

"malingering" cast suspicion on the claimant's credibility).

Ms. Webb details 9 specific instances the ALJ referred to in discrediting

Ms. Webb's testimony about her subjective symptoms and their effect on her

functioning:

1.     Ms.Webb refused Dr. Steves' November, 2012, offer to refer her to a

neurologist/neurosurgeon for her Chiari malformation and Ms. Webb refused

Dr. Steves' offer to prescribe headache medications.  AR476.

2.     Ms. Webb had not seen Dr. Curiel, the physician who diagnosed

her Chiari malformation, in 9 years.  AR466.

3.     Ms. Webb was not seeing a dermatologist for her skin condition.

4.     The ALJ found Ms. Webb's description of her symptoms to be

inconsistent with her activities of daily living.

5.     The ALJ found Ms. Webb's failure to obtain a BiPAP machine to

address her sleep apnea to be incongruent with Ms. Webb's description of the

severity of her symptoms.  AR39.

6.     The ALJ concluded Ms. Webb's skin condition and her anxiety

were fairly well controlled with antibacterial soap and prescribed medication,

respectively.

7.     The ALJ found that by May, 2014, Ms. Webb still had not obtained

her BiPAP machine and that she was "doing well" on psychiatric medications.

8. The ALJ found Ms. Webb wanted to continue her medications in October, 2014, because her conditions were "under good control" with those medicines. AR40.

9. The ALJ found Ms. Webb said in April, 2015, she was "doing all right" after losing her medications due to the loss of Medicaid. AR40.

The court groups these 9 instances into 3 categories for purposes of discussion: (1) failure to follow recommended treatment, (2) impairment is well-controlled with medication, and (3) inconsistent with activities of daily living.

**2. Failure to Follow Recommended Treatment**

There are several instances the ALJ asserted Ms. Webb failed to pursue treatment or failure to follow treatment recommendations by her doctors. The ALJ did not follow the recommendations of SSR 82-59 as to these issues. The ALJ did not advise Ms. Webb of the importance and consequence of whether she followed her doctors' recommendations. The ALJ did not ask Ms. Webb why she failed to follow her doctors' recommendations. The ALJ did not give Ms. Webb an advance warning about the import of this issue and afford her an opportunity to try the recommended treatment. The result is a record before this court wholly inadequate to determine this issue.

Most basic to this inquiry is the requirement of a finding by the ALJ that the recommended treatment is "clearly expected to restore capacity to engage in any SGA." SSR 82-59. Here, as to Ms. Webb's Chiari malformation and its attendant headaches, depth perception distortion, and imbalance issues,

Ms. Webb testified the only treatment for the underlying condition itself is surgery. AR88-89. She further testified that surgery is only "successful" in 50-percent of the cases. Id. Finally, she testified that even in "successful" surgeries, the headaches are alleviated, but the imbalance and depth perception problems are not fixed. Id. This was why Ms. Webb had not seen Dr. Curiel, the physician who diagnosed her Chiari malformation, in 9 years. AR466. The ALJ never recontacted Ms. Webb's doctors to "substantiate or clarify" whether this was true. Thus, there is an absence in the record of any evidence—other than Ms. Webb's own testimony—about whether surgery would restore Ms. Webb to an SGA level. Failure to follow treatment recommendations that do not restore SGA is not a black mark on one's credibility. SSR 82-59.

Similarly, with regard to her skin condition, Ms. Webb tried steroidal injections with Dr. Gasbarre, but they did not work. AR77. She told the Commissioner her dermatologist said she was not a candidate for surgery. AR376. She also stated creams do not work. AR77. Ms. Webb was not seeing a dermatologist for her skin condition at the time she was examined by Dr. Kamer. Neither Dr. Kamer nor the ALJ asked Ms. Webb why she was not seeing a dermatologist. Ms. Webb alleged before the agency she saw an unnamed dermatologist in September, 2015, who told her she was not a good candidate for surgery for her skin condition, but who prescribed a cream that cost $300 and which Ms. Webb could not afford. AR372, 376. Again, there is an absence in this record of any evidence—other than Ms. Webb's own

testimony—that there was a treatment for her skin condition that would have restored her to an SGA level.

With regard to Ms. Webb's headaches, it is true on *one* occasion in November, 2012, she refused a physician's offer to prescribe headache medication for her. AR476. Several months later in April, 2013, she described her headaches as worsening. AR472. The record shows many other doctors on numerous occasions prescribed headache medication which Ms. Webb tried—Topamax, nortriptyline, Prodrin, Indomethacin,[32] and salsalate among them. See, e.g. AR471, 474, 610, 677, 685, 713-14. Ms. Webb testified the Topamax worked initially, then ceased easing her headaches. AR76. She testified the nortriptyline never worked at all on her headaches. Id. In addition, she was injected on two separate occasions for acute treatment of severe headaches with Ativan (AR622) and Demerol and Phenergan (AR601). Refusing Dr. Steves' offer of prescription headache medicine on one occasion does not constitute failure to follow recommended treatment regarding headache medicine given the longitudinal evidence in the record.

Ms. Webb also refused Dr. Steves' offer to refer her to a neurologist or neurosurgeon. AR476. Ms. Webb explains before this court that she refused the referral because she did not have health insurance and could not afford to pay a neurologist/neurosurgeon. Docket No. 18 at p. 24.

---

[32] Although Indomethacin was prescribed, subsequent records show Ms. Webb never filled the prescription. AR633. However, there is a May 15, 2014, record indicating Ms. Webb was taking Indomethacin and "has totally lost control of the headache now." AR601.

Dr. Finley and Dr. Hogue saw a potential connection between Ms. Webb's headaches and her severe sleep apnea. AR613, 689. Therefore, it is possible if Ms. Webb had obtained a BiPAP machine, she may have improved her headaches. However, she never did obtain the prescribed machine so the court cannot tell on this record if the machine would have improved Ms. Webb to an SGA level. The ALJ never quizzed Ms. Webb about this issue during the hearing. In her opinion, the ALJ acknowledged Ms. Webb had been "unable" to obtain a BiPAP machine. AR39-40.

Ms. Webb states she was unable to afford the approximate $1,600 cost of obtaining a BiPAP machine. She specifically testified that South Dakota would not approve her to receive a BiPAP machine. AR82-83. This court assumes the reference to "South Dakota" is a reference to Medicaid or some other state-based system for helping indigent people obtain medical care. The ALJ never asked her about this, nor did the ALJ inquire about whether there were sources of free or reduced-cost assistance for the indigent in Ms. Webb's community.

The ALJ herself acknowledged that Dr. Finley's record from September, 2014, indicates Ms. Webb told him she could not afford the BiPAP. AR40. Unmentioned by the ALJ is a reference in Dr. Hogue's records that *he* checked with "the local DME" and they told Dr. Hogue they would not accept Ms. Webb's BiPAP prescription from Colorado. AR689. This was also confirmed by a note of a phone call Ms. Webb placed to Dr. Hogue. AR700.

"If a claimant truly has no access to health care, then the absence of such care would not tend to disprove her subjective complaints of pain." Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004). However, in evaluating a claimant's subjective complaints of pain, it is permissible for the ALJ to consider whether she sought out treatment available to indigents. Id.

The Commissioner asserts that Medicaid covers BiPAP machines and that Ms. Webb had a prescription for a BiPAP machine for over a year before she lost Medicaid coverage. Furthermore, the Commissioner supplies a citation to a web site where free or low-cost BiPAP machines can be obtained. Likewise, although Ms. Webb said her dermatologist prescribed a cream in September, 2015, that she could not afford, the Commissioner points out she did not indicate she explored any options for financial assistance for low-income patients. The question becomes who has the burden of proof to show access to low- or no-cost treatment? The Commissioner has placed the burden on the ALJ to (1) explain the importance of not following treatment, (2) to ask why treatment was not followed, and (3) to ask if there were alternatives to obtain the treatment at no or reduced cost. See SSR 82-59. Therefore, the fact that the record is silent on this issue is the failing of the ALJ, not Ms. Webb. Id.

The facts regarding the recommended treatment from Ms. Webb's doctors are undeveloped. No medical source has suggested Ms. Webb is malingering. There are no facts from which the court could conclude that, had Ms. Webb followed doctors' orders, she would now have been restored to an SGA level. Furthermore, because the ALJ did not advise Ms. Webb of the importance of

this issue, and did not even question her about this issue in most instances, the court cannot conclude the ALJ's decision comports with the Commissioner's own rules about evaluating a claimant's failure to follow doctors' orders.

The facts of this case are further complicated by the fact Ms. Webb moved from Fort Collins, CO, to Sturgis, SD, in September, 2013, thus disrupting the continuity of care with her Colorado medical care providers. AR580. Then, the first of November, 2014, she lost her Medicaid coverage. AR711. These facts make it all the more crucial that the ALJ perform her two-fold duty of advising the claimant about the importance of following recommended treatment and making inquiry as to why treatment was not followed in some instances. There is not enough information in the record for the court to conclude Ms. Webb's failure to follow recommended treatments was unjustifiable and, thus, undermined her testimony as to the effect of her symptoms.

### 3. Impairments are Well-Controlled with Medications

The ALJ concluded Ms. Webb's skin condition, anxiety, and headaches were well controlled with over the counter remedies or prescribed medication. The ALJ based this conclusion on reports that her conditions were "fairly well controlled," that she was "doing well," that her conditions were "under good control," and that she was "doing all right." AR38-40. Ms. Webb contests these citations to the medical records by the ALJ, asserting that whether one is "all right" is a relative term. Ms. Webb further asserts that a detailed look at

the medical records cited by the ALJ reveals conditions that were significantly impairing even with medications.

The ALJ found Ms. Webb wanted to continue her medications in October, 2014, because her conditions were "under good control" with those medicines. AR40. At that time, Ms. Webb points out, she was about to lose her Medicaid coverage. Ms. Webb argues that "under good control" is a relative term, and does not support the conclusion she was capable of working. Instead, she points to records from Dr. Arban showing she could not work. AR711.

The ALJ found Ms. Webb said in April, 2015, she was "doing all right" after losing her medications due to the loss of Medicaid. AR40. Again, Ms. Webb asserts the phrase "doing all right" is relative and not indicative of her ability to work full time. Furthermore, contemporaneous medical records describe daily, vice-like headaches, an inability to afford a BiPAP machine, severe sleep apnea, and other factors disturbing her sleep. AR722-23.

Ms. Webb also questions the accuracy of Dr. Finley's finding in September, 2014, that Ms. Webb was not suffering from fatigue or insomnia at that time. AR675-76. The records from other care providers during the same time frame document complaints of insomnia and fatigue. AR714. Furthermore, Dr. Finley failed to note Ms. Webb's skin condition in his September, 2014, record, calling into question the accuracy and thoroughness of that record according to Ms. Webb. AR675.

Ms. Webb is correct that phrases such as "doing well" or "all right" are relative. Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001). The ALJ

may not rely on these bromides to conclude a claimant is able to work.  Id.
Instead, the description of her symptoms in the medical records, objective
findings, and functional abilities is what the ALJ must scrutinize and
comments such as "doing well" must be placed into context in the longitudinal
record.  Id.

Here, the court has concluded that one of the primary reasons the ALJ
cited for not crediting Ms. Webb's description of the limiting effects of her
symptoms (failure to follow treatment), requires remand.  Thus, on remand, the
court instructs that the ALJ revisit all the Polaski factors in light of the record
as a whole, including the above statements of supposed well-being.

### 4. Activities of Daily Living Inconsistent with the Described Severity of Symptoms

The ALJ found Ms. Webb's description of the severity of her symptoms to
be inconsistent with her activities of daily living.  AR37-40.  The court notes
first that the absence in this record of any assessment of the impact
Ms. Webb's obesity has on her ability to function is a significant absence when
determining whether Ms. Webb's impairments are consistent—or
inconsistent—with her activities of daily living.  That said, the court turns to
Ms. Webb's description of her activities of daily living.

At the hearing before the ALJ, Ms. Webb testified she shares the cooking
duties with another adult female living with her and with her teenaged
children.  AR79-80.  She does not drive because of the depth perception and
balance problems that accompany her headaches.  AR57, 60.  She ventures
outside her home only occasionally and only if she is assured of not

encountering crowds. AR73. She has not attended any of her children's

activities for 4 years, except for parent-teacher conferences. AR80. She can

load laundry into the washer, but she needs her children to transfer the wet

clothes to the dryer. AR80. Her older children work outside the home full time

and the 11 year old is in school and has extended stays at her grandmother's

home in the summer. AR81. Ms. Webb testified she could stand for 30

minutes at a time, walk for 15 to 20 minutes, sit for 15 to 20 minutes, and lift

20 or 30 pounds. AR90. When her dad was terminally ill, she went to stay

with him and help him get his things in order, but the record does not show

what specific physical activities she engaged in on this occasion or whether she

drove herself to Colorado to see him. AR85.

When discussing Ms. Webb's activities of daily living, the ALJ cited to a

brief paragraph in Dr. Kamer's consultative exam report. AR38 (citing AR572).

In that exam, conducted a full two years prior to the hearing before the ALJ,

Dr. Kamer recorded the following:

> Ms. Webb indicates that she begins her typical day between 4 and
> 10 am and usually retires between 9 pm and 2 am. She indicates
> she is able to get herself in and out of bed, dress herself, and bathe
> herself as well as drive, cook, and clean for herself. She indicates
> that she spends her typical day, "wake up around 3-4 am with
> headache, take meds if headache eases up sleep until 6 or 7 am.
> Wake up kids, supervise them getting ready for school, do a load of
> laundry, clean dishes while I can stopping often, alternate
> housework, reading or napping, depending on the day. I have no
> set routines as I can't predict what will happen on a given day.

AR572. First of all, the above description is not terribly inconsistent with

Ms. Webb's hearing testimony: she described broken sleep, daily headaches,

intermittently effective headache medication, and stop-and-go household activities on both occasions.  Compare AR572 with AR57, 60, 79-87.

"Supervising" one's children and getting them ready for school, referenced by the ALJ, takes on a different meaning whether they are preschoolers or high schoolers.  Ms. Webb's children were older, both at the time she saw Dr. Kamer and at the time of the ALJ hearing.  At the time of the hearing the children were old enough to be employed outside the home full time with the exception of the 11 year old who attended school and had extended stays at a grandmother's home during summer break.[33]  AR81. Supervising teenagers certainly does not require the type of labor-intensive dressing, tying shoes, locating outerwear, threading small hands into gloves or mittens that dressing very young children does.  Getting one's teenagers out the door in the morning for school does not automatically undermine one's assertion one is unable to work.

There are some distinctions between Ms. Webb's hearing testimony and what she told Dr. Kamer two years earlier.  She told Dr. Kamer in August, 2013, she could drive,[34] do laundry, and cook.  AR572.  She testified at the

_____

[33] Ms. Webb's children were born in 1998, 2000, and 2003.  AR556.  In July, 2013, when Ms. Webb filled out a function report, her oldest child was 15. AR308.  Post-ALJ hearing, Ms. Webb wrote her children were old enough that they required little from her in the way of functional activity day to day. AR376.

[34] The record contains contradictory information about whether Ms. Webb drives or is able to drive.  Although she told Dr. Kamer in August, 2013, she was able to drive, in a function report one month earlier, she told the Commissioner she was not able to drive.  AR310.  In February, 2014, she told Dr. Hogue she was driving back and forth between Sturgis, SD, and Rapid City,

hearing that others helped her cook and launder and that she no longer drove. AR57, 60, 79-80. The Commissioner's policy guidance, SSR 16-3p, recognizes that symptoms may change over time—they can improve or worsen. The ALJ never asked Ms. Webb about whether her symptoms had changed since her consultative examination two years prior to the ALJ hearing. The conclusion that Ms. Webb's hearing testimony was therefore not worthy of credence is unsupported by the record at this juncture.

The court will remand with instructions for the ALJ to consider all of the Polaski factors in the context of the entire longitudinal record. Dr. Kamer's two-year-old statements about Ms. Webb's activities of daily living should be a subject of further development to determine (1) whether the impairments Ms. Webb has wax and wane and (2) whether any of her impairments worsened in the two years between the consultative exam with Dr. Kamer and the ALJ hearing. "Possibly a decision to disbelieve the claimant . . . would be proper, but on this record [the court] cannot so hold." Caviness, 250 F.3d at 605.

**H.  Did the ALJ Properly Evaluate Medical Sources' Opinions?**

Ms. Webb asserts the ALJ improperly evaluated nearly all the medical opinions in this case. Specifically, she alleges the ALJ improperly evaluated opinions of Dr. Houston, Dr. Kamer, Dr. Canham, Dr. Erickson, and Dr. O'Toole. See Docket No. 18 at 28-32.

---

SD, periodically. AR633. At the time of the ALJ hearing in July, 2015, she testified she did not drive and did not possess a driver's license. AR60.

### 1.   Dr. Houston's Opinion

Ms. Webb argues that 20 C.F.R. § 404.1520a required that, in evaluating Ms. Webb's mental impairments, Dr. Houston was required to consider Ms. Webb's own description of her symptoms and how those symptoms interfere with her functioning.  Here, Dr. Houston did not review Ms. Webb's written disability and function reports and he did not listen to her hearing testimony.  Therefore, Ms. Webb posits his opinion was faulty and the ALJ should not have relied upon it.

The Commissioner tacitly concedes Dr. Houston did not consider Ms. Webb's hearing testimony, function or disability reports.  <u>See</u> Docket No. 19 at 21-22.  The Commissioner also does not dispute that § 404.1520a required Dr. Houston to consider this evidence.  <u>Id.</u>  Instead, the Commissioner's argument is tantamount to a "harmless error" argument.  The Commissioner points out that Dr. Houston did review all the medical records, and those records included Ms. Webb's subjective descriptions of her symptoms.  <u>Id.</u>  Furthermore, the Commissioner argues that even if Dr. Houston did not consider Ms. Webb's own statements, the ALJ did because the ALJ considered the entire record.  <u>Id.</u>

First, the Commissioner has set forth in regulation how mental impairments will be evaluated.  <u>See</u> 20 C.F.R. § 404.1520a; and Pt. 404, Subpt. P, § 12.00C, D and E.  Those regulations provide that the Commissioner will consider all the relevant medical evidence showing a claimant's symptoms, signs, and laboratory findings to determine if there is a medically determinable

mental impairment.  <u>See</u> 20 C.F.R. § 404.1520a(b)(1).  The Commissioner then sets about rating the degree of functional limitation resulting from the mental impairments, which the Commissioner calls a "complex and highly individualized process."  <u>Id.</u> at (b)(2) and (c)(1).  The Commissioner states in arriving at the functional limitation decision, *all* relevant evidence will be considered "to obtain a longitudinal picture of your overall degree of functional limitation."  <u>Id.</u> at (c)(1).  The Commissioner specifically states it will consider whether a claimant's mental impairment is affected by the claimant living in a highly structured environment.  <u>Id.</u> at (c)(2).  The Commissioner specifically states it will consider the claimant's ability to function on a sustained basis.  <u>Id.</u>  The factors the Commissioner will consider are set forth in §§ 12.00C through 12.00H of the listings.  <u>Id.</u>

The Commissioner states it needs objective medical evidence from acceptable medical source(s) to establish that the claimant has a medically determinable mental disorder.  <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, § 12.00C1.  The Commissioner also states it will consider all relevant evidence about the claimant's mental disorder and her daily functioning that it receives from the claimant.  <u>Id.</u> at C3.  The Commissioner also states it wants longitudinal evidence—evidence that shows how the claimant functions over time so the Commissioner can evaluate any variations in the claimant's level of functioning.  <u>Id.</u> at C5.

Among the factors the Commissioner will consider are:  the claimant's own reports of her functioning; a complete picture of the claimant's daily

functioning; whether the claimant has created a highly structured environment by eliminating all but minimally necessary contact with the world outside her living space; whether she spends her time among only familiar people or surroundings, in a simple and steady routine or an unchanging environment. See 20 C.F.R. Pt. 404, Subpt. P, §§ 1200D1 and D3.

This is the type of evidence Ms. Webb presented in her testimony at the ALJ hearing. It is also the type of evidence she presented in her disability and function reports. Bits and pieces, here and there, of Ms. Webb's daily activities and functions are found in the medical evidence, but the medical evidence does not provide a clear and complete picture. Nowhere in the medical evidence does it reveal, for example, that Ms. Webb has not attended any of her children's activities for four years because of her anxiety about being outside the house and being around crowds. Ms. Webb testified her prescribed medications for her depression and anxiety, Wellbutrin and Celexa, allow her to function better *at least at home*. This qualification is not found in the medical records either. Ms. Webb testified she shops for groceries when the store first opens so as to avoid as much as possible encountering large numbers of persons. The medical records merely state Ms. Webb does her own grocery shopping.

Had Dr. Houston's opinion been the sole basis for the ALJ's formulation of Ms. Webb's mental RFC, that might warrant remand because he considered only medical records. However, as noted above in discussing the issue of whether a mental consultative exam was warranted, the ALJ accorded

"significant" weight to Dr. Houston's opinion, which did not take into account Ms. Webb's written and oral descriptions of her activities, functioning, and symptoms. AR36. And, the ALJ also accorded "significant" weight to Dr. Wanstrath's opinion, which *did* take into consideration Ms. Webb's written descriptions of her activities, functioning, and symptoms. Id.; AR102-09. The ALJ found both professionals' opinions to be persuasive. AR36. Comparing the PRTF completed by both, they are identical. Compare AR109-10, with AR68-69 (Houston hearing testimony). Furthermore, the mental RFCs rendered by both professionals are nearly identical. Compare AR113-15, with AR70-71.

The Eighth Circuit has made clear that when considering the activities of daily living of claimant's with mental impairments, it is important to consider whether the claimant has "structured [her life] in such a way as to minimize stress and reduce their signs and symptoms." Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001). The Commissioner's regulations make clear that if a claimant closets herself almost entirely in her house in order to compensate for a mental impairment, that is a significant factor to consider in determining—as the Commissioner says it must—whether the claimant can function on a sustained basis *in a work environment.* Id.; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D. Although Dr. Houston failed to take these factors into account, his opinion is not the only opinion in support of the ALJ's rendering of Ms. Webb's RFC. Dr. Wanstrath's opinion as to PRTF and mental RFC was

nearly identical to Dr. Houston's and was also relied upon by the ALJ. Remand is, therefore, unnecessary as to any inadequacies of Dr. Houston's opinion.

## 2. Opinions of Dr. Kamer, Dr. Canham and Dr. Erickson

Ms. Webb argues the ALJ improperly relied on the opinions of these physicians because they did not know of Ms. Webb's sleep study, severe sleep apnea, or her inability to obtain a BiPAP machine to address her sleep apnea. The Commissioner concedes this fact, but argues knowledge of Ms. Webb's sleep apnea could not have had any bearing on Dr. Kamer's opinion. Docket No. 19 at p. 22. Ms. Webb did tell Dr. Kamer she suffered from broken sleep and often woke up in the middle of the night with headaches. Id. (citing AR572). This was enough, the Commissioner argues, to make Dr. Kamer aware of Ms. Webb's sleep problems. Id. Moreover, the Commissioner asserts, the ALJ *did* consider Ms. Webb's sleep apnea and found it to be a severe impairment, so the court should ignore any irregularity with regard to Dr. Kamer's opinion. Id.

As to the state agency doctors, the Commissioner asserts these doctors did consider Ms. Webb's Chiari malformation (and the attendant headaches) and her weight when determining Ms. Webb's RFC. The Commissioner asserts before this court that Ms. Webb has failed to show harm as a result of the omissions. Id. at 23.

Ms. Webb counters that the effects of sleep apnea are best evaluated when observed over a period of time and that Dr. Kamer's one-time assessment that Ms. Webb did not seem affected by fatigue on a single day is not

determinative. Ms. Webb asserts neither Dr. Kamer nor any of the state agency consultants took into account fatigue and daytime somnolence as a result of Ms. Webb's severe sleep apnea.

When Ms. Webb had her sleep study in Colorado in July, 2013, she was asked to rate herself on the Epworth Sleepiness Scale. AR553. The scale uses 0 to mean "never"; 1 to mean there is a slight chance of dozing; 2 means a moderate chance of dozing; and 3 means a high chance of dozing. Id. Ms. Webb stated she would never doze off while sitting and talking to someone or while in a car stopped for a few minutes in traffic. Id. She stated there was only a slight chance of dozing when sitting inactive in a public place, as a passenger in a car for an hour without a break, or while sitting quietly after lunch without alcohol. Id. She stated there was a high chance of dozing while sitting and reading, watching television, or when lying down in the afternoon. Id.

Dr. Finley recorded that Ms. Webb reported "excessive daytime somnolence" associated with her sleep apnea. AR734. Finally, the ALJ found Ms. Webb's obstructive sleep apnea was a severe impairment. AR34. It was error to rely on RFCs from nontreating, nonexamining state agency physicians where those physicians were unaware of one of Ms. Webb's severe impairments. The agency physicians themselves gave Dr. Kamer's opinion little weight because *he* failed to take into account another of Ms. Webb's severe impairments—obesity. Because this matter is being remanded for other reasons, the court also remands for reconsideration of the opinions of

148

Dr. Kamer and the state agency physicians and/or further development of the record to taken Ms. Webb's severe sleep apnea into account.

### 3. Dr. O'Toole's Opinion

Ms. Webb notes the ALJ never mentioned Dr. O'Toole's objective impairment rating. Thus, she argues the ALJ failed to accord proper weight to this treating physician opinion.

The Commissioner notes the ALJ cited to the record which contained the impairment rating and asserts the ALJ was not required to discuss every piece of evidence. Docket No. 19 at 24. Furthermore, the Commissioner reasserts its earlier argument that Dr. O'Toole's impairment rating was rendered for purposes of worker's compensation and so has limited significance in this Social Security proceeding. Id. The Commissioner also reasserts its earlier argument that medical evidence subsequent to Dr. O'Toole's evaluation showed Ms. Webb's impairment resolved itself.

As to the latter, the court has already discussed at length the Commissioner's argument that other evidence in the record showed Ms. Webb's left ankle was unimpaired. That argument has been rejected because there is no record of any doctor subsequent to Dr. O'Toole who evaluated Ms. Webb's left ankle in the same detail applying the same objective standards promulgated by the American Medical Association. Dr. Kamer's August, 2013, ankle exam was expressed in a range of degrees of movement and did not distinguish between Ms. Webb's left and right lower extremities. Dr. Finley's

exam results were expressed in conclusory fashion.  Neither exam shows

Dr. O'Toole's exam to be invalid.

Regarding the Commissioner's argument that the ALJ considered, but

did not discuss, Dr. O'Toole's impairment rating, the court is not convinced.

The ALJ *did* cite Dr. O'Toole's records, exhibit 2F, in her opinion in the

following context:

> The medical evidence additionally documents the claimant's
> history of a left ankle injury in June 2011, for which she
> underwent reconstructive surgery in March 2012, followed by
> postoperative complications of left calf cramping and persistent left
> foot/ankle pain and paresthesias, with August 2012
> electrodiagnostic studies revealing a resolving peroneal
> mononeuropathy (*See* ex. 1F, 2F, 4F).  By August and September
> 2012, her pain had improved (*see* ex. 4F at 15); exams showed
> normal gait, normal range of motion, full strength, normal
> sensation except for "a few branches of the sural nerve", [sic] no
> calf pain or tenderness, and no swelling (*see* ex. 1F at 3, 2F at 1);
> and her prognosis was deemed "excellent" (*See* ex. 4F at 33).

AR35.

One reads the above passage and draws the definite inference that all

problems with Ms. Webb's left ankle had resolved by August or September of

2012.  However, if one reads the exhibits cited by the ALJ, they tell a different

story.

The ALJ cites to exhibits 1F, 2F, and 4F.  These correspond to pages

AR393-408, 409-464, and 484-552 in the administrative record, respectively,

collectively 140 pages of medical records.  The ALJ singles out citations to

page 3 of exhibit 1F, page 1 of exhibit 2F, and pages 15 and 33 of exhibit 4F.

AR35.  The court describes these records in chronological order.

On August 15, 2012, Dr. O'Toole dictated a report for Ms. Webb's worker's compensation claim. AR516 (ex. 4F at p. 33). He described Ms. Webb as still experiencing painful cramping, a 5 or 6 out of 10 on the pain scale. Id. Dr. O'Toole limited her to avoiding all stairs and walking as tolerated. AR517 (ex. 4F at p. 34).

On August 23, 2012, physical therapist Paul Brannin wrote that Ms. Webb continued to experience pain, paresthesia, and cramping in her left extremity. AR498 (ex. 4F at p. 15). He noted changes in her perineal and sural nerves. Id.

On August 30, 2012, Dr. Wesley Jackson wrote of Ms. Webb that it was "difficult to say" when she would reach maximum medical improvement. AR394 (ex. 1F at p. 2). Dr. Jackson wrote on the same date that Ms. Webb's calf cramping had not improved. AR395 (ex. 1F at p.1). He stated she was "moving in the right direction although it might take quite some time." Id. He also opined Ms. Webb might be developing a complex regional pain syndrome. Id.

The court notes the ALJ never cited to pages 7-9 of exhibit 2F, which is the location of Dr. O'Toole's permanent impairment rating of Ms. Webb's left leg. AR415-17. However, Dr. O'Toole's impairment rating was issued the same day as the above record from Dr. Wesley Jackson, August 30, 2012.

The final record cited by the ALJ is page 1 of exhibit 2F, found at AR409. This was a record of a September 14, 2012, visit Ms. Webb made to Dr. O'Toole. Id. On that occasion, Dr. O'Toole wrote that Ms. Webb continued

having difficulty negotiating stairs and was only able to do limited walking.  Id.
She reported instability in her ankle, such as a tendency to roll in the grocery
store.  Id.

The ALJ never mentions Dr. O'Toole's impairment rating anywhere in her
opinion.  And the records she did cite in her opinion, discussed above, do not
show that by August and September of 2012 Ms. Webb's left ankle was back to
normal.

Medical opinions from acceptable medical sources are considered
evidence which the ALJ will consider, along with all relevant record evidence, in
determining whether a claimant has an impairment, the nature and severity of
the impairment, and the claimant's RFC.  See 20 C.F.R. § 404.1527(a)(2).  All
medical opinions are evaluated according to the same criteria, namely:

> --whether the opinion is consistent with other evidence in
>   the record;
>
> --whether the opinion is internally consistent;
>
> --whether the person giving the medical opinion examined
>   the claimant;
>
> --whether the person giving the medical opinion treated the
>   claimant;
>
> --the length of the treating relationship;
>
> --the frequency of examinations performed;
>
> --whether the opinion is supported by relevant evidence,
>   especially medical signs and laboratory findings;
>
> --the degree to which a nonexamining or nontreating
>   physician provides supporting explanations for their

opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

--whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(a)-(f); Wagner, 499 F.3d at 848.

The Commissioner will give controlling weight to the opinion of a treating source as to the nature and severity of a claimant's impairment if (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) the opinion is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); Nowling v. Colvin, 813 F.3d 1110, 1122 (8th Cir. 2016). "A treating physician's opinion, however, 'does not automatically control or obviate the need to evaluate the record as a whole.' " Nowling, 813 F.3d at 1122-23 (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)). If the opinion of the treating physician is inconsistent, or if other medical evaluations are "supported by better or more thorough medical evidence" the ALJ may be entitled to discount or even disregard a treating physician's opinion. Nowling, 813 F.3d at 1123; House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007); Wagner, 499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881,

888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)); <u>Shontos</u>

<u>v. Barnhart</u>, 328 F.3d 418, 425 (8th Cir. 2003); <u>Kelley v. Callahan</u>, 133 F.3d

583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating

physicians, the ALJ must resolve the conflict. <u>Wagner</u>, 499 F.3d at 849.

Generally, the opinions of non-examining, consulting physicians, standing

alone, do not constitute "substantial evidence" upon the record as a whole,

especially when they are contradicted by the treating physician's medical

opinion. <u>Wagner</u>, 499 F.3d at 849; <u>Harvey v. Barnhart</u>, 368 F.3d 1013, 1016

(8th Cir. 2004) (citing <u>Jenkins v. Apfel</u>, 196 F.3d 922, 925 (8th Cir. 1999)).

However, where opinions of non-examining, consulting physicians along with

other evidence in the record form the basis for the ALJ's RFC determination,

such a conclusion may be supported by substantial evidence. <u>Harvey</u>, 368

F.3d at 1016. Also, where a nontreating physician's opinion is supported by

better or more thorough medical evidence, the ALJ may credit that evaluation

over a treating physician's evaluation. <u>Flynn v. Astrue</u>, 513 F.3d 788, 793 (8th

Cir. 2008)(citing <u>Casey v. Astrue</u>, 503 F.3d 687, 691-692 (8th Cir. 2007)).

Certain ultimate issues are reserved for the Commisioner's

determination. 20 C.F.R. § 404.1527(d). Any medical opinion on one of these

ultimate issues is entitled to no deference because it "invades the province of

the Commissioner to make the ultimate disability determination." <u>House</u>, 500

F.3d at 745 (citing <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1023 (8th Cir.

2002)).  See 20 C.F.R. § 416.927(e)(3).  The ultimate issues reserved to the

Agency are as follows:

1.    whether the claimant is disabled;

2.    whether the claimant is able to be gainfully employed;

3.    whether the claimant meets or exceeds any impairment in the Listing of Impairments (appendix 1 to subpart P of part 404 of 20 C.F.R.);

4.    what the claimant's RFC is; and

5.    what the application of vocational factors should be.

See 20 C.F.R. § 404.1527(d)(1) and (2); see also Wagner, 499 F.3d at 849 (the

ALJ "need not adopt the opinion of a physician on the ultimate issue of a

claimant's ability to engage in substantial gainful employment.") (quoting

Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998)).  The RFC determination is

specifically noted to be one of those determinations that is an ultimate issue for

the Agency to determine.  20 C.F.R. § 404.1527(d)(2); Cox, 495 F.3d at 619-

620.  In evaluating a treating physician's opinion, the ALJ must "always give

good reasons" supporting her decision regarding the weight afforded that

opinion.  Nowling, 813 F.3d at 1123; Reed, 399 F.3d at 921; 20 C.F.R.

§ 404.1527.

Although the Commissioner suggests before this court that the ALJ

rejected Dr. O'Toole's opinion as to impairment because it was inconsistent

with the record as a whole (Docket No. 19 at p. 25), this court is left to guess

whether that was so.  Because the ALJ never discussed Dr. O'Toole's treating

physician opinion, and because the citations to medical records the ALJ did

discuss do not show Ms. Webb's left ankle problem had resolved, the court

would have to guess at the ALJ's reasoning.  Did the ALJ find Dr. Kamer's

opinion supported by better or more thorough medical evidence than

Dr. O'Toole's?  One cannot say.  The ALJ simply did not identify Dr. O'Toole's

opinion and give "good reasons" why that opinion was not given controlling

weight.  Accordingly, the court finds this issue merits remand as well.

## I.     Did the ALJ Apply the Correct Standard to Determine the Availability of Jobs at Step Five?

At step five, the ALJ found there were other jobs Ms. Webb could do with

her RFC.  The ALJ's conclusion was based on testimony from the VE that there

were 271,000 merchandise marker jobs "in the United States."  AR94.  He also

testified there were 136,000 housekeeping cleaner jobs "in the United States."

AR94.  By testifying to the number of jobs available in the entire United States,

Ms. Webb alleges the VE, and the ALJ, used the wrong standard.  Her

argument is based on statutory language.

Section 423(d) of Title 42 provides in pertinent part as follows:

(d) "Disability" defined

> (1)The term "disability" means—
> (A) Inability to engage in any substantial gainful
> activity by reason of any medically determinable
> physical or mental impairment which can be expected
> to result in death or which has lasted or can be
> expected to last for a continuous period of not less
> than 12 months;

* * *

> (2) For purposes of paragraph (1)(A)—
> (A) An individual shall be determined to be under a
> disability only if his physical or mental impairment or
> impairments are of such severity that he is not only
> unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. ***For purposes of the preceding sentence*** (with respect to any individual), ***"work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.***

<u>See</u> 42 U.S.C. § 423(d)(1)(A) and (2)(A) (emphasis added).

What is clear from the above emphasized language is that "work which exists in the national economy" is a term of art in Social Security law.  It does not mean work in the entire United States.  Instead, it means "work which exists in significant numbers either in the *region* where such individual lives or in *several regions* of the country."  <u>Id.</u> (emphasis added).  Now, what does that definition mean exactly?

The Commissioner argues it need not establish jobs exist in Ms. Webb's immediate area.  Yes.  That is true, but it begs the question.  The Commissioner *does* have to show that jobs exist in Ms. Webb's "region" or in "several regions of the country."  We know from the statutory language that "region" does *not* mean "immediate area," but defining what a term does not mean is not all that helpful in defining what it *does* mean.

The Commissioner's regulation, 20 C.F.R. § 404.1566, is likewise unhelpful.  It does not define "region."  <u>Id.</u>  It says that "region" is not equal to "immediate area."  <u>Id.</u> at (a)(1).

In Barrett v. Barnhart, 368 F.3d 691, 692 (7th Cir. 2004), the court held the "other regions" language that Congress used in § 423(d)(2)(A) was intended to prevent the Social Security Administration from denying benefits on the basis of isolated jobs existing only in very limited numbers in relatively few locations outside the claimant's region.  This sentiment is paralleled in the Commissioner's regulation where it states:  "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.'  We will not deny you disability benefits on the basis of the existence of these kinds of jobs."  20 C.F.R. § 404.1566(b).

The dictionary defines "region" as "a large, indefinite part of the earth's surface, any division or part."  Webster's New World Dictionary, at 503 (1984).  "A subdivision of the earth or universe."  OED (3d ed. Dec. 2009).  We know from Congress' statute and from the Commissioner's regulation, that "region" does not mean the entire country.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 1566(b).  The dictionary defines "region" as an indefinite parcel that is part of the whole, and so must be something less than the whole.  The court concludes, as it must, that "nationwide" does not truly mean "nationwide."  Such is the nature of agency law.  Instead, at step five, the ALJ must find that jobs the claimant can do exist in substantial numbers in the claimant's own "region" (something less than the whole nation), or in "several regions" (several parts that, together, consist of something less than the whole nation).  Id.

The Commissioner cites <u>Johnson v. Chater</u>, 108 F.3d 178 (8th Cir. 1997), in support of the assertion that in the Eighth Circuit, "nationwide" does mean the entire country. But that is not what <u>Johnson</u> says. In the <u>Johnson</u> case, the claimant appealed the issue whether the VE's testimony was sufficient to prove that there were jobs existing in substantial numbers in the national economy. <u>Id.</u> at 178. The VE had testified that Johnson could perform sedentary, unskilled work such as being an addresser or document preparer. <u>Id.</u> at 179. The VE said that there were 200 such positions in Iowa and 10,000 such positions nationwide. <u>Id.</u> Johnson took issue with whether 200 positions in his home state of Iowa constituted "substantial" numbers of jobs. <u>Id.</u> at 180 n.3. The court rejected Johnson's argument and held that the VE's "testimony was sufficient to show that there exist a significant number of jobs in the economy that Johnson can perform." <u>Id.</u> at 180.

The facts in <u>Johnson</u> stand in stark contrast to the facts in Ms. Webb's case. In <u>Johnson</u>, the VE testified to the number of jobs available in the claimant's *region* (in that case, his state), and also the number of jobs available in the whole country. <u>Id.</u> at 179. Here, the VE testified *only* to the number of jobs available "in the United States." AR94. As established above, both § 423(d)(2)(A) and § 404.1566 require more specificity than that. The ALJ and the VE must find that substantial numbers of jobs are available in Ms. Webb's region or in several regions. <u>See</u> <u>Harris</u>, 356 F.3d at 931 (the ALJ must find at step five that claimant is "capable of performing work that exists in significant numbers within the *regional and national* economies.") (emphasis added).

The burden on is on the Commissioner at step five of the sequential analysis. <u>Johnson</u>, 108 F.3d at 180. Therefore, the absence of valid evidence of substantial numbers of jobs in Ms. Webb's "region" or in "several regions" is an absence of evidence that cuts against the Commissioner. While this court might hazard a guess that there are substantial numbers of housekeeping cleaning jobs available in South Dakota, or in the region consisting of South Dakota, North Dakota, Wyoming and Montana, or in several other regions in the country, this court is not allowed to guess about facts that might have been able to have been adduced at the agency level. The failure of proof requires remand to the agency to further develop the facts at step five.

**J.    Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Webb requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Any one of the errors in the record might not, by itself, warrant remand, but the culmination of each of the errors convinces the court that remand is in order. See Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008) (stating, "[s]everal

errors and uncertainties in the opinion, that individually might not warrant remand, in combination create sufficient doubt about the ALJ's rationale for denying [disability benefits] to require further proceedings below."). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing facts, law and analysis, this court hereby

ORDERS that plaintiff Amber Lei Webb's motion to reverse the Commissioner [Docket No. 17] is granted. This case is remanded to the agency pursuant to 42 U.S.C. § 405(g), sentence four for further proceedings in accordance with this opinion.

DATED March 5, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge